1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                            23-CV-04729(RER)
JEANNETTE FIGUEROA,

                                            United States Courthouse
          Plaintiff,                        Brooklyn, New York

          -versus-                          October 20, 2025
                                            12:00 p.m.
MAYFLOWER INTERNATIONAL
HOTEL GROUP, ET AL.,

          Defendants.

------------------------------x

            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE RAMON E. REYES, JR.
                UNITED STATES MAGISTRATE JUDGE
                       BEFORE A JURY


APPEARANCES


For the Plaintiff:        BY:  AARON SCHWEITZER, ESQ.


For the Defendant:        BY:  KEVIN K. TUNG, ESQ.
                               BO CHEN, ESQ.


Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                          Phone:  718-613-2268
                          Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

PROCEEDINGS                    2

(In open court)

THE COURTROOM DEPUTY:  All rise.  The Honorable Ramon E. Reyes, Jr. presiding, United States District Judge.

THE COURT:  You may be seated.

THE COURTROOM DEPUTY:  Docket No. 23-CV-4729. Figueroa  versus Mayflower International Hotel Group Inc. et al.

Sounds like feedback from a cell phone.

THE COURT:   Hold on just a second.  Okay, let me do this.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  This is on for a civil trial.

THE COURT:  It's the reporter's mic.

Okay, that's better.  All right.

THE COURTROOM DEPUTY:  Counsel for the plaintiff, please state your name for the record.

MR. SCHWEITZER:  Good morning, Your Honor.

My name is Aaron Schweitzer from Troy  Law Firm, PLLC, counsel for the plaintiff Jeanette Figueroa.

THE COURT:  Good morning.

THE COURTROOM DEPUTY:  Counsel for the defendants please state your name for the record.

MR. TUNG:  Good morning, Your Honor.  Kevin Tung and my co-counsel Bo Chen on behalf of all the defendants: Mayflower International Hotel Group Inc., Yan Zhi Hotel

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Management Inc., Weihong Hu and Henley Liang.

Good morning.

THE COURT:  Good morning.

You may be seated.

Okay, folks.  We're going to begin shortly.  I propose that we take a break for lunch at 1:00 p .m. and resume again at 2:00.  We will bring the jury in in a minute, but I wanted to give you any opportunity to -- well, a couple of things.  I wanted to give you any opportunity to ask me anything bearing issues that may be lingering and also to find out how long your openings are going to be.

Mr. Schweitzer.

MR. SCHWEITZER:  Fairly brief.  Less than ten minutes.

THE COURT:  Do you have any issues that you need to discuss before we begin?

MR. SCHWEITZER:  Yes.  There are a number of exhibits which neither side has objected at the start of each parties' case in chief.  We would just move those into evidence.

THE COURT:  I would prefer that we do it one at a time when you are going to seek to introduce those exhibits, because rather than have a wholesale admission of evidence that doesn't get discussed through testimony and, you know, the jury just got these documents, they don't know what to

make of them, so we'll go one by one.

If there are no objections listed in the joint pretrial order, then they're likely going to be admitted because my rules require that you make the objections in the joint pretrial order, so.

Mr. Tung, how long is your opening?

MR. TUNG:  About ten minutes.

THE COURT:  Okay.  And do you have any issues you want to discuss?

MR. TUNG:  Not at this time.

When it is time for the final jury instruction, we will state our issues.

THE COURT:  Yes, we will discuss that later.

And you received the preliminary jury instructions?

MR. TUNG:  Yes, Your Honor.

THE COURT:  Last night?  Okay.

MR. TUNG:  I received -- I have no problems with the preliminary.

THE COURT:  All right.  I wanted to let you know that there's going to be a change in that we described the case.  So on page 4.

Is there any objection with that description of the case?  It's different than what Judge Kuo used during jury selection.

MR. SCHWEITZER:  No objection from plaintiff,

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Your Honor .

THE COURT:  Mr. Tung.

MR. TUNG:  I don't know if --  I mean, if we should add something to the defendant's side.  Just,  I mean, in addition to defendants deny liability and that any violations occurred.  I mean, because, you know, I can do this on my own in openings or...

THE COURT:  And they've already heard the defendant's side from Judge Kuo.

MR. TUNG:  I don't think they heard all of the defenses.

But the major defenses, one is, it's whatever plaintiff's harm was not caused by the defendants.  That's what.

And the other one is even if defendant did report as soon as -- I mean, did talk to the City shelter, they did do something.  It's not like the defendant didn't do anything.  After they hear the complaint, the defendant did what they supposed to do; they talk to the shelter.  Whether or not the shelter, the City, take any action, that's another story.

And also, in addition, the defendant even when offer a different position at a different hotel, Fresh Meadows hotel, which the plaintiff refuses to take because of shift, she didn't want to work night shift.

These were all the defenses not included here, but I

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                                6

can talk in opening.

THE COURT:  Okay.  You can raise that to the jury.

MR. TUNG:  Okay.

THE COURT:  Okay, so let's bring in the jury.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  You may be seated.

Ladies and gentlemen, my name is Ramon Reyes.  I'm the district judge that has been assigned this case and I will be presiding over it for the next three or four days until we're done.  I want to thank you for being here with us.

And I know you've met already the parties and the attorneys during the jury selection and you've now met my deputy, Miriam, who will be taking care of you for the next few days.  I have some law clerks who are in the gallery who assist me in doing what I do as a district judge.

We're going to begin the trial.  We're going to hear the openings from the parties and then we're going to most likely break for lunch.  Or we might get into some testimony before that, actually.  We'll see.

But the first thing that we need to do is to swear you in as jurors.  So, if you'll stand up and raise your right hand, I will give you the oath.

(Jury sworn/affirmed.)

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                    7

THE COURT:  Great.  Please be seated.

Members of the jury, now that you've been sworn, I will give you some preliminary instructions to guide you in your participation in this trial.

Jury service is an important civic obligation of American citizenship.  Jurors, including all of you, perform a vital role in the American legal system.  Any person involved in a civil dispute, including the parties in this case, has a constitutional right to a jury trial.

As jurors, it will be your duty to find from the evidence what the facts are.  You, and you alone, are the sole judges of the facts.  You will then have to apply those facts to the law I will provide to you at the end of this trial.  You must follow the law, whether you agree with it or not.  You, the jurors, will reach a conclusion on these facts as applied to the relevant law and reach a conclusion, which is known as a verdict.  Nothing I may say or do during the course of this trial is intended to indicate nor should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other items received into the case as exhibits.  The evidence is also any facts that the lawyers agree to or stipulate to or that I may instruct you to find.

Certain things are not evidence and must not be

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

considered by you, including:

First, statements, arguments and questions by the lawyers.  That's not evidence;

Second, objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe that evidence being offered is improper under the Federal Rules of Evidence.  You should not be influenced by the objections or by the Court's rulings on any of them.  If the objection is sustained, ignore the question.  If the objection is overruled, treat the answer like any other.  If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.  If the witness has answered the question prior to the counsel's objection and the objection is sustained, you must ignore the witness's answer.  When this occurs, the witness's answer is not evidence.  Stated another way, testimony that I exclude or tell you to disregard is not evidence and must not be considered in reaching your verdict;

Third, you may have seen or heard outside the -- what you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide this case solely on the evidence presented here in this courtroom and not on anything else.

Generally speaking, there are two kinds of evidence: Direct and circumstantial.  Direct evidence is proof of a fact

such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  I will give you further instructions on these as well as other matters at the end of the case, but bear in mind that you may consider both kinds of evidence, direct and circumstantial.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you some guidance for determining the credibility of witnesses and assessing the evidence at the end of the case.

This is a civil case.  The plaintiff has the burden of proving her case by what is called a preponderance of the evidence.  That means that the plaintiff has a responsibility to produce evidence which leads you to believe that the plaintiff's claim is more likely true than not true.  To put it differently, if you were to put the plaintiff's evidence and the defendants ' evidence on opposite sides of a scale, the plaintiff's evidence would have to make the scale tip, however slightly, in her favor in order for you to find for her.  If the plaintiff fails to meet this burden, the verdict must be in favor of the defendants.

Those of you who have sat on a criminal case before have probably heard of a different burden of proof, proof beyond a reasonable doubt.  That burden of proof does not

apply to this case and you should not apply it at all.

Remember, this is a civil case.  The burden of proof is called a preponderance of the evidence, which is a lower burden than proof beyond a reasonable doubt.

As you know, this case involves a dispute between the plaintiff, Jeanette Figueroa, and the defendants, Mayflower International Hotel Group Incorporated, doing business as Mayflower Hotel and Wyndham Garden; and Yan Zhi Hotel Management Incorporated, also doing business as Mayflower Hotel and the Howard Johnson Hotel; and the individual defendants, Weihong Hu and Henley Liang.

Ms. Figueroa alleges that during her employment at defendants' hotel between April 2nd, 2021 and September 15th, 2021, she was subjected to sexual harassment.  The harassment included verbal and physical incidents and gestures from hotel residents who were housed at the hotel through a contract with the City of New York.  Plaintiff alleges that she reported the harassment to defendants on numerous occasions, but they failed to take corrective action.  Plaintiff claims that because of those failures, the defendants created a hostile work environment where sex or gender discrimination was tolerated.  She alleges that as a result, she suffered injuries, money damages, and emotional distress.  The defendants deny liability and that any violations of the law occurred.

I will now give you some instructions regarding your conduct as jurors in this case.

First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Don't talk amongst yourselves about the case.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you are simply not to talk about the case at all.

Second, do not read or listen to anything touching on the facts or law of this case in any way.  By that I mean, if you should come across a news article or social media posting or radio or television report relating to this case, don't read the article, don't watch or listen to the news report.  And if anyone should try to talk to you about the case, please bring it to my attention promptly.

Third, do not do any internet research or make any other investigation about the case on your own.  Since this case involved the incident that allegedly occurred at a particular location, you may be tempted to visit that location yourself.  Please don't do that.  This case must be tried solely on the evidence presented in this courtroom and not upon any information or impression, whether correct or not, which you might acquire from research or from visiting a scene or anything like that.

Fourth, during the trial you should not talk with or

PROCEEDINGS                                    12

speak to any of the parties' lawyers or witnesses involved in the case.  If you see the parties or the lawyers in the halls of the courthouse at a recess or pass them in the morning when you're coming to court, simply pass by them, don't talk to them.  They have been instructed not to talk to you.  They're not being rude or unfriendly when they seem to ignore you; they're simply following the law.

Finally, do not form any opinion on this case until all of the evidence has been presented to you.  Keep an open mind until you start your deliberations at the end of the case, after you have heard all of the evidence and have been instructed on the law.

You have been given notebooks, and I hope a pen as well.  You may take notes if you want to.  But if you do, please leave them in the jury room when you leave for the day.  And remember, these notes are for your own personal use.  They are not to be given to or read by anyone else.

Now, the trial will begin very shortly, in a matter of minutes.  When it does, each side will make an opening statement.  An opening statement is neither evidence nor argument.  It is simply an outline of what each party intends to prove or disprove and is offered to help you follow the evidence which will be presented throughout the case.

After that, the plaintiff will present her witnesses, who will give their testimony, and the defendants

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                          13

will have the opportunity to cross-examine each witness.

Then, the defendants will present their witness, who will give their testimony, and plaintiff's counsel may cross-examine them.

After that, the attorneys will make their closing statements and help you interpret the evidence that's been presented.  The defendants' counsel will go first and then the plaintiff's attorney will get the last word because the plaintiff has the burden of proof in this case.

After you've heard the closing arguments from both sides, I will instruct you on the law that you will apply to the case.  Then you will retire to the jury room to deliberate on your verdict.  You may deliberate on your verdict for whatever length of time you think is necessary.

I must emphasize at this time the importance of arriving each morning and after our lunch breaks on time.  We will begin every day at 9:30 in court.  So that means you have to come to the courthouse before then.

We generally take -- and I think Judge Kuo should have instructed you on this.  We generally take a break at around 11:15, a 15-minute break, and then another break at 3:30-ish, 3:15-ish each day.  And on Wednesday, we are going to break for the day early.  We're going to break at 2:00 p.m. and we will not have a lunch break.  1:45, 2:00 p.m.  And then resume on the Thursday.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

OPENING STATEMENT - MR. SCHWEITZER                    14

Lastly, ladies and gentlemen, keep in mind that the dispute between these parties is no passing matter. For them, it is very important. They and I rely upon all of you to give your full and conscientious attention to this matter and at the end of the day -- or at the end of the trial, render your verdict based on the evidence and the law.

Mr. Schweitzer.

MR. SCHWEITZER: Thank you, Your Honor.

Members of the jury, counsel, parties, good afternoon.

This case presents to you, this jury, a shocking and disgraceful failure of responsibility, a case where a woman, Jeanette Figueroa, who applied for and was hired for a job as an ordinary hotel front desk clerk ended up working at what turned out to be a shelter hotel under contract to New York City and was forced to endure repeated sexual harassment, threats, and physical violence; not from coworkers, but from the residents that she was required to assist. Instead of protecting her, her employers, the managers and owners of the Howard Johnson Hotel where she worked, turned a blind eye, made jokes about what she experienced, said she should be on America's Funniest Home Videos and told her to bear with her treatment and not to report it to the police.

You will hear that Ms. Figueroa was hired in

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

OPENING STATEMENT - MR. SCHWEITZER                    15

April 2021 to be an assistant manager at the Howard Johnson Hotel, at that time doing business as a shelter during COVID, under a series of hotel management entities, including Yan Zhi Hotel Management Inc. and Mayflower  International Hotel Group.

You will hear that she was overseen and her employment was controlled by the owner, Weihong Hu, and the general manager, Henley Liang, and from nearly day one the environment she had to endure was hostile to her as a woman. From very early on, she was repeatedly cat-called, sexually harassed, sexually propositioned, and subject to verbal and physical indecent exposure by hotel shelter residents.

You will hear that she had coworkers in a similar position, including a man, David Anderson, who was not cat-called, sexually harassed, but subject to verbal and physical indecent gestures.

Over time, the harassment worsened.  It turned physical.  It turned violent.  Residents repeatedly exposed themselves, masturbated in corridors, hurled objects at Ms. Figueroa, shoved her with their hands, threatened her with sexual assault and made obscene sexual demands and propositions.

Ms. Figueroa repeatedly, after these incidents, requested from her employers that security be increased and she be reassigned from Howard Johnson Hotel to another hotel

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

under the defendants' group, Wyndham Garden, which was not serving  as a shelter at the time.  And you will hear that each time, her requests  were either ignored and no action was taken or denied outright.  Her horrific treatment was dismissed as part of the job, a job she had not initially applied for or initially expected that she would have to do.

You will hear evidence about many incidents, but three in particular stand out and I want to highlight them for you here.

On April 3,  2021, the first day, almost, after she was hired, a resident hurled a wet-floor sign from the floor above her, the mezzanine, into where she was at the front desk and it hit her.  In response, the defendant, Ms . Hu, and her assistant, Janice Chen, laughed it off.  That's when they made the comment about how it should be on America's Funniest Home Videos.

On June 21, 2021, Ms. Figueroa was again struck, the table this time, thrown by one of the residents, and suffered serious physical injury to her neck and shoulder, all of which required surgery to screw in a platinum plate, requiring physical therapy.  When this incident was reported to Mr. Liang, he said he wasn't going to do anything about it, wasn't his problem.

Finally, in 2021 there was an incident where one of Ms. Figueroa's coworkers, Fiona Whitaker, was spat on by one

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

OPENING STATEMENT – MR. SCHWEITZER                17

of the residents and she was called in to intervene.  Part of that, she called the police.  And Mr. Liang's response was to tell her not to call the police anymore, not to do that, because the hotel didn't want to lose its shelter contract with New York City during the COVID-19 pandemic.  The hotel didn't want any trouble.

But where there was trouble, when there was trouble, it was severe, it was pervasive, it was ongoing, their response was to downplay and to hide and not to work to solve it.  Because that would put their business in jeopardy, their business relationship with New York City.

Besides these three incidents, you will hear about numerous complaints to Henley Liang, Janice Chen, and Weihong Hu.  You will hear that Ms. Figueroa requested transfers, increased security, and other accommodations to keep her and her female coworkers safe.  You will hear that the defendants took no action at all except to laugh and wave away concerns.

You will hear that due to this treatment, Ms. Figueroa essentially  had to end her career.  She tried to get other jobs in the industry and couldn't sustain them anymore; she couldn't work.  She had to visit psychiatrists. And you will hear that she was effectively taken out of the labor force due to the treatment she has suffered here.  And accordingly, she wasn't able to earn wages anymore due to the

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

treatment she had suffered here.

At the end of the trial, after all the evidence is submitted and the Judge instructs you on the law, we, Ms. Figueroa and I, will ask you to rule in favor of her and we hope that you'll find that she was, in fact, sexually harassed in the workplace and that her employers had an obligation -- they knew about it, it  had been reported to them -- to take some action, any action, other than it's not our problem, we think it's funny, you should live with it. Because that sort of an action, after something's been reported to you by one  of your employees, that's a violation of federal, state and city law.  And we hope you will award her damages to compensate her for the danger and mental anguish she endured and that the defendants took no steps to reduce and to compensate her for her lost wages that she endured as a result of her injuries.  And if you think it's reasonable, to deter any future similar conduct, or I should say failure to act, on behalf of the -- by the defendants. I'd like you to send them a message that this is not something you can wash your hands of; this is something you should be responsible for.

Thank you.

MR. TUNG:  Good afternoon, ladies and gentlemen.

We are sitting here today to determine an issue, whether or not the employer, the hotel here, is liable for the

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

alleged -- the allegations alleged by one of its employees at hotel with another -- whether the employer is liable for what she claims she has sustained, the injury.

In her lawsuit, the plaintiff allege she was discriminated because of her race.

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

MR. TUNG:  In the complaint, the plaintiff allege she was not treated anything better than other employees due to her sex.

The evidence will show, the hotel, the employee work there, whether or not it is a male employee or whether or not it is a female employee, the -- the environment, the work environment there, it is as the plaintiff just pointed out; the hotel was used as a shelter, served as a shelter for the City, where the guests of the shelter -- or the residents, they called, the residents of the shelter  are challenged and mentally ill persons.  And those guests were not selected by the employer, the hotel owner.  The hotel owner rents, have a contract -- rents the hotel to the City and the City operates this as a shelter.

According to the contract, it is the responsibility of the City to make sure, to ensure the safety operation of the shelter.  The City does.  It hires -- I think it hired more than close to 20 security guards.  And at the place where

the plaintiff works, that's in the front in the lobby, front desk. She was the manager for the front desk operation. Now, in that lobby area, there are security guards, security companies, security guards 24 hours, 7 days, 365 days, hired by the City, by the City shelter program. They were there on the same floor, just like here, you know. The front desk is there and City security guard all over the place.

And after the first -- the evidence will show, after the first incident where one of those guests throwing a wet sign, wet-floor sign, not directly to her, just throwing in the area, and she complained. The employee complained. And she not only complained to the management of the hotel, which I think her manager, direct manager, immediate supervisor is Mr. Liang, and she also complained to the case manager from the City. Those case manager were assigned to the project at the hotel. So the employer, what else -- if you ask a reasonable standard person, right? What else the hotel employer should make additional complaint to the hotel? Tell the case manager for the City, which they did anyway. They communicate with the City, and the City increased the security guard, securities, at even the front desk.

At one point in time, the plaintiff was offered to have a security guard sitting next to her at the front desk so she wouldn't be - - that would offer additional protection even though there's tons of people in the floor, in the lobby

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

area, security guards, the hotel employees.

The plaintiff -- the evidence will show the plaintiff refused to have a security guard sitting next to her at the front desk for the reason because the security guard was a male.  So if there is anything, she's discriminating by race -- I'm sorry, by sex, that was by herself.  She does not want a male security guard sitting next to her to protect her.

And the evidence will also show, as the plaintiff counsel just acknowledged, the injuries suffered by the plaintiff was not caused by the employer, it was not caused by anybody, the coworkers, the supervisors from the hotel management.  It was caused by the challenged, mentally ill guests.  Those are not employee; third parties.  And those people are not managed or controlled by the employer.  The most the employers can do is to make complaint to the City, saying that you should do better job of providing more security.

Knowing the fact that these people are unstable, the plaintiff, throughout these six months, a short period of time working at the hotel, she could have a choice.  If she think she cannot handle the situation, she can quit.

Actually, the evidence will show, as the counsel pointed out, she requested to be transferred to a different location, a different hotel that the owner owns in Fresh Meadows.  And they offer her a transfer.  You can move

to a different location.  That's all the employer can do, right?  Both hotels were used to accommodate people, release inmates from jails.  This is a program.  The shelter program operating by the City.  They didn't have much of a choice.  So if she wanted to go to Fresh Meadows, that's it, they said there is only one position at the time was open, a night shift.  Because she didn't want that shift.  So the employer did what they could do under the circumstances; they offer an alternative to her, which she didn't take.

The evidence will show that the plaintiff never actually made a formal written complaint to either the management or the City shelter program.  Under that circumstances, the employer wouldn't be able to take that formal written complaint and forward it to the City.  And the evidence will show it was her complaint -- you can call it complaint; it's actually not really a complaint because she works at a shift, 3: 00 until 11:00 at night, so she is kind of know that all these complaints she alleged, all these complaints, she said she made a complaint, was actually to Mr. Liang when -- you know, when Mr. Liang comes to work and she's kind of reporting the status, what had happened yesterday or what had happened, those things to Mr. Liang, the employer.  Right?  He's the manager of the employee.  And he is taking those complaints as if she's reporting, okay, there's a water -- leaking water yesterday or there's

OPENING STATEMENT - MR. TUNG                    23

something else, a lock is not working.  He's just taking whatever she described as what she's reporting to him what had happened on the previous day.  So there was actually never a real complaint filed.

So the employer didn't fail to communicate to the City.  Even under that circumstances, the employer still communicate to the City, and the City still increased the securities at the area.

And the evidence will show one of the challenged, mentally ill person, right, the guest, offered to walk her to subway station every day, every day for almost the entire period of time.  She never refused.  And that was a person -- actually, that was the person on August -- on April 3rd, 2021, when she just started to work, that was the person in the first incident he throw the wet-floor sign to -- not to her directly, just throw it in the area.

(Continued on the next page.)

MR. TUNG:  The evidence showed that the employer never contributed encouraged, condone, or approved the conduct of the third-party, the residents or the guests of the hotel. Either Mr. Liang, Ms. Wu and hotel management, they never allowed them to tell them, tell those residents to do some discrimination against the plaintiff, to do some harm.  They never participated, there was never a plan.

You will not see any evidence against the individual defendants here, individual in their own individual capacity. Mr. Liang works at hotel in business capacity, he is manager for hotel.  He himself did not participate or planned with the residents or the guests to come up with some plan to injure the plaintiff; nor was Ms. Wu.

The plaintiff give testimony in a deposition in her deposition she never even met with Mrs. Wu, the hotel owner. She never even knew Ms. Wu and she named her as a defendant here.  Ms. Wu never contributed anything to what the injuries that she suffered.

The judge will tell you at the end of the trial whenever the words I use is causation, during the trial, pay attention to the facts.  If you determine what was the causation, what caused her injury, was that caused by the employer's fault or was that caused by a third-party, which is not named here.

In addition, I will bring your attention, the

evidence will show that she already brought a lawsuit against the city, I don't remember, I don't know -- I mean, what was the result of this lawsuit. And she, for any physical injury she suffered on the job, she was covered by worker's compensation. If even a challenged mentally ill guest throwing a table in the air that causing her injury, that was covered by the worker's compensation insurance. So there is no double recovery here. She's already compensated for worker's compensation insurance do.

At the end of the trial I'm asking you to determine what was the actual cause of her injury. Whether or not she had been covered and whether or not the employer, the hotel, the owner of the hotel, made any contributions toward her injury. At the end of the day I'm asking you to return a verdict for my clients. Thank you very much.

THE COURT: Ladies and gentlemen, it seems to me that we should break now for lunch rather than hear some testimony then break in ten minutes. So we're going to break for lunch now. I'd like you to be back in the jury room at 1:50 p.m. and we'll then come get you, Miriam will get you and continue with the trial.

Again, the admonition, don't talk about the case amongst yourselves, don't do any research. If you see the lawyers or the parties in the hallway, just smile and continue on your way. They are not going to talk to you. And if

PROCEEDINGS                                    26

anyone does approach you, tries to engage you about the case,

please let me know about that.  Okay?  Thank you.

            (Jury exits the courtroom.)

            THE COURT:  Do we need about anything before lunch?

            MR. SCHWEITZER:  I'd like to speak with your Honor's

deputy about the HGMI/VGA connection; but other than that, no.

            THE COURT:  When Miriam comes back -- what do you

need to know?

            MR. SCHWEITZER:  My colleague was here and not me

for the pretrial conference I just want to test the

connection.

            THE COURT:  Okay.  Thank you.

            MR. TUNG:  Your Honor, the only issue we have is

still regarding whether or not the plaintiff can impeach

Ms. Wu regarding the criminal charges pending against --

            THE COURT:  You can't -- you're not going into

criminal charges, are you?

            MR. SCHWEITZER:  I may ask her if she has a criminal

charge related to dishonesty pending; but not beyond that --

            THE COURT:  That's not relevant.  It's just a

charge, there's no conviction.

            MR. SCHWEITZER:  It's still relevant to her

credibility.

            THE COURT:  No, I'm not going to allow it.

            MR. TUNG:  Thank you, your Honor.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER        27

(Lunch recess.)

(In open court)

THE COURTROOM DEPUTY:  All rise.

(Jury enters the courtroom.)

THE COURT:  You may be seated.  Mr. Schweitzer.

MR. SCHWEITZER:  Plaintiff calls Jeannette Figueroa.

(Witness takes the witness stand.)

**JEANNETTE FIGUEROA**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT:  You may be seated.

Tell the court reporter your name.

THE WITNESS:  Jeannette Figueroa.

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

THE COURT:  You may inquire.

MR. SCHWEITZER:  Thank you, your Honor.

BY MR. SCHWEITZER:

Q    Ms. Figueroa, where do you live?

A    In Yonkers.

Q    How old are you today?

A    Forty-eight.

Q    How far did you get in school?

A    Just up to the 12th grade.

Q    Did you graduate from 12th grade?

A    No, I left school because I was being bullied.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER   28

Q    Did you have any education after you left high school?

A    No.

Q    After you had left -- when you did leave high school in what year?

A    Ninety-two.

Q    That's 1992?

A    Correct.

Q    And what jobs did you have in the hotel industry after leaving school?

A    I started with Wyndham.

Q    What Wyndham is that?

A    On 42 and Second Avenue, a time share.

Q    From when to when did you work at Wyndham on 42 and Second Avenue?

A    It must have been 2018, 2017 to 18.

Q    For about how many months?

A    Close to a year until I was offered another job.

A    Like about six, eight months.

Q    What was your job there at Wyndham 42 Street?

A    I was a greeter.

Q    What did you do after you left?

A    They while I was working I was offered a job for real estate office in Grand Central called New York City Office Suites.

Q    Where did you do at that employer?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    29

A    Front desk, I also showed the rooms office to be rent the out, I showed it.  I help with the inventories like paperwork, mail things like that.

Q    Until when did you work for this real estate renting office?  When did you leave your employment there?

A    Must have been 2019.

Q    What was the next job you had after that?

A    The Howard Johnson.

Q    When did you start working at the Howard Johnson?

A    April 2021.

Q    Where was the Howard Johnson located?

A    3859 12th Street Long Island City.

Q    Why did you leave the real estate renting office and start working at Howard Johnson?

A    When?

Q    Why?

A    Why.  I was moving from place to place I had to move.

Q    Did you have any jobs between leaving the real estate renting office and starting at Howard Johnson?

A    No.

Q    How did you find out about the job at Howard Johnson?

A    Indeed.

Q    Had you making job applications through Indeed since leaving your job at the real estate office?

A    Yes.

Q    Who interviewed you for the job at Howard Johnson?

A    Henley Liang.

Q    Is Mr. Liang present in the courtroom today?

A    Yes.

Q    Can you point him out?

A    In the corner.

Q    The gentleman from the blue shirt and black jacket?

A    Correct.

Q    What happened after the interview?

A    I got hired the next day.

Q    He made the decision to hire you?

A    Yes, he, Henley Liang, called me that I was hired.

Q    What job did you apply for?

A    Assistant manager.

Q    What was your understanding of the duties the assistant manager position had?

A    When I got hired he told me that I was going to be his eye and ears when he's not around.

Q    He being Mr. Liang?

A    Mr. Liang, yes.

Q    Do you have any idea what your duties would be other than acting as Mr. Liang's eyes and ears?

A    Supervising the housekeeping, attending the front desk, making keys.

Q    At the time you were hired, did you have any belief as to

whether the hotel was being used as a shelter?

A    Not at that moment, no.

Q    Did the posting on indeed say anything about whether the hotel was used as a shelter?

A    No.

Q    Did Mr. Liang tell you during the interview that it was being used as a shelter?

A    I don't recall, no, no, he didn't.

Q    How long did you end up working at the Howard Johnson?

A    About six months.

Q    From April 2021 through when?

A    September 2021.

Q    Are you familiar with the Mayflower International Hotel Group?

A    Yes.

Q    What is it to your knowledge?

A    It's part of the Howard Johnson hotel.

Q    Are there any other hotels that are part of the Mayflower International Hotel Group besides the Howard Johnson?

A    They have the Wyndham and the Yan Zhi.

Q    When you say Wyndham?

A    Wyndham Garden.

Q    Is that the same one as 42 and Second?

A    A different Wyndham, at the Meadows, Fresh Meadows.

Q    In Queens?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     32

A    Correct.

Q    Other than the Howard Johnson did you work for any other hotels in the Mayflower group?

A    No.

Q    Once you started working at the Howard Johnson hotel, what did you come to realize about the sort of business it was doing?

A    It was a men's shelter.

Q    What services did the hotel provide to the shelter if any?

A    We provided laundry, the keys, and housekeeping the cleaning rooms.

Q    Are you familiar with Weihong Hu?

A    Yes.

Q    Who is she?

A    I have heard about her she's the boss.

Q    Do you recognize her?

A    I never seen her like in-person over there.

Q    I see.  How do you know she's the boss?

A    Henley Liang told me.

        MS. CHEN:  Objection.  Hearsay.

        MR. SCHWEITZER:  Party opponent statement.

        THE COURT:  Overruled.

BY MR. SCHWEITZER:

Q    Do you know why the Howard Johnson was used as a men's

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER     33

shelter?

A    No.

Q    What are the different positions or job titles within the Howard Johnson hotel and how many people filled them?

A    We were three.  It was me front desk, David Anderson the assistant manager for the daytime, and part-time night girl that worked overnight.

Q    You also mentioned housekeeping and cleaning staff?

A    Yes.

Q    How many of those were there?

A    It must have been like four, two girls, two boys.

Q    What duties did you end up performing after you got hired?

A    I had to supervise the housekeeping.  When I came in I had to do front desk, make the keys, inspect the rooms before the housekeeping go in and make sure that everything is properly like safety for them to go in before cleaning the rooms.

Q    At the time you joined Howard Johnson were you able to perform these job functions?

A    Yes.

Q    Were you able to walk without assistance or mobile?

A    Yes.

Q    What tasks, if any, did Mr. Anderson do as the assistant manager?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    34

A    The same as me but during the day.

Q    Did you have different shifts?

A    Yes, he was daytime I was evening 3:00 o'clock.

Q    When you say daytime you mean from what o'clock to what o'clock?

A    I think he started eight to three or five with Henley, with Henley Liang.

Q    And your shift would begin at three and run until when?

A    I was supposed to work from three to 11 but I always ended up midnight or past midnight.

Q    At what rate why you paid?

A    Fifteen dollars.

Q    Per hour?

A    Yes.

Q    At what rate was Mr. Anderson paid, to your knowledge?

A    Eighteen.

        MS. CHEN:  Objection.

        THE COURT:  Only if you know.

A    Eighteen.

Q    Dollars per hour?

A    Correct.

Q    How often were you paid?

A    Every two weeks.

Q    How you were paid?

A    By check.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     35

Q     Checks from what payors?

A     Mayflower and Yan Zhi Hotel.

Q     Generally what is that?

A     Hotel.

Q     Also part of the Mayflower Group?

A     Correct.

            MR. SCHWEITZER:  Can the witness see the shared screen?

            THE COURT:  Do you see that?

            THE WITNESS:  Yes.

BY MR. SCHWEITZER:

Q     I'm showing you what is marked for identification as Plaintiff's Exhibit 1, do you recognize it?

A     Yes, one of my paychecks.

Q     There are eight pages of this document, I'm going to scroll through them and ask if you recognize them?

A     Yes, those are my paychecks.

Q     Each of these documents is one of your pay stubs?

A     Correct.

Q     Who is the payor on page one here?

A     Mayflower International Hotel.

Q     Who is the payor on pay stub on page two?

A     Yan Zhi Hotel Management.

            MR. SCHWEITZER:  Your Honor, at this time I ask that Exhibit 1 be moved into evidence.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     36

THE COURT:  Any objection?

MR. TUNG:  No objection.

THE COURT:  Received Exhibit 1.

(Plaintiff Exhibit 1, was received in evidence.)

MR. SCHWEITZER:  Please publish to the jury.

BY MR. SCHWEITZER:

Q    I'm going to show the jury on page one payor Mayflower. Page two is Yan Zhi Hotel Management Inc.

Ms. Figueroa, do you know why you were paid sometimes by one entity and sometimes by another?

MS. CHEN:  Objection.  Calls for speculation.

THE COURT:  Overruled.

Do you know why?

A    Because they worked under the same hotel, Mayflower Group, they were all connected.

Q    Was there a centralized payroll department?

A    Correct.

Q    Is there a central office?

A    Yes.

Q    Where was the central office located?

A    Queens, the same location, but I'm not sure where.

Q    Is that Queens Long Island City or --

A    Long Island City.

Q    To your knowledge were there any other connections between the Howard Johnson hotel where you worked and the

Wyndham hotel?

A    There were all connected, they were all one hotel.

          MS. CHEN:  Objection.  Calls for speculation.

          THE COURT:  You can cover on cross-examination.

BY MR. SCHWEITZER:

Q    Did any employees at Howard Johnson work at Wyndham or vice versa?

A    Yes.

Q    Which employees from Howard Johnson worked at Wyndham?

A    I can't remember their name like that, they were Chinese names.

Q    What positions were they in?

A    One was housekeeping was cleaning like gardening or something he was transferred to the Wyndham as a chef.

Q    To your knowledge, who did the transferring?

          THE COURT:  Do you know?

A    No, I wouldn't know.

Q    Who, if anyone, was managing the Howard Johnson hotel?

A    Henley Liang.

Q    Mr. Liang was your immediate supervisor, right?

A    Correct.

Q    Who, if anyone, did he report to?

A    Wei Hu the boss.

Q    Are you familiar with Janice Tian?

A    Yes.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    38

Q    Who was that?

A    A manager for the other hotel at the Garden.

Q    Wyndham?

A    Yes, correct.

Q    How would you describe your time at Howard Johnson once you started working?

A    Dangerous.

Q    Why?

A    There was a very hostile environment every day as I walked in there was fighting arguing.  I was being cat called as soon as I walked in.  They would go to the front desk and tell me nasty things like to my face or they would urinate at the front desk and they would throw their keys, like the card, and say:  Do my key, bitch.

Q    Who are you referring to?

A    The residents there the men in the shelter.

Q    Can you tell the jury what cat calls you got called?

A    One of them was one person came in front of the desk almost jumped across the desk and tell me he was going to bust a knot in my face.

        The other one was going to masturbate so he could sleep well.

Q    After the incident where someone said he would bust a nut in your face, what did you do?

A    I told security, did you hear what he said?  And they

were laughing and making gestures, like they mentally they are crazy, not to pay attention, and they just laughed.  They didn't, they let them continue.  I couldn't do anything else just stay there.

Q    You're referring to the security guards?

A    Yes.

Q    Did you make any complaints to hotel management?

A    Yes, to Henley Liang the next day.

Q    What, if anything, did he do in response?

A    He said he was going to speak to the boss, Hu.

Q    To your knowledge was any action taken by the hotel?

A    No.

Q    Did you ever see Mr. Anderson get cat called or did someone threaten to or say they would bust a nut in his face or anything of the sort?

A    Never.

Q    Your shifts overlapped for about two hours, right?

A    Yes.

Q    During those two hours you never saw him treated that way, correct?

A    At all, no.

Q    Were there other occasions when you asked the security guards directly for assistance?

A    Say it again?

Q    Were there other occasions that you asked the security

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER       40

guards directly for assistance?

A    Yes.  I have told them to escort me like when I had to change lights or I had to go reboot an elevator, I wanted somebody to help me and go upstairs they were like no because they were not here for the hotel they were here for the city the shelter.

Q    The security guards told you that?

A    Can yes.

Q    Why did you want a security guard with you when you were fixing a light or elevator?

A    Because I was always being followed.

Q    Who was following you?

A    Them the men, any all of them followed harassed.

Q    You're referring to residents?

A    Yes, the residents the men.

Q    Any particular residents give you trouble?

A    There was one, Besley.

Q    B-E-S-L-E-Y?

A    Correct.

Q    What did Besley do?

A    He was always harassing in the front desk.  Always constantly asking me out.  I used to say to them that he's at the front desk, please take him away.  Or he used to take walk me to the train and I used to say don't, you know stay behind because I was afraid of there are projects between the trains

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER     41

I was afraid of being pushed and being raped.  So I used to tell him stay behind me so you won't get in trouble like giving them psychology, so he won't hurt me.

Q    Did you ever ask him not to follow you to the train?

A    Yes, I told him you're not supposed to follow me.  He would like act crazy, kicking the air, curse.

Q    Were you ever successful in dissuading you from following you to the train?

A    No, never, never.

Q    Did you ever go to the guests rooms?

A    To supervise them before the housekeeping go in.

Q    What do you mean supervise them?

A    I had to make sure -- the girls used to tell me oh, one of them is naked or they are playing pornography on the phone. They didn't want to go in.  So I had to go in see with my own eyes and call the supervisor that is in charge of the city, like whoever was working, or Henley, call them and let them know what is going on.  And Henley used to tell me that he would call and speak to the city people worker there for them to correct it.

Q    Did you ever observe Henley talking to the city people?

A    Never.

Q    Did you ever observe any changes in what the city employees were doing?

A    It got worse.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     42

Q    How so?

A    They were getting angry because they were just getting upset.

Q    Did that have any tangible effect on your job?

A    Yes.

Q    What sort?

A    I was afraid of just going to work and being raped in the basement or being raped in one of those rooms, pushed in.

Q    What happened on April 3, 2021?

A    Besley I think was arguing with one of the social worker upstairs on the second level.  And there was commotion.  I was at the front desk and all of a sudden the wet sign, a yellow thing they put when the floor is wet, came flying and hit me on the left side of the head.

Q    Do you know where it came from?

A    It came from up there when he kicked it.

Q    What happened then?

A    He came down and security came to the front desk with him standing behind him.  And security asked me if I wanted to charge press charges.  I said no because he was right there, I was afraid of saying yes and he will come out the next day and I'm at work and he would hurt me.  So I said, no, it's okay.

Q    Did you tell Henley about the April 3rd incident?

A    Yes.

Q    What did you say?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER      43

A      What happened, that I got hit.  He didn't say anything about it.

Q      Did you tell him that you were afraid of your safety?

A      I was afraid, I told him that.

Q      How did he respond?

A      Nothing.  He didn't say anything that he would just go speak like always to Hu.

Q      To your knowledge did he speak to Ms. Wu about the April 3 incident?

A      I'm not aware if he did speak to her about it because I didn't see anything happen, like for them to do for me.

Q      What, if anything, changed after the April 3 incident?

A      Just things got worse.

Q      How so?

A      Janice went the next day, the manager from the other hotel, the Wyndham Garden, and there she said that she saw the incident with Ms. Hu and that they thought it was funny; that it will be going to America's Funnest Video.

        MR. TUNG:  Objection.  Hearsay.

        THE COURT:  Statement party opponent?

        MR. SCHWEITZER:  Janice Tian is not, but this is not offered for the truth.

        THE COURT:  It's not even hearsay.  Overruled.

BY MR. SCHWEITZER:

Q      When you say they saw it, what do you mean?

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER     44

A     Janice told me when she came to the front desk she told me that Ms. Hu and her they saw it.

                MS. CHEN:  Objection hearsay.

                THE COURT:  Overruled.

BY MR. SCHWEITZER:

Q     In-person or?

A     In-person she said to me.

Q     No.  Did they view the incident in-person were they watching it or did they view it later on on a video recording?

A     She told me they viewed it on the phone of Ms. Hu.

                MS. CHEN:  Objection.  Hearsay.

                THE COURT:  Overruled.

BY MR. SCHWEITZER:

Q     What did you understand that to mean on the phone?

A     What did I what?

Q     What did you understand on the phone to mean?

                MS. CHEN:  Objection.  Calls for speculation.

                THE COURT:  Overruled.

A     What was the question?

Q     What did you understand on the phone to mean?

A     What did I understand the phone when she said that?

Q     What did you understand the phrase "on the phone" to mean?

A     That they were looking at the video of what happened what occurred.

Q    That they were viewing video on the phone?

A    Yes, the video from work.

Q    How did Janice telling you that she and Ms. Hu thought that your incident was humorous how did that affect you?

A    It hurt me a lot.

Q    In what way?

A    In a way that I didn't feel like they, they didn't care, like it was just funny for them that's all.  I was nothing to them.

Q    What, if anything, happened on June 4, 2021?

A    That day I came in, I was about to warm up my coffee, the maintenance guy was there.  There was a commotion, there was loud noises, came down, that person came down kicking and screaming and took a picnic table, real long and wide, and just threw it up the air.  But it came towards the front desk as a Frisbee, it hit me.  And I lost conscious and I fell to my left, cracked my shoulder, cracked my neck.

Q    When you say this person who are you referring to?

A    Jeremiah Robinson.

Q    Who is that?

A    The person who hurt me.

Q    Was he one of the residents?

A    Yes.

Q    You said you lost consciousness, did you regain consciousness at some point.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    46

A    A couple minutes, yes.

Q    After you already gained consciousness, what did you see?

A    I was disoriented.  I saw that he came still after me.

Q    Did any of the security intervene to separate you?

A    No, nobody.

Q    Did you ask for help?

A    I was conscious, I was like disoriented.  I guess I was asking to help for somebody to call 911.

Q    To your knowledge did anybody call 911?

A    No, it was me.

Q    That is, you called 911 at some point?

A    Yes.

        MR. SCHWEITZER:  Please restrict the broadcasting to the witness and not to the jury.

BY MR. SCHWEITZER:

Q    Ms. Figueroa, I'm playing for you a video recording marked Plaintiff's Exhibit four, do you recognize it?

A    Yes.

Q    What do you recognize it to be?

A    That's me with the maintenance guy and that's Jeremiah.

Q    Is this the recording of the June 4, 2021 incident?

A    Correct.

Q    How did you get this recording in your possession?

A    David Anderson passed it to me.

Q    Did you record what he showed you on your phone?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    47

A    Yes, before it was erased.

MR. SCHWEITZER:  Your Honor, I ask that Exhibit 4 be moved into evidence.

THE COURT:  Any objection?

MR. TUNG:  No objection, your Honor.

THE COURT:  We'll receive Plaintiff's Exhibit four which is the video into evidence.

(Plaintiff Exhibit 4, was received in evidence.)

MR. SCHWEITZER:  Permission to publish and play the video for the jury.

BY MR. SCHWEITZER:

Q    We are one second in.  Can you point out where you are on this?

(Video played.)

A    That's me dressed in the long black sweater in the corner of the front desk.  And that's the maintenance guy, I forgot his name, he worked for the hotel.

THE COURT:  What color is his shirt?

THE WITNESS:  Blue shirt.

THE COURT:  You're next to the gentleman with the blue shirt?

THE WITNESS:  I'm the one with the black in the corner up there, on the top by the mirrors on the wall.

BY MR. SCHWEITZER:

Q    Top right quadrant?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     48

A     That's me next to the blue shirt.  I go to warm up my coffee.

Q     The gentleman in the black with the blue bag that's Jeremiah?

A     No the person next to me he's maintenance person.

THE COURT:  The gentleman who just walked past.

A     No that's you're Maya comes from up stairs, that's him that's him Jeremiah.

(Video played)

BY MR. SCHWEITZER:

Q     Who, if anyone, pictured currently is security?

A     The one that backed up with the white shirt he was the supervisor for security there, the one that backed up.

Q     This fellow in the bottom, right?

A     Yes, he was the supervisor.

Q     Who if anyone is this gentleman on the very left?

A     That's Mr. Cheek, one of the supervisors for the city of the shelter.

Q     And who is seated directly above him?

A     A resident most likely.

Q     Who is the gentleman in the turquoise who is leaning over you?

A     He was one of the security fellows.  An older gentleman, I don't remember his name.

(Video played)

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    49

Q    Who is this person in black?

A    Fiona, the laundry girl.

Q    Fiona Whittaker?

A    Yes.

Q    What were you, she and these two gentlemen talking about at this point?

A    She's interfering.  She's helping me.  She's getting in the middle so I won't get hurt again.

Q    In the middle of who else?

A    And Jeremiah that is going to come back.

Q    Where is Jeremiah?

A    He's somewhere, he's going to come in from the outside. They are looking for my glasses.  That's him, yeah, that's him.

Q    What, if anything, is Jeremiah saying at this point?

A    He was just calling me names and saying like why I called the police, like angry.

Q    Had you called the police by that point?

A    I called the police myself, yes.  I kept calling.  He came after me to hit me again because I was calling the police for somebody to help me because nobody called the police, not even the supervisors from the city upstairs.  They didn't do anything.  Which I don't know him, I don't know why he was after me, I don't know this person.

Q    Did you report the June 3, 2021 incident to Mr. Liang

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER          50

Ms. Hu or anyone else at the hotel?

A     That incident, yes, they knew about it.  They called, I think the laundry girl, Fiona, that it was her that called Henley Liang.  And he literally just left, it wasn't ten, 15 minutes ago when he left the building.  He was in his car.  He said he wasn't going to go back, to call the cops.

Q     Did you hear him say that?

A     That's what they told me, Fiona told me just to call the cops he wasn't coming back.

        MS. CHEN:  Objection.  Hearsay.

        THE COURT:  Overruled.

BY MR. SCHWEITZER:

Q     How did it make you feel to believe that Mr. Liang was in a position to help but did nothing?

A     So worthless, like they didn't care.

Q     Once you eventually called the police what happened?

A     They came.  The ambulance came.  I was seen by the ambulance.

Q     Where were you taken?

A     Just to the ambulance.  I was too scared, I wanted to go home.

Q     To your knowledge did anybody else see this video?

A     I don't know.

Q     Did you make a written report to anyone concerning this incident?

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    51

A    I didn't write it now, no; but the police was already there making the reports.

Q    From time to time did you text message with Mr. Liang?

A    Yes.

Q    What would you say to him?

A    I wasn't feeling safe to go back.  I needed more security for me to feel safe in there.  He said I needed to go in because nobody else was there to cover me.

Q    Turn off the broadcasting to the jury, please.

        I'm showing what you is marked for identification as Plaintiff's Exhibit two.  Do you recognize this document?

A    I can't see it.  There is nothing on my screen, it's black.  Now I see it.

Q    Do you recognize it now?

A    Yes, that's the app that we use to text the employees to -- well, me to Henley Liang.

Q    There are six pages to this document.  Are all six of them dealing with text messages between and Mr. Liang?

A    Correct.

Q    You obtained these text messages from your phone?

A    Yes, the phone I used to have from work.

        MR. SCHWEITZER:  At this time I ask that Exhibit 2 be moved into evidence.

        THE COURT:  Any objection.

        MR. TUNG:  No objection.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    52

THE COURT:  Received.

(Plaintiff Exhibit 2, was received in evidence.)

THE COURT:  Plaintiff's Exhibit two a series of text messages.

MR. SCHWEITZER:  Please publish.

BY MR. SCHWEITZER:

Q    Referring to text messages on May 15, 2021.  On page one here what is it your talking to Henley Liang about?

A    I was talking about, I was talking to Henley about the disrespect that I get at the front desk; basically every where, but the front desk.  Yes, I was talking to him about one of the complaints.

Q    You refer to a so-called house manager here?

A    Those are like Mr. Cheeks and Flo, like the managers from the city, like when they came in, those are the people that we were supposed to talk to.

Q    What did you understand by the phrase "he can take it," over here?

A    That's I always complain.  He don't want to hear it no more.

Q    What did you mean when you said:  I said to the house manager please let them know they have to ask them because they come to the front desk disrespectful and demanding and security doesn't tell them anything?

A    The keys and like when they go get, like, they ask for

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER     53

the key to like do the keys again because they would probably get off the system it won't open again.  Or they will ask for towels.  But they will come to me and say:  Listen, bitch, I need some towels.  Listen, bitch, do my card.

Q   Henley Liang responded:  I understand.  I will take care of it.  What did you understand that to mean?

A     That he will literally take care of it.

Q     What changes did you expect Mr. Liang to make?

A     For them to have more security, at least for us, for them to tell them not to do that, for them to write them something for them to stop it and act normal in there.

Q     Did Howard Johnson have its own security at that point?

A     No, it was for the city.

Q     Did you expect to Mr. Liang or Ms. Hu or anyone from Howard Johnson would hire security?

A     If I expected?

Q     Did you want?

A     Yes.

Q     Turning to page two.  This appears to also be from May 15 and somewhat later in the day.  What were you discussing with Mr. Liang at this point?

A     Basically the same one, just complaining to him about the people, the men going to the front desk and asking for whatever they needed but in a very bad way.

(Continued on next page.)

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    54

DIRECT EXAMINATION

BY MR. SCHWEITZER:  (Continuing)

Q    What did you mean "their residents must ask them first before getting anything from us at the front desk"?

A    They had to let the house manager know what are they going to come to get at the front desk.  Like, if they were -- needed a towel, they would go to the house manager and tell them, listen, I need a towel.  So the house manager would be the one that has to tell me or would send them to say, okay, they would give me a sign upstairs and say yes, he spoke to me about it, give him a towel.  So I would, like, go and do whatever it was supposed to be done, but that way.  But they didn't.  They always used to come straight to me, harass me and ignored everything.

Q    And what you were asking for was essentially a policy to minimize direct contact with the residents?

A    Exactly.  Correct.

Q    And so that the house manager would be an intermediary?

A    Correct.

Q    And to your knowledge, was that policy ever implemented?

A    No.

Q    Turning to page -- excuse me -- the fourth page of the exhibit.  It's page number 12.  This is on June 25, 2021.

What is it you're asking Mr. Leang for here?

A    That day that I -- that was the incident that Fiona got

spit in her face and I had -- I couldn't stay there because I'm -- Jamal, the guy that spit on her face, was threatening me, like telling me that I deserve to get, you know, whatever I get, deserve, like basically, like, me or something.

Q    I'm afraid I don't know.  You have to say.

What did you understand him to mean?

A    When we called the cops on him after he spit Fiona, he knew about him, he was upset.  And he said that I, you know, I deserve whatever comes to me.

Q    What did you understand that to mean?

A    Get hurt, be raped.

Q    And what did you mean when you asked Mr. Leang to fix your time to midnight?

A    Because I was working overtime.  I was supposed to leave at 11.  And I always used to stay overtime, either waiting for the girl that worked overnight or waiting for a special guest maybe that they were expecting and I would have to stay there. It was always something for me to stay past eleven.  But he told me not to clock at that time, that he would do it when I clock out.  That he would take care of it, my clocking out.

Q    Was that a regular practice, that Mr. Leang would clock out for you?

A    No.

Q    You sent this message at 8:02 p.m.  What gave you the impression you would be staying until midnight?

A    Because the girl wasn't going to be -- she was running late by that time.  She was running -- it was 8:00.  Fiona -- I was supposed to wait for the girl to come in late.  But that was the same day that I said that I'm too nervous to stay.

Because I said:  Hey, I'm too nervous to stay.  Fiona offered to stay at the front desk.  Please fix my time to midnight.  Don't want to lose my hours.

Because I was supposed to stay and wait for the girl coming later, to midnight.

Q    Did you get paid for those hours?

A    No.

Q    Turning to page 5, Bates No. 13.  These are text messages from August 14, 2021.

What does 1008 refer to?

A    It must have been -- I don't recall.  It has to be the time or -- not the room number.  But it had to be like the time that I told him what Jamal was doing.

Q    That is 10:08 in the morning?

A    The night.  No, the --

Q    Previous night?

A    Yeah.  Correct.

Q    And what incident are you describing?

A    That was the time I said it right here, that he was harassing Fiona while she was doing the garbage at night, in his floor.  And that's when he spit on her, on her face.  And

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER      57

then I -- I said Mr. Cheek wrote an incident, that it happened at 7:40 p.m. when she was doing her garbage.

Q    And Mr. Cheek, that would be one of the City employees?

A    Yes.  That was the person on the video that you told me who was that.

Q    And what action, if any, followed from this?

A    Again, like, we had to call the cops on our own.  Call the cops.

Q    Was Jamal kicked out of the shelter?

A    No.

Q    Did security take any measures to restrict access between him and Fiona or him and you?

A    No.

Q    Was any action taken, to your knowledge?

A    No.

Q    Turning to the final page, page 6, Bates No. 14.

On June 6th, what are you referring to when you ask about being transferred with Janice?

A    Ever since I got hurt, I was telling Henley to please transfer me to the other hotel as front desk, to the Wyndham Garden.

And I text him here to remind him again:  Hi.  On my way to work.  Please talk about being transferred with Janice. I'm going to work feeling nervous and anxious for my safety. Please.  Thanks.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

And he says:  I will, but can also talk to her about the schedule.

Q    What did you understand that to mean, "talk to her about the schedule"?

A    Maybe they weren't going to give me the same time or something at that job, at that -- if I wanted.  Because I had 3:00 to 11:00, so nobody -- and they didn't have any -- they were not telling me if they had any other opening from 3:00 to 11:00.  So it has to be that, to mention the schedule.

Q    Was there anything especially desirable to you about the 3:00 to 11:00 schedule?

A    I was fine with 3:00 to 11:00.

Q    Would you have been fine with a morning shift or an evening shift?

A    Yes.  Any shift.

And he just responds to me to just stay behind the desk, like if I'm -- that's like if that's my safety spot, but it's not.

And I write to him:  We didn't have time to talk because the cops -- I'm confused here.

They didn't have to -- we didn't have time to talk because she had the cops there.  So when I see her, I'll guess on Thursday or I'll call her on Monday.

Q    When you say " her" there, you're referring to Janice?

A    Yes.  To let her know that I wanted to transfer.

Q    Did that conversation ever take place?

A    No.

Q    Did you ever receive a transfer?

A    Never.

Q    Were you ever offered a transfer?

A    No.

Q    What authority did Henley and Janice have to make transfers?

A    As the manager, they would have to -- they had the authority, but they were -- at the end of the day, they would actually have to speak to Ms. Hu.  Ms. Hu had the last word.

Q    Did Mr. Liang tell you why you weren't being transferred?

A    He said that there's no opening there right now.

      Then it says it right here, too, when I said but please.  And he says, okay, but wait until I get a replacement.  Like he still wanted me there.

Q    And --

A    Just wanted me to work there, stay there.

Q    What did you understand by "a replacement"?

A    That they would look for somebody else so they could transfer me.

Q    To your knowledge, was anyone else ever hired while you were still working there?

A    No.

Q    Did you go on Indeed and see whether they were posting

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     60

job openings?

A    I was looking, but I -- the saying, like it takes too long.  But I was still with my job.

Q    You referred to resident Jamal spitting on Fiona.

Did Jamal interact with you at all?

A    Yes.  He would walk in the front desk.

Q    And what would he do?

A    He would make those gestures like, you know, when the dog -- when a dog finish doing his thing, the dogs they move their paws to the back, like if they're cleaning their paws.  And he used to do it crossing the front desk and doing that to me.

Q    What did you understand that gesture to mean?

A    I don't know, but it was very hurtful.  I didn't like it. I didn't feel safe.  I don't know what -- what was it, dog poop to him.  I don't know why he's making that noise or that mimic of a dog with the paws.

Q    And what, if anything, did you do in response?

A    I told him.

Q    What did you tell Jamal?

A    I didn't used to tell anything to Jamal.  I was afraid of him.  He was a big person.

Q    When you say told him, what are you referring to?

A    To Henley.  I told Henley  the next day.

Q    What, if anything, did Henley do?

A    Like always, he would talk to Ms. Hu.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    61

Q    Did he tell you that you should or should not take any particular action?

A    No, he just told me to walk with my phone.

Q    For what purpose?

A    And if anything, call 9-1-1.  Because security wasn't there, so I had to walk with a phone all the time.

Q    Did you call 9-1-1 after the spitting incident with Fiona?

A    I think that was the last time I called 9-1-1, that was it.

Q    Why did you call 9-1-1 at that time?

A    She was hysterical when he spit her.  And nobody was doing anything for her.  The social workers.  And she had to call me, and it was just me and her alone in the hotel, like, at night.  So I was the only person to go help her.

Q    How did Jamal respond to your calling 9-1-1, if at all?

A    That's when he said that I -- that -- that's when he told me by the elevators that I hope that -- he hopes that I get what I deserve.

Q    Did anyone ever tell you not to call the police?

A    The same time after a while Henley told me to not -- to try not to call them so much because Hu and the director upstairs, Sarah, the social worker, the director, that she didn't want them -- that that made them more angry when we call the cops at them, that that doesn't help the situation.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    62

And that they didn't want to lose -- they didn't want to lose the contract with the City.  And Liang told me that.

MS. CHEN:  Objection.  Hearsay.

THE COURT:  Overruled.

MR. SCHWEITZER:   Turn off the publication?  Sorry.

Q    Showing you what's been marked for identification as Plaintiff's Exhibit 3.

Do you recognize this document?

A    It's off.

THE COURT:  Hold on.

Q    It's off on your machine?

A    Oh, now it's on.  What was that now?

Q    Same question.  What is it?

A    This is when Fiona's telling me -- is saying about the incident about him spitting on her face.

Fiona text to please come up, that Mr. Cheek was over there --

THE COURT:  Just one second.

Hold on just one second.

Q    All I want to know is, was it a text from Fiona  and you?

A    Yes, correct.

THE COURT:  Hold on just one second, please.

Okay.  Let's try that.  We were getting a little feedback there with microphones.

Q    Just to make sure, this is a series of texts between you

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER      63

and Fiona?

A     Yes, the night of the spitting incident to her.

Q     And these texts came off of your phone?

A     Yes.  She's telling me to please come up to Floor 9, that Mr. Cheek's with -- 1008 is the room.  I don't remember the room.  And he's trying to spit on her and that he's --

MR. TUNG:  Objection, hearsay, Your Honor.  That's not even in evidence yet.  Fiona is not a party.

Defendant is deprived of the opportunity to cross-examine Fiona.

THE COURT:  Please, Mr. Tung.

What is the purpose of offering this?

MR. SCHWEITZER:  The purpose of offering this is just to show that she was receiving reports from -- from -- sorry, calls to incidents from another employee.

THE COURT:  I'm not going to allow this.

MR. SCHWEITZER:  That's fine.

Q     And as a result of what happened at the hotel, did you receive any medical or psychiatric treatment?

A     When?  After the incident?

Q     After, yes.

A     After my incident, yes, I started seeing doctors.

Q     What for?

A     The pain.

Q     Physical or emotional or both?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     64

A     Both.

Q     Which doctors did you see?

A     I'm not -- I don't remember their names, but there  was one in NYU Langone and New  York Spine Institute, where they -- where I had the surgery.  Sorry.  Where I had the surgery.  And a psychotherapist.

Q     Did you speak to a social worker, Jacob Miner?

A     Yes, he was my therapist.

Q     I'm showing you what's been marked for identification as Plaintiff's Exhibit 7.

      Do you recognize this document?

A     That's where my doctor was, the psychiatrist.

Q     And turning to the -- and is it signed by Jacob Miner, Licensed Clinical Social Worker?

A     Correct.

Q     That's your therapist?

A     Yes.  Was my, yeah.

Q     When did you begin seeing Mr. Miner?

A     Like, weeks after the incident.  Because I couldn't sleep, I couldn't eat.

      THE COURT:  When you say the incident, what do you mean?

      THE WITNESS:  June.  June 4th, when I got hurt.

      THE COURT:  When the table was thrown at you?

      THE WITNESS:  Yes.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

After that I started seeing doctors and the therapist.

Q    And what diagnosis, if any, did you receive?

A    Diagnosed me as PTSD.

Q    And that diagnosis appears on page 5 of this report, correct?

A    Yes.

MR. SCHWEITZER:  Your Honor, I ask that Exhibit  7 be moved into evidence.

THE COURT:  Any objection?

MR. TUNG:  Objection.  This is a report that's supposed to be provided by the expert, not by this lay witness.  She already testified she has seen the doctor, but whatever the conclusion is there, it's going to be the -- the testimony should be provided by the experts.

THE COURT:  There's no objection in the joint pretrial order to this exhibit.

MR. TUNG:  I am objecting now for being introduced, this document, into evidence because this is -- they really need a doctor to come to testify so the Defendant can cross-examine.

THE COURT:  I will receive Plaintiff's Exhibit 7 into evidence.

MR. SCHWEITZER:  Thank you, Your Honor .

THE COURT:  Over the objection of the Defendants

that was not listed in the joint pretrial order but should have been.

(Plaintiff Exhibit 7, was received in evidence.)

MR. SCHWEITZER:  Permission to publish?

THE COURT:  Just one second.

MR. SCHWEITZER:  Of course.

Q    To your recollection, did you receive any medication for your PTSD?

A    No.  I was just seeing the therapist.

THE COURT:  We're getting close to the time when we're supposed to be taking our mid-afternoon break.

Why don't we take a break now, and then when we return, you will expedite this process of trying to get in these medical records.

MR. SCHWEITZER:  Yes.

THE COURT:  Okay, ladies and gentlemen.  We're going to take a 15-minute break.  We'll come back at around 3:30. Okay?

Again, don't talk about the case and I will see you in a few minutes.

(Jury exits.)

(Witness steps down.)

THE COURT:  You can be seated.

(Recess taken.)

THE COURT:  You may be seated.

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    67

(Jury enters.)

THE COURT:  You may be seated.

You may continue, Mr. Schweitzer.

MR. SCHWEITZER:  Thank you, Your Honor.

Q    Ms. Figueroa, did you continue seeing Therapist Miner after about February 2023?

A    Yes, I continued seeing him after a while.

Q    Are you still seeing him?

A    No.

Q    When did you stop?

A    The Workers' Comp was finished and I couldn't continue with him, so I had to look for somebody else.

Q    Can you put a date to that, a month and year?

A    It had to be about two years.  2023, '24...

Q    Say again.

A    About 2022, maybe.  '23.  I don't remember.

Q    I'm showing you what's been marked for identification as Plaintiff's Exhibit  8.  This is a series of notes from Therapist Miner after various sessions.

Do you recognize this document?

A    Yeah, that's my doctor.

Q    Would it be fair to say that after each session, after about February 2023, he wrote down one of these sets of notes?

A    Yes.

Q    And to your knowledge, is this a complete record of the

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER        68

notes that he wrote down after about February  2023?

A    Yes.

MR. SCHWEITZER:  Your Honor, I ask that Exhibit 8 be moved into evidence.

THE COURT:  Any objection?

MR. TUNG:  For the record, we still object on the same ground that a medical records, a report should be provided by the expert,  not from this lay witness.

THE COURT:  Well, that's technically not correct. Medical records don't need to be testified to by experts.  But I will receive this in evidence, in light of the fact that there is no objection listed in the joint pretrial order.

(Plaintiff Exhibit 8, was received in evidence.)

MR. SCHWEITZER:  I ask that the exhibit be published, please.

(Exhibit published.)

THE COURT:  Just keep it brief, Mr. Schweitzer.

MR. SCHWEITZER:  Yes, Your Honor.  Excuse me.

Q    I'm showing you the 44 th page of the exhibit, it says encounter dated March 26th, 2024.  Is that the last time you saw Therapist Miner?

A    Yes.

Q    And as of that time, you were still being diagnosed with PTSD, correct?

A    Correct.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    69

Q    As well as chronic pain?

A    To this day, yes.

Q    What was the chronic pain from?

A    Neck and back and shoulder.

Q    I mean, what caused it?

A    The incident, the June 6th.

Q    And you said you were still suffering chronic pain?

A    I still am, yes.

Q    Is that why you walk with a cane?

A    Yes.  I lose balance when I walk a distance.

        MR. SCHWEITZER:  Please turn off the publication.

Q    I'm showing you what's been marked for identification as Plaintiff's Exhibit 9.  It's titled Michael Nguyen, M.D.

        THE COURT:  Hold on.

Q    New York Vein Treatment Pain Treatment Specialist.

        THE COURT:  Hold on.  Don't do it.

Q    Do you recognize this document?

        THE COURT:  It's not working.

        MR. SCHWEITZER:  Oh.  She can't see it?  Oh, I'm sorry.

        THE COURT:  There it is.  Now she can see it.

Q    Try again.  Showing you what's been marked for identification, Plaintiff's Exhibit 9.

        Do you recognize this document?

A    One of my doctors that I had.  I don't recall by his

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    70

name.  But yes, one of the doctors of – – I think that was in Brooklyn.

Q    Are you familiar with New York Vein Treatment Pain Treatment Specialists?

A    Yes.

Q    What is that?

A    I was getting steroids in the back for my pain.

Q    From when to when, approximately?

A    I'm sorry?

Q    From when to when, approximately?

A    I think it lasted, like, about 6 to 8 weeks, 7 weeks.

Q    And is this a record of that course of treatment?

A    Correct.

MR. SCHWEITZER:  I ask that Exhibit 9 be moved into evidence.

THE COURT:  Same objection?

MR. TUNG:  Yes, Your Honor.

THE COURT:  I'll receive Plaintiff's Exhibit 9 in evidence.

(Plaintiff Exhibit 9, was received in evidence.)

MR. SCHWEITZER:  Thank you, Your Honor.

Q    After the course of treatment, did you receive physical therapy?

A    Yes.

Q    For how long?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    71

A    About a month or so, a month and a half maybe.

Q    And did you regain some function?

A    Very little.

Q    Are you familiar with the New York Spine Institute?

A    Yes.  That's where I got my -- the platanium  (sic) plate in my neck.

Q    Titanium, you said?

A    Platanium plate.

Q    Platinum?

A    Yes.

Q    You had surgery done there?

A    Yes.  I had it here, the front or the back and with screws.

Q    And is this a record of that intervention, Plaintiff's Exhibit 10?

A    Correct.

       MR. SCHWEITZER:  I ask that Exhibit 10 be moved into evidence.

       THE COURT:  Same objection?

       Same objection?

       MR. TUNG:  Same objection.

       THE COURT:   Same ruling.  Received.

       (Plaintiff Exhibit 10, was received in evidence.)

Q    Now, showing you Plaintiff's Exhibit  11.  Excuse me. This is a further set of information from the New York Spine

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    72

Institute.  It's called progress note.

Do you recognize this document?

A    Yes.

Q    What do you recognize it to be?

A    I'm sorry?

Q    What is it?

A    It's results from my therapist for the Spine Institute.

Q    That would be Fernando Jose Veliz?

A    Yes.

MR. SCHWEITZER:  I ask that Exhibit 11 be moved into evidence.

MR. TUNG:  Same objection.

THE COURT:  Same ruling.

(Plaintiff Exhibit 11, was received in evidence.)

Q    Turning to Exhibit 12 from the Fifth Avenue Surgery Center LLC.

What is this?

A    My left shoulder surgery.  When I fell, it cracked.

Q    This is from July 2022?

A    Correct.

Q    Did that have anything to do with your occupation at --

A    Yes.  That's when the person hit me with the -- Jeremiah Robinson hit me with the picnic table, and I fell to my left, and I cracked my left shoulder with my spine -- with my neck.

Q    That was when you were hit with the table?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    73

A    Yes.  When I fell to the floor.

Q    Would it be fair to say you had two surgeries related to that, one on your neck, one on your shoulder?

A    Correct.

MR. SCHWEITZER:   I ask that Exhibit 12 be moved into evidence.

THE COURT:  Same objection, same ruling.  Received.

(Plaintiff Exhibit 12, was received in evidence.)

Q    Turning to Exhibit 13.  This is from McCulloch Orthopedic Surgical Services PLLC, referring to a check-in or intervention  of some sort on June 22, 2022.

Do you recognize this document?

A    Yeah, it's from my doctors.

Q    What do you recognize it to be?

A    I think this was for the surgery, for the surgery to the shoulder.

Q    And this is by Kenneth McCulloch?

A    Yes.

Q    Who was that?

A    He was the shoulder surgery doctor.

Q    He performed the procedure on your shoulder?

A    Correct, correct.

Q    And did he write this report?

A    Yes.

Q    And this is a report of the results of your shoulder

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     74

surgery?

A    Yes.

MR. SCHWEITZER:  I ask that Exhibit 13 be moved into evidence.

THE COURT:  Same objection, same ruling.

MR. TUNG:  Thank you.

(Plaintiff Exhibit 13, was received in evidence.)

Q    You had a hysterectomy in 2014, correct?

A    Correct.

Q    Other than that hysterectomy, the shoulder surgery and the neck surgery, have you had any other surgeries?

A    No.

Q    Did you get any imaging done related to your injuries on June  4th?  Imaging, meaning things like x-rays, CAT scans, MRIs?

A    Not that same day, but afterwards with the doctors that was happening.

Q    I'm showing you Exhibit 14 from Alpha 3T MRI & Diagnostic Imaging.

Do you recognize this document?

A    Has to be from the x-rays, MRIs.

Q    This refers to an MRI being performed on September 14, 2021.

Does that refresh your memory?

A    Correct.  It's an MRI.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

MR. SCHWEITZER:  I ask that Exhibit 14 be moved into evidence.

MR. TUNG:  Same objection.

THE COURT:  Same ruling.

(Plaintiff Exhibit 14, was received in evidence.)

Q    I'm now showing you Exhibit 15.

Do you recognize this document?

A    It has to be, like, the bills, the bills, hospital bills.

Q    This is a set of bills from August 26th to May 5 -- sorry.  August 26, 2022 to May 5, 2023, correct?

A    Correct.

Q    Is this your physical therapy bills?

A    Yes.

Q    Are you familiar with DHD Medical PC?

A    I don't know if that's the therapy, physical therapy. I'm not sure, I don 't remember.

Q    Did you attend an evaluation on March 2, 2023?

A    Yes.  I remember going there.  Now I do.

Q    And were you referred to this physical therapy practice by Dr. McCulloch after your shoulder surgery?

A    Correct.

MR. SCHWEITZER:  I ask that Exhibit 15 be moved into evidence.

THE COURT:  Same objection, same ruling.

MR. TUNG:  Thank you.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA - DIRECT - MR. SCHWEITZER     76

MS. CHEN:  We said our objection from Mr. Tung.  I also have objection of relevance because it's not caused by sexual harassment or sexual mistreatment.

THE COURT:  Those are arguments you make to the jury.

I'll receive it.

Did you move 14 into evidence?

MR. SCHWEITZER:  I thought I did.  Let's check the transcript.

THE COURT:  To the extent you didn't, I'll receive that into evidence over Defendants' objection.

MR. SCHWEITZER:  Thank you, Your Honor.

(Plaintiff Exhibit 15, was received in evidence.)

Q    I'm now showing you Exhibit 16 from Dr. Moura at Lenox Hill Radiology?

A    Yes, Moura was the surgeon that did the cervical spine fusion on me.

Q    I see.

MR. SCHWEITZER:  I ask that Exhibit 16 be moved into evidence.

THE COURT:  Same objection, same ruling.

MR. TUNG:  Thank you.

(Plaintiff Exhibit 16, was received in evidence.)

Q    Showing you Exhibit 17 from Jeffrey Perry, Pain Management, Physical Medicine and Rehabilitation.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER     77

Do you recognize this document?

A    Yes, that was some sent to the physical therapist, correct.

MR. SCHWEITZER:  I ask that Exhibit 17 be moved into evidence.

THE COURT:  Same objection, same ruling.

(Plaintiff Exhibit 17, was received in evidence.)

THE COURT:  Let me ask you this question, Ms. Figueroa.

THE WITNESS:  Yes.

THE COURT:  All of these medical records and bills and such that we've been looking at, they all relate to the injuries that you claim you sustained as a result of the picnic table, or whatever it is --

THE WITNESS:  Correct.

THE COURT:  -- being thrown and hitting you, as we saw in the video?

THE WITNESS:  Yes.

THE COURT:  All of it?

THE WITNESS:  Yes.

THE COURT:  All right.

Q    And that includes both physical and psychological injuries?

A    Correct, yes.

THE COURT:  And are you going to go through,

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    78

Mr. Schweitzer, Exhibits 18 through...

MR. SCHWEITZER:  33, Your Honor.

THE COURT:  33?

MR. SCHWEITZER:  Yes, Your Honor .

THE COURT:  In the same manner?

MR. SCHWEITZER:  In the same manner, yes.

THE COURT:  Okay.  And all of these exhibits relate to the injuries Ms. Figueroa claims she sustained, both physical and emotional, as a result of the incident with the picnic table?

MR. SCHWEITZER:  Yes, Your Honor.

THE COURT:  Okay.

And you raise the same objections?

MS. CHEN:  Yes, all the medical record.  And they were obtained from the  Workers' Compensation attorney and after, you know, they resend it to me as a --

THE COURT:  I'm sorry, I'm not sure that the court reporter can hear you.  But the question is, without arguing with me, the objections are the same as raised previously to the other exhibits?

MS. CHEN:  Yeah, all the medical records and all the -- yeah.

THE COURT:  I just need to know that you object for the same reasons.  And you can make arguments later as to -- to the jury as to why they should not consider these.  But I

hear your objection and I'm overruling it.

So I will receive into evidence Exhibits 18, 19, 20, all the way through 33.

And unless there is something specific about a particular exhibit, you can move on.

MR. SCHWEITZER:  Thank you very much, Your Honor.

(Plaintiff Exhibit 18 – 33, were received in evidence.)

Q    Did you at some point leave your employment at Howard Johnson?

A    Yes.

Q    Why?

A    I wasn't feeling safe anymore.

Q    Who did you tell you were quitting?

A    Henley.

Q    And what did he say in response, if anything?

A    I remember him just getting mad at me.

Q    What words did he use?

A    Like, just understanding why I was, like, quitting. Like, he just was shocked, like, I was quitting.

Q    And did you tell him why you were quitting?

A    Because I didn't feel safe and they didn't do anything for me to come to work and feel safe.  I couldn't continue working at that time and not feeling safe anymore in there.

Q    Thinking about everything you experienced at Howard

JEANNETTE FIGUEROA – DIRECT – MR. SCHWEITZER    80

Johnson Hotel, how did that experience cumulatively effect you?

A    It was very hurtful.  I feel like I wasn't appreciated. They didn't care if I come or go.  They just wanted me there. I was feeling very insecure already.

Q    Did you seek other employment after you left?

A    Yes.

Q    Where did you try to work?

A    Hotel Le Bleu in Downtown Brooklyn.

Q    Were you able to continue working there?

A    No, I -- the pain in the morning getting up because it was a different schedule now, it was morning, I couldn't take that pain anymore.  I was going in late when I had to be on time.  So yes, they did get rid of me.  I got fired.  I couldn't make it on time no matter what.

Q    For how long did you work at Le Bleu Hotel?

A    About three weeks to a month.  Close to a month.  Three weeks.

Q    Generally speaking, how much money did you earn on a weekly basis at Le Bleu?

A    It was 18, 19.  Around there.  $18.

Q    $18 per hour?

A    Yes, correct.

Q    How many hours per week?

A    It was full time.  40.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                81

Q    That would be $720 per week?

A    Correct.

Q    And after you were fired from Le Bleu, did you seek employment elsewhere?

A    I couldn't.

Q    What prevented you?

A    My pain.

Q    Why are you seeking a verdict from this jury today?

A    I'm seeking because I feel like Mayflower Hotel didn't protect me from sexual harassment like they was supposed to, and I don't think that workers should be forced to endure, like, harassment, threats, and things like that from work when their employer is supposed to be protecting them from these people. And I feel like Mayflower should be held accountable.

Q    Thank you, Ms. Figueroa.

A    And I want justice.

        MR. SCHWEITZER:  Thank you, Ms. Figueroa.  I have nothing further.

        THE COURT:  Mr. Tung.

CROSS-EXAMINATION

CROSS-EXAMINATION

BY MR. TUNG:

Q    Ms. Figueroa, good afternoon.

A    Hi.  Good afternoon.

Q    You testified earlier that you never had met with Ms. Hu;

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA - CROSS - MR. TUNG                    82

is that correct?

A    Correct.

Q    Other than saying that you never met with Ms. Hu, did you communicate with Ms. Hu through other means, such as Messenger, WeChat, et cetera, or writing letters to Ms. Hu, the owner of the hotel?

A    Not to her, but to Henley Liang.

Q    So you don't have direct knowledge or personal knowledge that -- if Ms. Hu was aware the incidents occurred at the hotel, right?

A    If she -- if I knew if she was aware of that?  Well, I was trusting Henley Liang to tell her about the situation.

Q    Ms. Figueroa, that was not my question.

My question to you is:  Do you have personal knowledge, personal knowledge, not through someone else.  You do not know if Ms. Hu was aware that you suffered injury from those incidents occurring at the hotel,  right, as you described today, the three major incidents?

A    No, I don't know if she was aware or not.

Q    So the answer is no?  I just want to be sure.

A    No.

Q    And you also don't have any knowledge that Ms. Hu participated those incidents, right, that was inflicted upon you by the guests or residents of hotel, right?  She didn't participate with any of these incidents, right?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

A     No.

Q     And she did not approve any of those attacks or injuries upon you, right?

A     No.

Q     And she did not adopt or encourage any of these guests or residents to cause you to have –– to suffer your injury, right?

A     No.

Q     Then why is she named as a Defendant here?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

You can ask it another way.

Q     Ms. Figueroa , you testified earlier, you said the hotel, the Howard Johnson Hotel in Long Island City where you worked was a place with dangerous condition; is that right?

A     Correct.

Q     And could you describe to us what kind of dangerous condition, you know, as you –– you know, you can observe from – – when you walk into the hotel or when you worked there?

A      As soon as I walked into my shift, there was fighting, there was mess, there was graffiti.  There were people on the elevator arguing.  Every day was a commotion in there.

MR. TUNG:  Your Honor, can I just go get my exhibit?

THE COURT:  Yes.

MR. TUNG:  Can we have the exhibit only published to the witness?

Q    Ms. Figueroa, can you see the picture in front of you?

A    Yes.

Q    Does this picture accurately describe the scene, the front lobby in the hotel where you worked?

A    That's not where I worked.  That's not -- that's -- that's Christmas thing.  I don't know, I wasn't working there.

Q    I'm not talking about the date and the time, I'm just talking about the place, whether it's Christmas or whether it's Thanksgiving day.  This is -- my question to you --

A    The walls, the back looks the same as where I was working, and the revolving doors looks the same.

Q    So this picture, overall the environment that describes the place where you worked, the front lobby, the front desk, is that the accurate description for the picture of the scene where you worked?

A    That is the place of the scene.  But I don't know about that Christmas thing.  I wasn't there with that Christmas picture thing.

Q    I'm only asking you the picture, whether that described the place you worked.

A    I just told you, the mirrors and the revolving door looks familiar.

THE COURT:  You have your answer, Counselor.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                    85

MR. TUNG:  Okay.  Your Honor, I move this Defendants' Exhibit B into evidence, which is already in the exhibit binder.

THE COURT:  We didn't receive any objection from the Plaintiff, so we will receive that in evidence.

(Defense Exhibit B, was received in evidence.)

MR. TUNG:  Thank you.  Can we publish to the jury?

(Exhibit published.)

THE COURT:  Mr. Tung, could you move the picture up so we can -- no, no.  No, the other way.  The other way.

MR. TUNG:  No?

THE COURT:  All right.  Hold on.  Hold on.  Let me do it.

Don't touch it, don't touch it.

MR. TUNG:  Oh, okay.

THE COURT:  I think it's out as far as it goes.

It seems like we're missing the bottom of the picture.  That's not going to help them.

Miriam will help you.

MR. TUNG:  Does that help?

THE COURT:  That's a little better.

No.  The other way.  The other way.

No.  You need to go the other way.

Stop.  That's good.  That's good.  Right there.

Right there.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA - CROSS - MR. TUNG                    86

MR. TUNG:  Thank you very much.

THE COURT:  You can continue inquiring.

Q    Ms. Figueroa, is this the area I'm pointing to, that's the front desk --

A    Yes.

Q    -- that you worked, right?

A    Correct.

Q    And that was your working station, right?

A    Yes.

Q    And I'm pointing to this gentleman here.  And this is where the security guard on the same floor in the lobby, right?

MR. SCHWEITZER:  Objection.

THE COURT:  I'm going to overrule the objection and I'm going to let Ms. Figueroa answer the question, if she can.

A    That's the location where security should be.

Q    And those security guards are working for the City, right, for the shelter, right?

A    I don't know that lady.  Those people weren't there when I was working.  Those are not the same people.

THE COURT:  Let me ask you this question:  Was that, whatever it is, security guard station, in the lower middle portion of the picture with that person standing there with what looks like a metal detecting wand or whatever, was that stationed there when you worked there, or was it a different

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

location?

THE WITNESS:  It was very -- no, the security system was put there, was placed there, in that area where this person is at.

THE COURT:  Okay.  So that security table was there when you worked there?

THE WITNESS:  Yes.  Not the same, but yes.

THE COURT:  Okay.

THE WITNESS:  Yes.  It was the -- they had the security on that side, next to the stairs that goes up.

THE COURT:  Okay, okay.

Q    And this security station was there seven days a week, 24 hours  a day, and 365 days in a year, right?  They were always there, right, when you worked in there, right?

A    Yes, they were there.

MR. SCHWEITZER:  Objection.  Calls for speculation.

THE COURT:  Sustained.  She wasn't there for a whole year.

THE WITNESS:  That was Christmas.

MR. TUNG:  Sorry.  Well, I can rephrase the question, Your Honor.

Q    So from the beginning, you started to work in April, until the time in September 2021 by the time you left --

A    Correct.

Q    -- the hotel, the security station was always there 7

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                88

days a week, 24 hours a day, correct?

A    Correct, yes.

Q    And from the videos that was displayed earlier and multiple people, multiple security guards were assigned in that area, right?  The people watching at the screen monitor?

And if you don't remember, I can show, you can replay the tape.  The security guard was monitoring the computer screen and the security guard standing next to this magnetic detector, right?

A    Security didn't monitor the security cameras.  I did.  We did.  Anderson -- David Anderson, Henley Liang.  Because we had the security system in the front desk, like right here.

So security didn't have access to that unless we showed them the incident or anyone else.  But we -- I was -- I controlled the -- I'm with the monitor.  I controlled the monitor because when detectives used to go there, I controlled it.  Henley controlled it.  David Anderson controlled it.

Q    And the person behind that computer screen was doing packaging, you know, when people coming, you know, the guest coming, they have to put their packages through this metal detector so the security guard, they can look, you know, what's inside this, their package, right?

A    Well, that security camera for the packages, that belongs to them.  But the security camera that belonged to the building, we took care of that monitoring.  We had it in the

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA - CROSS - MR. TUNG                89

front desk.

Q    So isn't that true, at all times that multiple security guards in that area, right?

A    Yes.

Q    Ms. Figueroa, from your point of view, how much more securities do you want the City, the hotels to be put into this lobby?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

You can answer the question.

A    It doesn't matter if it's one.  I just needed help when that happened.  And it would have been nice for the security to be there for us, the employees of the hotel that are catering to them.  And they weren't there for us.  So they had -- it didn't matter how much security they had in there.  They weren't for us.  They weren't for me or Anderson or Fiona.  They weren't there for us.

Q    Ms. Figueroa , so you're asking the hotel to provide personal body guards; isn't that right?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

You can answer.

A    Not personal body guards, but security that we could feel safe and know that we have somebody there for us.

Q    How many personal body guards do you think, if the hotel

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                 90

or the City were provided to you, that will make you feel safe?

A    If I would have had somebody to step forward for me, it would have been fine.  I don't know what you want me to say about personal body guard.  Did I know I was going to be attacked that day?  I just needed somebody to step up.  And as soon as he started kicking, something, he should have been stopped.

Q    Ms. Figueroa , I'm sorry that I hope I did not -- I did not --

A    You know what you did.

Q    Provoked you.  But I am asking you a simple question, Ms. Figueroa.

Okay.  Everybody in this courtroom, just minutes ago, had reviewed the videotape, correct?

A    Correct.

Q    Do you agree with me when Mr. Robinson, the person throwing that picnic table into the air, he was not directly intentionally aimed at you; isn't that correct?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

Answer if you can, Ms. Figueroa.

A    It wasn't directly to me, but it came to me.  And afterwards, he did come after me without knowing me.  And I don't know that person.  So he did come after me.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                    91

Q    You were hit by that table because you were standing behind him when he's throwing this table, it just accidentally landed on your body; isn't that correct?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    I wasn't standing behind him.  I was standing at the front desk going to warm up my coffee.  How am I supposed to know that that's going to hit me?  Why didn't they stop him when he came acting from over there?  And it wasn't the first time, and he already attacked a social worker, like, about two weeks ago in the basement.

Q    Ms. Figueroa , do you agree with me, even if you were provided with body guards, personal body guards, that incident could still occur?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.  You can answer the question, if you can.

A    All I know that I got hurt and I just wanted somebody to step up.  I don't care about how many security.  I don't know what you're trying to say.  It's my fault because I was standing there?

Q    Nobody said it was your fault, Mrs. --

A    But that's what you're saying.

MR. SCHWEITZER:  Argumentative.

THE COURT:  Let's not argue with each other.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

J. FIGUEROA – CROSS – MR. TUNG                    92

Q     Isn't that true, Ms. Figueroa ?

A     No.

Q     What was not true?  You tell me now.

A     That you're accusing me that I'm the one  that was standing there.

Q     Did I accuse you of that?  Everybody hear that.  Did I accuse you, Ms. Figueroa?

            MR. SCHWEITZER:  Objection.  Argumentative and badgering.

            THE COURT:  Sustained.

Q    Ms. Figueroa , I'm asking you another question.

            Did the hotel provide Workers' Compensation insurance to you, to every employee?

            MR. SCHWEITZER:  Objection.  Compound.  To you or to every employee?

            MR. TUNG:  I'll rephrase it, sir.

Q    Ms. Figueroa , did the hotel provide Workers' Compensation to you as an employee?

A     I had the worker's compensation.

Q     And what is your understanding what Workers' Compensation insurance do?

A     When the employees get hurt, they cover it.

Q     And isn't it true that you got hurt because you worked at the hotel and somebody throwing a table that accidentally hit you, so you were covered by Workers' Compensation insurance,

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

right?

A    It covered it going to the clinic, the hospitals, and doctors' appointment, yes.

Q    And the Worker's Compensation insurance paid for your time off from work, correct?

A    Time off?  I didn't get paid time off.  I got paid for the medical bills.

Q    You got cover for the medical bills?

A    Medical bills.  I didn't get any other check for cover, like, to be home, no.

Q    So isn't that the -- if the Worker's Compensation insurance didn't cover for the time that's off and that is not the problem with the hotel, right?  The employer, right?  They paid this already.  It is obviously for the Worker's Compensation Board who determines that you're not entitled to, correct?

              MR. SCHWEITZER:  Objection.

              MR. TUNG:  I'll rephrase the question, Your Honor.

              THE COURT:  I'd like a sidebar.

              (Continued on the next page.)

(Sidebar.)

THE COURT:  Where are you going with this?

MR. TUNG:  Because she's covered by worker's compensation insurance.

MR. SCHWEITZER:  Worker's compensation doesn't --

MR. TUNG:  This is --

THE COURT:  For what?

MR. TUNG:  This is an accident.

THE COURT:  She doesn't get pain and suffering from worker's compensation.

MR. TUNG:  I didn't ask that.

THE COURT:  Why don't you just say:  You got paid or they paid for X bills and we have the records and here they are, so we don't get covered for that.  You've already been paid for that.  I mean, she doesn't know what worker's compensation covers and what it doesn't.

MR. TUNG:  All right.  I can ask it something like that, in that line of question.

THE COURT:  The question is whether this --

MR. TUNG:  Is a double --

THE COURT:  No, no.  The question is whether, the real question for the jury is whether this incident is part of the hostile work environment or some crazy guy throwing a table.

MR. TUNG:  You're right.

SIDEBAR                                95

THE COURT:  Which you already sort of covered.

MR. TUNG:  I'm going to drive that it was not encouraged or set up by the employer.  So that's not hostile work environment created by the hotel employer.  I didn't ask the questions, your Honor.

How much time do I have?

THE COURT:  We're stopping at 5:00 o'clock so finish your cross completely.

MR. TUNG:  Today?  Everything?

THE COURT:  You guys are making this the trial of the century.  It's not.

MR. TUNG:  I'm only asking to give me another hour or so, we can come back tomorrow.

THE COURT:  We're going to go to 5:00 o'clock then we'll see what remains whether continued cross or redirect.

THE COURT:  Who do you have tomorrow?

MR. SCHWEITZER:  I subpoenaed Ms. Whittaker and Mr. Anderson, but neither responded, so I don't anticipate having anyone.

THE COURT:  But you're calling both defendants, correct?

MS. CHEN:  Defendant only available at 2:00 o'clock, so tomorrow morning we are free.  So we can --

THE COURT:  Tomorrow afternoon, tomorrow is Tuesday.

MR. TUNG:  We can finish by Wednesday.

SIDEBAR                                              96

THE COURT:  Okay.  So it will be Ms. Figueroa, and the two defendants.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

MR. TUNG:  Shall I proceed?

THE COURT:  Yes, please.

MR. TUNG:  Thank you.

BY MR. TUNG:

Q    Ms. Figueroa, how often did it happen when those guests or residents of the shelter, people, are throwing tables around like this?  Did that occur on a weekly basis?

A    That big incident, it was the first time.  But other days they would throw anything else, like the object that hit me on the head, the floor sign.  They would take the picture paintings or whatever is on the wall, they would throw it on the floor.

Q    So the answer --

A    Always something every day in there.

Q    So Ms. Figueroa, isn't it fair to say somebody throwing a resident or hotel guest throwing tables like this does not occur on a weekly basis.  Do you agree with me?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    Me working there that big incident that happened to me was the first time seeing that.

Q    Ms. Figueroa, the incident that a resident or a hotel guest -- not hotel guest, the shelter resident or guest throwing a table, that event, right, you do not have any

evidence that the hotel management planned this for them, right?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A     Planned it?  What do you mean?

Q     Plan, they work with them, they set you up.  You don't have any evidence like this, right?

A     No.

Q     You don't have any evidence the hotel management intended to encourage those residents or guests of throwing tables in that hotel, right?  You didn't see any signs encouraging them they can do this, right?

A     No.

Q     You also don't have any evidence that hotel management endorsed that practice or that incident right people throwing tables, right?

A     No.

Q     And you don't have any evidence seeing any documentation that the hotel approves these kinds of activities, right?

MR. SCHWEITZER:  Asked and answered.

THE COURT:  Overruled.

A     No.

Q     Those incidents when it takes place, it does not matter whether the front desk worker is a female or whether the front desk worker is a male, right?

FIGUEROA - CROSS - MR. TUNG                99

A    With me?  It was because I was a female.  I was sexually harassed.  They came in, they used to disrespect me as a female working there, peeing in the front desk.  They didn't do that with David Anderson when he was working during the day.

Q    Ms. Figueroa, I did not interrupt you, the reason is, my question is -- not I'm not asking this.

I'm just asking, that incident when Mr. Robertson tossing the table through the air, it doesn't matter who was the front desk, male or female, they would have gotten injured if it landed on them, right?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    Anybody would have gotten hurt.

Q    Ms. Figueroa you also testified earlier this afternoon that you said one of the guests or attempt to masturbation in front of you in the front desk; is that right?

A    Yes.  They would take out their part and they would pee and make gestures.

Q    Did they actually pee in the lobby?

A    Yes.

Q    In front of the desk?

A    Yes.

Q    In front of you?

A    Yes.

FIGUEROA - CROSS - MR. TUNG                    100

Q     And at that moment of time, did you call the security guard across the hallway?  They were there, right, they were there all the time.  Did you call them for help?

A     They were there seeing it.

Q     Did you call them asking them for help?

A     Yes, I would tell them, look what they are doing.  They would just laugh and not do anything just send them to their rooms.

Q     Then did you have access to a cellphone with you?

A     Yes, my cellphone.

Q     Did you use your cellphone to call the police.  It's a crime --

          MR. SCHWEITZER:  Objection.

          THE COURT:  Sustained.

Q     Did you use your cellphone to call the police yourself?

A     I didn't call the police because they are urinating there.  I told the security that is in front of the front desk of me to tell them, for them to stop, to tell them to stop.

Q     And can you walk away from the person who is doing this urinating in front of you?

A     I'm behind my front desk, where am I going?

Q     I'm asking if you can walk or not.  If you want to walk if you do not want to see?

A     I turn my face away.

Q     Did you write a formal written report to the management

of the hotel complaining that the guests of the shelter doing these kinds of lewd events?

A    By the next day.  I used to Henley Liang when I used to come in by the afternoon, I used to tell him everything that went on the day before.

Q    And is that part of a discussion with Henley Liang, your manager, about what had happened the previous day in your work, and that's a normal routine; is that correct?

A    Yes.  Because he didn't want anything to be written down on the computer, everything was to supposed to be told to him and he will go to the boss but not to write anything down.

Q    Even if he told you not to write anything down but you still could have done so, right, you can still send this report to the management, correct?

A    I didn't have those emails like for the big management or like the big boss.  We didn't have no information like that. We weren't allowed to send any message if it's not going through Henley first.

Q    You also know the case manager from the city for the shelter on the floor, right?

A    Correct.

Q    Did you write anything, a formal complaint, to the case manager for the city of New York?

A    I wasn't supposed to go directly to the social workers I was supposed to go to Henley first and Henley was to go to

them and tell them.

Q    As a front desk manager, and your main function is to managing the front desk area, right?

A    Correct.

Q    If something like this -- do you think this is normal somebody pee in front of you?  Do you think this is normal?

A    No, it's not normal.

Q    Do you know -- those are the guests, right?

A    They were the residents of the shelter.

Q    Shelter, right.  And you as well as the management of the hotel does not have a privy a relationship with those people, right?

          MR. SCHWEITZER:  Objection.

          THE COURT:  I'm going to sustain it.

A    Relationship?

          THE COURT:  See if you can ask it another way.

A    Relationship?  Why?

BY MR. TUNG:

Q    Ms. Figueroa, do you know for a fact that the management of the hotel or even Henley Liang cannot directly go to these people because they are the guests or the resident of the city shelter, right?

A    I don't know.  All I know is I used to go to Henley to give all the complaints and everything that is going on.  I had to go to Henley first.

Q    Why do you have to go to Henley first?

A    That's what he told me, you come to me and then I'll tell my boss or I'll solve the problem, whatever it has to be solved come to him always.

Q    So now you're telling me you don't have the authority to go to tell the city case manager because you cannot skip Henley Liang.  Is that what you're trying to tell the jury here?

A    While I was working, yes, I had to Henley Liang what was going on.  And for him to speak to them and to solve the problem.

Q    So your job is only to manage your hotel employees but not to managing the entire area the lobby area?

A    I didn't manage the hotel, that was Henley Liang's job. He was the manager, I was his assistant manager.  My job was to cater to the social workers, to the residents if they need a key, if they need towels, and also supervise the house keeping when they had to do the cleaning.  That was my job.

Q    So you don't think you have the obligation or even out of your consciousness do you think you should talk to these manager on the floor, which there are -- everybody is on this floor, the lobby floor, that what had occurred and ask them to refrain from doing this again.  You don't think you have the obligation?

           MR. SCHWEITZER:  Objection.

A    I had to speak --

              THE COURT:  Overruled.

A    -- to Henley Liang.  I couldn't even speak to Sarah, the director.  I couldn't go up there.  He told me, you cannot speak to her, you talk to me and I'll talk to them.

Q    Now the next question.  When you say you had to report to Henley Liang, do you know if Henley Liang who would go and talk to these people?

A    I don't know.

Q    You do not know.  So you do not know for a fact --

A    Because nothing changed.

Q    -- if Henley Liang reported the incidents, correct?

A    I don't know.

Q    And you do not know if Henley Liang on behalf of the hotel management had communicated with the city and asking them to do something about this, correct?

A    I don't know if he did.  I know that I told him to do something, to speak to them.

Q    And did there come a time, I think that was the first incident that occurred in April 3, 2021 when you just got hired and there was a gentleman by the name of Besley.  Do you know that incident when Besley throwing a wet floor sign to the air in the hotel.  Do you still remember that incident?

A    Yes.

Q    So that person's name is Besley, right?

A    Correct.

Q    And did you complain about him to Henley Liang?

A    Yes.

Q    As you said you don't complain to anyone else?

A    Yes.

Q    Did there come a time that somebody, I do not know if it's from city from the security company, they offer to have security guard stationed at your front desk.  Did that occur? You do you remember that they asked you if you would like to?

A    That never happened.

Q    That never happened?

A    That never happened, sir.

Q    You never told them, you never told the people who would offer a security guard stationed next to you that because that person sex is a male you said I don't want a male security guard stationed next to me.  You do not remember?

A    I never said that, it's not that I don't remember, I never said.

Q    There is never such an incident?

A    I never said that.  They never secured -- of course, I need a male next to me.  How am I going say no to that?

Q    After you complained to Henley Liang, did the security, number of security staff, the person on the floor has increased?

A    Everything was the same, nothing changed.

Q     What do you mean by the same?  Do they have the same number of security guards at the location?

A     As I remember, yes, they had the same supervisor, the same employees there, nothing changed.

Q     But you don't know after you complained to Henley Liang if Henley Liang had communicated with the shelter management, right.  You don't know that, right?

A     I don't know.  All I know is I did complain to my manager that was Henley Liang.

Q     When you see there was no change at the lobby, do you ask Henley Liang again why after I made a complaint there is no change made by the management?  Did you ever ask Henley Liang?

A     Yes.  I told him I wasn't feeling safe coming into work after the incident because I'm still not getting the help that I need, like the security next to me.  Or when I have to go upstairs and do things for them like change a light bulb because they couldn't pay the maintenance bill and I had to do things for maintenance with no security and just surrounded by these people looking at me changing a light bulb on top of a chair inside of a room alone.

Q     How many bodyguards do you need to accompany you to change a light bulb?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

BY MR. TUNG:

Q    Remember you testified that one day there is another incident, one of your employees that you supervise by the name of Fiona, she went to cleaning room and the guest there spit on her.  Remember that incident you testified?

A    Yes, it was Jamal that spit on her.

Q    You also testified earlier that it was your job, you had to go into the room first to inspect if there is any guest or resident inside the room, right, and you make sure it's safe before you would have the employee going there inside the room to clean up the bedroom, right?

A    Fiona is not a housekeeper, Fiona was doing the garbage at night.  I don't supervise her.  She only tells me what is going on.  She was doing the garbage, so I only, like not that I don't supervise her, I don't have to be up there when she's doing the work.  I supervise after the garbage to see if she took everything from every office.

Q    I thought your job is to make sure inside each guest room there is no danger or unsafe condition before the employee go in there to clean up the room.  If Fiona has to go inside the room to pick up the garbage, do you think you had to do your inspection first?

A    She was doing the hallway garbage.

Q    Okay.  Did she go inside the guest resident room?  She was spit in the hallway?

A    Correct, she's not housekeeping.

Q    Let me ask you the mechanism of the management relation now.  Was Fiona having a -- who was her boss or supervisor?

A    I was her supervisor.  If I'm there, I'm supervising her.  She doesn't go into rooms.  She was doing the garbage from the hallway and he saw her.

Q    Minutes ago you said Fiona was not supervised by you; now you're telling us you are the supervisor of Fiona, correct?

         MR. SCHWEITZER:  Objection. Mischaracterizes.

         THE COURT:  I'll overrule the objection.  You can answer the question.

A    Yes.  I supervise her after she does the garbage, like I go see after she does it.  She tells me:  Ms. Figueroa, I finished doing the garbage.  And I'll go.  That's what I supervise, like that.

         THE COURT:  So you don't actually as she's doing the garbage on the floors follow her around to make sure.

         THE WITNESS:  No, that's at night and she was doing that.  I supervise the cleaning girls.

         THE COURT:  But you were her supervisor overall.

         THE WITNESS:  Correct.

BY MR. TUNG:

Q    Let me ask a question.  If Fiona ha d encountered some problem, who should she report to?  Report to you or Henley Liang or anyone else?

A    It will be both.  But if I'm there, she will literally

FIGUEROA – CROSS – MR. TUNG          109

come to me if the incident is happening right there.  I would have to call tell Henley Liang what is going on.

Q     So you are a supervisor for Fiona not only for specific job, but also in general you are the supervisor for Fiona, right?

A     Yes.

Q     So now after Fiona contact you, what did you do as the supervisor?

A     I remember telling her that I -- I told Mr. Cheek what was going on upstairs.  I told him.  And then I texted, I was texting Henley Liang to tell him what was going on.  And I was telling her to call the cops because nobody was at coming.  We told the security, they didn't go upstairs to him.  Mr. Cheek said that it was like, he let it go, like he was going to stay in his room, that he wasn't going to act up, to leave it alone.

Q     Who was Mr. Cheek?

A     He was one of the supervisors from -- I mean, social worker.

Q     He works for the city?

A     Uh-huh.

Q     Right.  And isn't that true, you told us you are not allowed to talk to the city employees, right, you had to go through Henley Liang first.  Why you changing your rules now here?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

A    I did tell Henley Liang, but the incident was, the commotion was right there at the moment that he was right there standing.  I'm telling him Mr. Cheek, look at what is going on.  I have to go upstairs.  It's the moment right there that I'm speaking to him.  He's right there.  It's not like I went upstairs to his office and tell him that.  He was right there when the incident was going on.  I told him do something.

Q    So he didn't do anything?

A    No.

Q    Under that circumstance, under that moment, what do you think was the thought that you can bring on Mayflower management at that moment?

THE COURT:  Do you understand the question?

THE WITNESS:  No.

MR. SCHWEITZER:  Neither do I.

MR. TUNG:  Rephrase the question, yes.

BY MR. TUNG:

Q    In your lawsuit you bring on Mayflower that they didn't do anything, right, when you complained.  I'm asking in this particular situation, you were there, right, and Fiona called you.  You went up there because you are her supervisor.  And you talked to Mr. Cheek, who is from the city, he's also right

there.  And Fiona is there, but you said the security guard didn't go there, nobody does anybody else.  Now, actually isn't that true, you were there you were on behalf of the hotel, correct?

A    I worked for the -- on behalf of the hotel, I was there.

Q    You don't think you should do anything else, do you?  Did do you anything else?

A    What else can I do?

Q    Did you call the cops?

A    We called the cops.

Q    After you called the cops, did you wait until the cops arrive so you can explain the situation to them?

A    I didn't wait because it was getting -- he was getting more agitated, Jamal.  And Jamal was literally threatening saying all these things, like I said, that I deserve what I get.  Then he was passing through the lobby and doing the doggy, the dog thing.  I was already nervous.  He didn't want to leave the lobby.

Once he left the lobby, I said I need to go home because I was alone.  It was already late.  I told Fiona to wait for the cops and explain to them, and I'll handle it tomorrow with Henley Liang.  I even told Henley Liang we did call the cops.

When I went there the next day, the cops didn't even go over there, we had to call the precinct.

FIGUEROA - CROSS - MR. TUNG                112

Q    Where is the fault that the management didn't do anything.  Where did that come from --

MR. SCHWEITZER:  Objection.

Q    -- on this particular incident?

THE COURT:  Overruled.

A    I don't know.  Where did it come from what?

Q    You bring on Mayflower management.  I'm asking for this particular incident, one of the three incidents, what was something wrong that the Mayflower hotel management didn't do under these circumstances?

A    They all work they under one umbrella.  My checks were everything was Mayflower.  So Mayflower, Howard Johnson belonged to Mayflower group, Wyndham and the Yan Zhi.

Q    I try to understand.  Are you telling me that the -- yes, you worked for Mayflower, they hired you as a front desk manager.  And yet they had to provide you another person to protect you?  Isn't that -- are you telling me is that what you're telling us, otherwise Mayflower is not doing their job to protect their employees?  Isn't that something you want to tell me?

A    I didn't feel protected by Mayflower to protect me from the sexual harassment.

THE COURT:  Twelve minutes.

MR. TUNG:  I try to go as much as possible so tomorrow we can finish.

FIGUEROA – CROSS – MR. TUNG                113

BY MR. TUNG:

Q    Do you agree with me in order to hold Ms. Hu the owner of Mayflower be responsible, be accountable for the incident occur on that day, that a resident, hotel guest of the shelter, spit on Fiona, she has to be made known first. Right?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

Q    This afternoon you also testified at certain part of time during your employment you requested your employer or your manager, Henley Liang, to transfer you to a different location where Mayflower has another hotel, right?

A    Yes.

Q    And at that point in time what was your understanding of that hotel and what kind of business they do, that hotel is that the one in Fresh Meadow?

A    They were a regular hotel, they weren't running a shelter.

Q    They were also running a hotel --

A    They were regular hotel.

Q    So it was your understanding it was a regular hotel?

A    Correct.

Q    What is your definition of a regular hotel?  That means it's the guests were from general public, not inmates released from jail or mental person who are not stable mentally, those

FIGUEROA - CROSS - MR. TUNG                    114

are not the people as guests, right?

A    It wasn't from the city, no, it wasn't shelter.

Q    So you think the other place is a regular hotel.

And now when you asked for to be transferred there, did they tell you that they only have evening position, night shift position available, did they tell you that?

A    They didn't tell me anything.  They said they didn't have any opening.  Mr. Henley Liang told me they didn't have anything for me.

Q    You didn't put in writing requesting a transfer, right?

A    I told him on the text, on the app telling him to remind Janice about the transfer.

Q    Did Henley Liang respond to you in writing through text?

A    He said that he would speak to her, that for now stay at the hotel at the shelter.

Q    Did he specifically write in those texts to you saying that they didn't have an opening there?

A    He said that to me in-person when he literally said --

Q    So your answer to me is, no, so he didn't write to you?

A    No text.

Q    No text, only your recollection that he said to you no position was available at that hotel, right?

A    Yes, we spoke about it at the front desk.

Q    I want to direct your attention back to that picture. Ms. Figueroa, you in your complaint you allege that the

FIGUEROA – CROSS – MR. TUNG                    115

employer Mayflower created a hostile work environment; is that correct?

A     Correct.

Q     And now we just went through this picture and this is a working environment, I'm not talking about the Christmas party I'm talking about the layout, right.  Your front desk is against the wall in the back, and in the area there are security guards stationed there, about seven days a week, and 24 hours a day.  I'm asking you, this work environment, where was the hostility, a hostile work environment?  How could you work a hostile work environment?  I mean, if we can compare -- why this is a hostile work environment?  Can you tell the jury here?

            MR. SCHWEITZER:  Objection.

            THE COURT:  Sustained.

BY MR. TUNG:

Q     Ms. Figueroa, if you look at the picture when you describe your working area and security guards there in a typical lobby, right.  This kind of arrangement is almost common place in every other building, a building, hotel.  Why is this wrong?

            MR. SCHWEITZER:  Objection.

            MR. TUNG:  I didn't finish the question.

            THE COURT:  Then finish.

BY MR. TUNG:

Q    Why this that you describe as a hostile work environment?

MR. SCHWEITZER:  Objection.

THE COURT:  Ladies and gentlemen, I'm going to sustain the objection because whether something is a hostile work environment is a question that you have to answer after you hear all of the facts as testified to by the witnesses and you hear what the law is on a hostile work environment.  It is not a plaintiff's obligation to testify as to a legal conclusion.  They testify as to facts:  This is what I saw, this is what I experienced, this is what happened.  Then you determine later is that a hostile work environment or isn't it.

MR. TUNG:  All right, Judge.

BY MR. TUNG:

Q    Ms. Figueroa, tell me something, the arrangement I'm talking about the surrounding arrangement in this lobby, was that different from any other typical hotel, even buildings entrance, is there anything that you see is particular that makes this place is different from the rest of the world?

A    That picture is Christmas; when I was working, there was graffitis on the walls.  That wasn't like that.  This is totally a stage, okay.

This was a men's shelter.  You had men screaming. You had men walking around like sometimes naked in their underwears.  You had the elevators all messed up.  You had,

there was something else in the front desk, there was a

vending machine.  Here where you see that Christmas tree,

there was a venting machine there okay.

So this picture here I never seen that there.  What

I worked was a hostile environment.  Every day working in

there fighting, the cops was called every day.  If it wasn't

called by me, it was probably called by the social workers

they had to do it.  It wasn't, this here is paradise compared

to where I worked.  This is a front to me.

Q    All right.  So isn't that true now that you're telling me

that this picture with a condition that is no longer

dangerous, right, the hotel management has improved whatsoever

to make the space like a paradise, you described it, isn't

that true?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

A    They did that after --

THE COURT:  When I sustain an objection.

THE WITNESS:  Sorry.

THE COURT:  You don't have to answer.

THE WITNESS:  Sorry.

THE COURT:  That's okay.

BY MR. TUNG:

Q    Obviously the graffitis were the removed from the lobby,

right?

FIGUEROA – CROSS – MR. TUNG                118

A    When I was working there it wasn't removed, so I don't know.

Q    I'm talking about in this picture, the graffitis were removed, right?

A    It looks like it.

Q    Therefore, you cannot say the management does not do anything in responding to your complaints, right?

THE COURT:  Sustained.

MR. SCHWEITZER:  Objection.

MR. TUNG:  Your Honor, I think this might be a good point to stop.  I want to go into a different area tomorrow.

THE COURT:  Okay.

(Continued on the next page.)

(Sidebar conference.)

THE COURT:  Approximately how much time do you have left with her?

MR. TUNG:  I think half an hour.  The area is the injury is not sexual harassment.

THE COURT:  About how much redirect do you think you'll have?

MR. SCHWEITZER:  I don't have any redirect stemming from today; I don't know what I'll have tomorrow.

MS. CHEN:  Our interpreter cannot come in the morning for Chinese, can only come at 2:00 o'clock in the afternoon.

THE COURT:  That's what I'm trying to figure out.  When you say tomorrow afternoon?

MS. CHEN:  2:00 o'clock.

THE COURT:  And that would be for you to put on -- does Mr. Liang need an interpreter?

MS. CHEN:  Yes.

MR. TUNG:  That is your witness.

MR. SCHWEITZER:  I'm not calling him.

THE COURT:  So you're going to rest after the plaintiff?

MR. SCHWEITZER:  Yes.

THE COURT:  So we're going to begin tomorrow at 10:30 a.m., continue the cross with Ms. Figueroa, and do the

SIDEBAR CONFERENCE                      120

redirect.  And then we can rest, plaintiff will rest.

After we get Mr. Anderson and Ms. Whittaker get them -- rest.  If you have any motions you want to make, we can do that.  Lunch.  Then at 2:00 o'clock we'll pick up with the defendant's case.

MR. TUNG:  We'll finish everything by Wednesday.

MR. SCHWEITZER:  Not deliberations.

THE COURT:  We're breaking early on Wednesday.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

THE COURT:  Okay, ladies and gentlemen, we're going to break for the day.  I have a bit of good news.  We're going to begin tomorrow at 10:00 a.m., gives you a little extra time to get in.  And I'm not going to promise anything, but it looks like we may be done with the whole trial a little earlier than we thought.  So the goal is maybe Wednesday, more likely Thursday morning we're done.

Go home.  Have a great night sleep.

Don't talk about this case.  If your loved ones asked what is going on, say I'm on a civil trial.  That's it.

Don't talk to the parties or the lawyers.  Don't go to the hotel to check it out.  Don't do any Internet research anything of that.

Keep an open mind.  I'll see you tomorrow at 10:00 a.m.

(Jury exits the courtroom.)

THE COURT:  You're still under oath.  We're taking a break for the day.  Do not talk about your case, your testimony or anything, with the attorney.  You're still on the stand.  All right.  Cross-examination is not done.  I'll see you tomorrow morning.

THE WITNESS:  Tomorrow at ten?

THE COURT:  Yes.

(Whereupon, the witness steps down.)

PROCEEDINGS                    122

THE COURT:  I told the jury 10:00 so we can begin promptly at 10:30 so everyone will be here.  But you should aim to be here at ten.

MR. SCHWEITZER:  Thank you, your Honor.

MR. TUNG:  Thank you.

(Proceedings adjourned.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

123

I N D E X

WITNESS                                          PAGE

**JEANNETTE FIGUEROA**

DIRECT EXAMINATION    BY MR. SCHWEITZER    27

CROSS-EXAMINATION    BY MR. TUNG          81

PLAINTIFF'S EXHIBITS

1                                          36

4                                          47

2                                          52

7                                          66

8                                          68

9                                          70

10                                         71

11                                         72

12                                         73

13                                         74

14                                         75

15                                         76

16                                         76

17                                         77

18 – 33                                    79

DEFENSE                                          PAGE

B                                          85

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*