124

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                        23-CV-04729(RER)
JEANNETTE FIGUEROA,

                                        United States Courthouse
          Plaintiff,                    Brooklyn, New York

          -versus-                      October 21, 2025
                                        10:30 a.m.
MAYFLOWER INTERNATIONAL
HOTEL GROUP, ET AL.,

          Defendants.

------------------------------x

          TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE RAMON E. REYES, JR.
              UNITED STATES MAGISTRATE JUDGE
                    BEFORE A JURY


APPEARANCES


For the Plaintiff:        BY:  AARON SCHWEITZER, ESQ.


For the Defendant:        BY:  KEVIN K. TUNG, ESQ.
                               BO CHEN, ESQ.


Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                          Phone:  718-613-2268
                          Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

125

(In open court)

THE COURT:  Is there anything we need to discuss before we bring in the jury and continue with Ms. Figueroa's cross-examination?

MR. SCHWEITZER:  No, your Honor.

MR. TUNG:  Your Honor, last night --

THE COURT:  You sent an email.

MR. TUNG:  We have to address the individual defendants.

THE COURT:  Now is not the time to discuss that. We'll talk about that during the charge conference, but we received your email.

MR. TUNG:  Thank you very much.

THE COURT:  Let's bring in the jury.

Ms. Figueroa you can take the stand.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT:  You may be seated.  Good morning ladies and gentlemen.  We will continue with Ms. Figueroa's cross-examination.

I'll remind you Ms. Figueroa you are still under oath.

(Witness takes the witness stand.)

**JEANNETTE FIGUEROA**, called as a witness, having been previously first duly sworn/affirmed, was examined and

JEANNETTE FIGUEROA – CROSS – MR. TUNG          126

testified further as follows:

Mr. Tung.

MR. TUNG:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. TUNG:

Q    Good morning, Ms. Figueroa.

A    Good morning.

Q    Yesterday you testified the major incident we talked about that was caused by a hotel resident, guest of the shelter, by the name of Besley.  Right?  You remember that, right, Besley?  You testified that Mr. Besley tossed a wet floor sign into the air and that occurred shortly after you just started to work at the hotel, right?

A    Correct.

Q    On that day when you encountered that incident, did you call the police?

A    No.  He came to me with -- the security person came with Besley to the front desk to ask me if I wanted to make a report.

Q    And what did you say?

A    I said no because Besley was right behind him asking not to, so I was afraid of saying yes and if he comes out of jail and I get hurt.  I was just afraid of it.

Q    So the reason -- is that fair to say the reason that you do not want to report to police that was not caused by the

JEANNETTE FIGUEROA – CROSS – MR. TUNG          127

hotel management, right?

                    MR. SCHWEITZER:  Objection.

                    THE COURT:  Overruled.

A    No, it wasn't caused by the hotel, it was caused by Besley.

Q    And did there come a time that the guest, Mr. Besley, offered to walk you to the subway station every day after you get off work from the hotel.  Did Mr. Besley offer you that?

A    Every night and I used to tell him no.

Q    Withdrawn.  Did Mr. Besley ever walk you to the subway station from the hotel?

A    Yes.

Q    When did he do that?  Is that at the time when you get off work from the hotel?

A    He basically started doing that like the night that I started working, like following me.

Q    When you walk to the subway station with him he was behind you or he was next to you?

A    He was totally behind me.

Q    He was totally behind you.  Did he in any way talk to you when he walked you to the subway?

A    Yes:  I want to go out with you, let me get your number, let's go out.  All those words walking behind me.

Q    Did you tell him:  Please, do not follow me.

A    I told him not to.  And he used to get upset.  Then I was

JEANNETTE FIGUEROA - CROSS - MR. TUNG        128

telling him it's because you could get in trouble.  I was giving him this psychology for him to stop following me to the train.

I told Henley I was being followed to the train.  I don't want this.  I need it to stop.

Q    How often did Mr. Besley to do this, offer to accompany you to the subway station, how often?

A    Basically every night when I got out.

Q    Every night since when?

A    Yes.

Q    Since you started to work?

A    And other residents as well.

Q    Other hotel residents of the shelter?

A    Correct.

Q    And they also follow you to the subway station from the work, right?

A    Correct.

Q    Did you ever report these stalking just to follow you, those events incidents, to the police?

A    Not to the police but to Henley Liang and my manager.

Q    What, if anything, did you ask Henley Liang to do for you?

A    To please correct it to talk to somebody for them to stop doing that.

Q    Did Henley Liang -- withdrawn.  Do you know for a fact if

JEANNETTE FIGUEROA - CROSS - MR. TUNG        129

Henley Liang had talked to anyone regarding this incident?

A    I don't know.

Q    The place that you worked at the hotel Howard Johnson that was operating as a shelter, right?

A    Correct.

Q    That was not a jail, right?

A    No.

Q    That was not a place where the people mentally ill were kept or monitored, right?

A    No.

Q    Do you agree with me that even those residents or the guests of the shelter, they were released from jail or some facilities where they keep mentally ill people?

A    I don't know that.

Q    You don't know that.  But you know those people most of these guests were released or released from certain institutions, right?

A    I don't know that.

Q    Most of these residents have some problems with their mental illness, right?

            MR. SCHWEITZER:  Objection.

            THE COURT:  Sustained.

            MR. TUNG:  If she knows.

            THE COURT:  Do you know anything these shelter guests residents, whatever?

JEANNETTE FIGUEROA – CROSS – MR. TUNG        130

THE WITNESS:  I don't know anything about them.  I only worked for the hotel.  I wasn't allowed to ask questions.  I was doing what I was supposed to do.  I don't know who came from where, what is their problem.  I don't know anything of that.  I don't know them.

THE COURT:  Okay.

BY MR. TUNG:

Q    But then how did to distinguish this hotel, this shelter, versus other hotels Mayflower has.  Yesterday afternoon you said the other hotel serves the regular customers.  Is there any difference between this hotel and the other hotel?

A    Because Henley told me the other hotel was a hotel with tourists coming in.  That Howard Johnson was the only shelter running.

Q    The Howard Johnson shelter, so it is, to your understanding, the Howard Johnson shelter is not a regular hotel, right?

A    No.

Q    No.  So what do you think of this?  Is this the housing regular customers or travelers?

A    Huh?

Q    Is this shelter is providing housing to certain people right who have mental issues, right?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.  She testified she doesn't

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

know anything about the mental conditions of the residents at the Howard Johnson.

BY MR. TUNG:

Q    So then these people, these guests, residents, guests of the shelter are not different from the regular hotels, right?

A    The environment was a shelter.  The people there was a shelter.

Q    You do know -- with me, those people, those guests, those residents of the shelter who were released from certain institute at least they have been determined by some organizations --

THE COURT:  Sustained.  She doesn't know, Mr. Tung. Move on.

BY MR. TUNG:

Q    Isn't that true, that it is not the management of the hotel who decides to select whoever can reside in that hotel, right?

A    I don't know that.

Q    Isn't that true, you testified yesterday that the hotel provides three kinds of services to the shelter, right?

A    Correct.

Q    One of them is to provide laundry service, right?

A    Yes.

Q    And the other service you provide is to provide the keys right to the guest rooms, right?

JEANNETTE FIGUEROA – CROSS – MR. TUNG          132

A     Yes.

Q     And the other service you provide is housekeeping, cleaning the guest rooms, right?

A     Yes.

Q     So among all of these services you provided to the guests, is there a process or service that you know the hotel management will be engaged to screening those residents or guests?

A     Screening them?  I don't know.

Q     To select.  As a front desk manager, do you do this job to screening the residents of hotel guests?

A     No.

Q     No.  So you never did it.  Did you observe anyone else working for the hotel have to do a job to screening the residents or guests of the shelter?

A     No.

Q     Is it fair to say that the hotel only provides room service to accommodate the residents and/or the guests of the shelter, correct?

A     Yes.

Q     Yesterday afternoon did you tell the jury or the Court that Henley Liang told you not to call police often regarding those incidents occur at the hotel, did you say something like that?

A     Yes, I did.

JEANNETTE FIGUEROA – CROSS – MR. TUNG          133

Q    And especially he mentioned there was a person by the name of Sarah, right?

A    Correct.

Q    And who was Sarah?  Is Sarah a case manager for the shelter, correct?

A    She was the director of the shelter.

Q    Okay, she's the director of the shelter.  And your testimony that she didn't want to call police too often because she does not want to cause the residents or the guests of the shelter to become more agitated to become more angry which will make the situation there even worse.  Is that something similar to what you testified before?

          MR. SCHWEITZER:  Objection.  Mischaracterizes.

          THE COURT:  Overruled.  You can answer.

A    I was told by Henley that, yes.

Q    So this is, I mean you describe why Henley Liang told you not to call the police often, right?

A    Yes, Henley Liang told me.

Q    In your opinion, is Henley Liang's telling you not to call police often is that a reasonable decision, reasonable instruction to you?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A    If it comes from my manager then I'm going to trust him and believe that he's going to do something about it by me

JEANNETTE FIGUEROA - CROSS - MR. TUNG          134

telling him what was going on.

Q    I'll direct your attention to the treatment that you received from your doctors.  Yesterday afternoon your counsel offered or submitted lots of exhibits with doctors reports to the court.  Now can you tell me, among all of these reports or records submitted to the Court, can you tell me if any of these reports were related to your allegations that you were sexually harassed as a result of your -- withdrawn.  Let me recompose the sentence.

     Among those reports submitted by your counsel to the Court, are you aware, is there any reports, medical reports or diagnosis report, medical records, that is specifically related to the suffering as a result of you being sexually harassed?

A    With my therapist.

Q    With your therapist?

A    Talking about it, yes.

Q    What was the name of your therapist?

A    I had different ones, it would have been all of them. The names I don't remember all their names but I -- Miner, something.

Q    Jacob Miner?

A    Yes.

Q    I believe that's Exhibit 8, if the jury will go back to deliberation room.

The plaintiff submitted a report called Bridge report that was written by Jacob Miner, right?

A    Yes.

Q    And did you give -- who actually found Jacob Miner, is that you or somebody else?

A    Say that again?

Q    Okay.  Who did you tell -- who told you to go to see Jacob Miner?

A    When I was looking for doctors, the recommendations, referrals of doctors when they send you.

Q    Who sent you the recommendation for the doctor?

A    One of the main doctors that I was seeing or in the -- probably my lawyers.

Q    Your lawyers, great, because you gave the same testimony in the deposition --

MR. SCHWEITZER:  Objection.

MR. TUNG:  Your Honor, withdrawn.  You don't have to make a decision.  I didn't even finish the question.

BY MR. TUNG:

Q    So you do not dispute with me that Jacob Miner was recommended by your lawyer, right?

A    I said by probably by the doctor, I'm not sure, I don't remember which one was it.

Q    But you found Jacob Miner through your lawyer, right?

A    By my doctor or my lawyer, I don't remember which one was

JEANNETTE FIGUEROA - CROSS - MR. TUNG          136

it.

Q     And when you referred -- the name your lawyer, which lawyer you're referring to him sitting here or a different lawyer?

A     They were my injury lawyers.

Q     Your personal injury lawyer.  And did there come a time that you filed a lawsuit against the city and its affiliated groups in Supreme Court of New York?  Do you remember that?

A     Yes.

        MR. TUNG:  Your Honor, I would like to offer a copy of the complaint.  This is a public document.  I do not know if, I can just, if permitted I'd like to offer this into evidence.

        MR. SCHWEITZER:  Objection.  Exhibit E has been offered for impeachment.  There has been no proffer for impeachment at this time.

        THE COURT:  Mr. Schweitzer is correct.

BY MR. TUNG:

Q     Ms. Figueroa, in the lawsuit that you filed against the city, what kind of claims do you assert against the city?

A     It was the injuries.

Q     Injuries.  What kind of injuries specifically do you assert against the city of New York?

A     It was my shoulder, my left shoulder, and cervical spine.

Q     It was your left shoulder.  And the suffering of your

JEANNETTE FIGUEROA – CROSS – MR. TUNG        137

left shoulder, that was as a result of, if I'm wrong right,

that was caused by Mr. Robinson when he tossed the picnic

table, as everybody seen yesterday in the hotel, right?

A    Correct.

Q    Tell us, what happened to this lawsuit if you know?  If

you do not know, don't worry, I have a chance to introduce the

documents.

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.  Ask the question again

without the last part again, please.

BY MR. TUNG:

Q    Ms. Figueroa, do you remember -- withdrawn.

Ms. Figueroa, what happened to the lawsuit that you

filed against the city and its affiliate agencies?

A    It was finished.

Q    It was finished.  What do you mean by finished?

A    It was settled.

Q    It was settled.

A    Uh-huh.

Q    Did you get any compensation?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    Yes.

Q    Yes.  So those compensation was to your understanding

what are these compensations for?

JEANNETTE FIGUEROA – CROSS – MR. TUNG        138

A    For my injury.

Q    For your injury.  And that injury that you suffered, you suffered from Mr. Robinson, right, as a result of Mr. Robinson's tossing the table at the hotel, right?

A    Yes.

Q    And also in addition to this lawsuit you filed against the city and its agencies, you also filed a complaint -- you also filed a claims for worker's compensation related to the incident that Robinson throwing the table of that accidentally landed on you, right?

A    Yes.

Q    Through that worker's compensation claims, what do you exactly claim for worker's compensation payments?

A    I don't get a claim, it was to pay the bill.  Every time I went, it was paid with by the phone, like the doctors appointment, I didn't receive any money myself, like a check or anything.  It was every time I went to an appointment they called the worker's compensation and that's the way.  But I didn't get any check like for me to deposit, no.  It he was going to appointments and they would call the worker's compensation department.

Q    So when you're referring to that, are you referring to the medical bills, right, you went to see a doctor?

A    Correct.

Q    The doctor issues medical invoices, and those invoices

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA – CROSS – MR. TUNG          139

were all paid by worker's compensation, right?

A     Correct.

Q     You didn't pay anything out of your own pocket to for those medical expenses, right?

A     No.

Q     This was what we just discussed was for the incident that was caused by Mr. Robinson, that's one of those three major events that you described yesterday, right?

A     Yes.

Q     Now, let me go back to the other one.  Remember you tried to stand up for your staff member Fiona when she was spit by a resident right at the hotel, right?

A     Yes.

Q     And did you suffer any injuries, physical injuries, in that incident?

A     No.

Q     Did you make any claims for any other expenses such as related to this incident with worker's compensation or any other places did you asking for compensation?

A     Because of that spitting issue?

Q     Right.

A     No.

Q     So that means you didn't ask for it, right.

      What about the other incident, one of the other three incidents, that was Mr. Besley, he tossed the wet floor

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA - CROSS - MR. TUNG        140

sign in the area that also caused, I don't know what -- what

did that cause you physical injury, or it's just a feeling

bad?

            MR. SCHWEITZER:  Objection.

            THE COURT:  Overruled.

A    It hit me.

Q    It hit you, okay.  So it hit you.  But you just testified

you didn't report to a police, right?

A    Yes.  But I had a reason why I didn't.  I said because he

brought the Besley behind him and he's begging me and jumping

like a little kid behind him no, no, no, please don't call the

cops.  How am I going to call the cops with him there?

Q    That was not my question, but that's fine you repeated it

again.

            My question to you is:  Did you file any claims such

as worker's compensation for your injury that you suffered?

A    No.

Q    No.  And did you look for any compensation from any

insurance or anybody any companies security companies or city

to pay for your injury to pay for that wet floor sign which

hit you?

A    No.

Q    No.  Reference to the doctor Jacob Miner, did you how did

you -- did you go to his clinic or hospital to see him?

A    It was video because I couldn't get up from my bed and

JEANNETTE FIGUEROA - CROSS - MR. TUNG        141

walk go to him like that, it was from video.

Q    So all of those sessions that you had with Dr. Jacob Miner was through virtual, right?

A    Correct.

Q    In Exhibit 9 of the Plaintiff's Exhibit you also submit a report that was written by Michael -- I cannot pronounce -- I forgot the name?

         MR. SCHWEITZER:  Nguyen.

Q    Was that a medical doctor?

A    Who again?

Q    What?

A    Who again?  The person who are you talking about.

Q    Michael Nguyen?

A    He was one of the doctors; I don't remember them.

Q    That doctor was recommended by your attorney also?

A    I don't remember.

Q    When you started to see that doctor, isn't that true, on the document that you see that was already in March of 2024, right?

A    Yes.

Q    That's about three years after the incident that Mr. Robinson throw that picnic table that accidentally landed on you, right?

A    Yes, to this day I suffer from pain.

Q    What did this doctor examine you, three years after the

JEANNETTE FIGUEROA - CROSS - MR. TUNG        142

incident occurred?

A    For pain, the spine, it must have been the back pain.  I don't remember, it must have been pain.  I saw different doctors.  And I continue seeing doctors.

Q    Even with Dr. Jacob Miner, you started to see him, that was one year after later after the incident occurred right?

A    I don't remember, but I was seeing him.

Q    Did you see any doctors shortly after the incident occurred, within a day or even within 24 hours?

A    In the -- like by the second day, I started seeing doctors.

Q    What kind of doctors did you see?

A    I remember I saw the doctor like regular doctor, like pain doctor.

Q    What is the name of the doctor?

A    It was in Brooklyn, I don't remember his name.

Q    How often did you see him?

A    I was basically had an appointment every day with him.

Q    You see a doctor every day and you still don't remember that doctor's name?

        MR. SCHWEITZER:  Objection.

        THE COURT:  Overruled.

A    It was in Brooklyn.  I can't remember his name.

Q    Do you know for a fact that your attorney provided medical records for this doctor's examination of you or

JEANNETTE FIGUEROA - CROSS - MR. TUNG        143

diagnosis of your injury?

A     If they have records?  They should.

Q     Can you point it out to the jury which --

MR. SCHWEITZER:  Objection.

A     Point what out?

THE COURT:  Sustained.

A     Point what out?

THE COURT:  You don't have to answer.

BY MR. TUNG:

Q     Isn't that true, you didn't really go to see doctors only after you retained attorneys to file the lawsuit in Supreme Court?

A     Yes, I was looking for a lawyer because I was afraid, I didn't know what to do.  I was afraid I needed to see a doctor.

Q     Isn't that true --

A     I didn't have the proper insurance to do it.  I didn't have Medicaid.  I was barely starting to get my life together again when I started working.

Q     Isn't that true the reason that you went to see the doctors years after the incident occurred, because that was for the preparation of the lawsuit?

A     No, I didn't continue years.  I continued right after seeing the doctor of 2021 and I still see doctors because I suffer from chronic pains till this day.  So that's a

JEANNETTE FIGUEROA - REDIRECT - MR. SCHWEITZER  144

continuation not that I stopped and continued, that I stopped and paused for three years and continued.  I've been seeing doctors for since --

Q    Isn't it true that it is your opinion, not your doctor's opinion, that you should continue to see the doctor?

MR. SCHWEITZER:  Objection.

A    What?  They make appointments.

THE COURT:  Sustained.

MR. TUNG:  I have no further questions, your Honor, at this time.

MR. SCHWEITZER:  I have redirect.

THE COURT:  Yes, Mr. Schweitzer.

REDIRECT EXAMINATION

BY MR. SCHWEITZER:

Q    Ms. Figueroa, did you share with your therapist Mr. Miner, that you believed you had been sexually harassed during your time at Mayflower/Howard Johnson?

A    Yes.

Q    After you shared that information with him, was that when he diagnosed you with PTSD?

A    Correct.

Q    Is it your belief that the harassment you experienced contributed to your PTSD?

A    Yes.

MS. CHEN:  Objection.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JEANNETTE FIGUEROA - REDIRECT - MR. SCHWEITZER  145

THE COURT:  Overruled.

A    Yes.

Q    I'm going to show you exhibit seven and eight, please publish to the jury they are already in evidence.  I'm showing you the second page of Plaintiff's Exhibit seven:  Patient also reports sexually harassed at her job prior to the attack.

What did you tell Dr. Miner about your sexually harassment?

A    Everything that happened from the like the indecent -- they used to say, like the bust the knot in my face thing, and the peeing, everything I told him.

Q    This is Exhibit 8, is this the same report?

A    Yes.

Q    In the lawsuit you brought against the city, that was to compensate you for your physical injuries, correct?

A    Correct.

Q    You told the jury the settlement you received was in compensation of your physical injury, correct?

A    Correct.

Q    Did you receive any compensation for emotional injuries?

A    No.

Q    Did you receive any compensation for psychological injuries?

A    No.

Q    Did you receive any compensation for pain and suffering?

JEANNETTE FIGUEROA – RECROSS – MR. TUNG        146

A    No.

Q    Likewise, the worker's compensation that you received was to directly fund your medical treatment, right?

A    Correct.

Q    But it did not compensate you for emotional psychological injuries or pain or suffering, correct?

A    Correct.

Q    Has your PTSD compromised your ability to work going forward?

A    Yes.

Q    That PTSD, in your opinion, stems at least, in part, from the sexual harassment you experienced, correct?

A    Correct.

        MR. SCHWEITZER:  Nothing further.

        MR. TUNG:  Your Honor, one question.

        THE COURT:  All right.

RECROSS-EXAMINATION

BY MR. TUNG:

Q    Ms. Figueroa, you just stated the settlement with the city was for physical injury but not for emotional, psychological injury, correct?

A    Correct.

Q    How do you know that?

A    Because it was for the injuries.

Q    For the injuries, how do you know the difference between

JEANNETTE FIGUEROA - RECROSS - MR. TUNG      147

all these injuries when you settle with the city?  How?  Was there any documentations?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    My lawyer stated that it was for the injuries.

Q    For the injuries.  Your lawyer separate the injuries into different categories, did he --

MR. SCHWEITZER:  Objection.  Privilege.

THE COURT:  Overruled.

A    I don't know, I didn't have a breakdown like that, I don't know.

Q    So isn't that true it was this lawyer here who lead you the questions --

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

BY MR. TUNG:

Q    So if you settle your claims with the city, that includes the security companies, right, that they hired, right?

MR. SCHWEITZER:  Objection.

THE COURT:  Do you know who the entities were that you settled your claims with?

THE WITNESS:  Allied Security, the city of New York, and the shelter.

BY MR. TUNG:

Q    According to the theory that you settled with the city

JEANNETTE FIGUEROA – RECROSS – MR. TUNG          148

only for partial of the injury that you suffered, correct?

A    Correct.

Q    What was left that was not settled with the city and other defendants?

A    I don't get it?  What did I get?

Q    What was left in the injuries that you suffered you didn't settle.  You only settle partial of the injuries with them?

          MR. SCHWEITZER:  Objection.

A    I don't get it.  I don't understand.

          THE COURT:  Overruled.  She doesn't understand your question.

BY MR. TUNG:

Q    In the settlement you had with the city, you just testified you only settle partial the injuries, sufferings that you had with the city, correct?

A    For the injuries, correct.

Q    And what was left that you decided not to settle with the city?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Sustained.

BY MR. TUNG:

Q    Is there anything that you think you should deserve to be compensated but you didn't ask the city to compensate you?

          MR. SCHWEITZER:  Objection.

JEANNETTE FIGUEROA - RECROSS - MR. TUNG        149

THE COURT:  Overruled.

A    I felt like it was for my injuries because when I asked for them -- that I was sexual harassed, and my salary wages that I worked for these people that it was more than just the injuries, they couldn't take that.  So that's why I had to look for another lawyer for that.

Q    Another lawyer for?

A    For my salary wages and sexual harassment.

Q    Salary wages, and that you can calculate, right, how much salary you're looking for salary and wages?

A    No.  I worked and did things that I wasn't supposed to be doing at the Howard Johnson.

Q    What do you mean you're supposed to do with -- let me understand a little bit.

So you said you had to look for another lawyer for salary and the time that you worked for that that you didn't get compensated?

A    Correct.

Q    That's one thing.  You also said sexual harassment.  I trying -- how do you quantify sexual harassment?

MR. SCHWEITZER:  Objection.

THE COURT:  This is beyond the scope of the redirect.

BY MR. TUNG:

Q    If you decided to settle with the city with partial of

your claims, then you coming back here to sue the employer here, right, the hotel for the rest, of whatever the sufferings that you think you should be compensated, right?

MR. SCHWEITZER:  Objection.  Sidebar?

THE COURT:  All right.

(Continued on the next page.)

(Sidebar conference.)

MR. SCHWEITZER:  This entire line of questioning about deciding to only settle part of the claims is predicated on a lack of foundation.  There is no record of what claims were brought in the first instance.  She didn't bring sexual harassment claims, she can't settled them.

MR. TUNG:  Your Honor --

THE COURT:  Not entirely correct.  She could have settled everything vis-a-vis those defendants.

MR. SCHWEITZER:  In any event --

THE COURT:  But not these defendants, they weren't party to that case.  Regardless of what she settled with Allied and the city, all of that, doesn't preclude her from bringing claims against these defendants.

MR. TUNG:  That's correct, your Honor.  But the only thing is if the claim against my client, let's say for $10, if she already get paid for her injury -- withdrawing the other answer.

If let's say the total injury she suffered is $100.  If she get paid by the city for $50, I'm entitled to ask questions --

THE COURT:  If the total that she settled for is $100 for physical injuries, even though she may have released other claims, all claims from the dawn of time to the end of time, as is typical in a Bloomberg release, doesn't mean that

SIDEBAR CONFERENCE                           152

she can't go after someone else for other claims.

MR. TUNG:  Your Honor --

THE COURT:  You don't have the settlement agreement, you don't have anything.

MR. TUNG:  He opposed, so I cannot introduce the rest of the documents.

Your Honor, I'm talking about not what she settled for.  I'm talking about what if she suffers the injury in the total amount is for a certain dollar amount, let's say $100, if she's already compensated for a party for $50 she can only go after another $50.

THE COURT:  It depends what she was compensated for.

MR. TUNG:  That's exactly his question, he started it.  You settled for emotional, psychology but not for physical.  So that's why I follow-up with the questions.  He separated it, not me, the plaintiff.  She settled for emotional, psychological.  That's what he said.  Now I'll follow-up, what else you didn't settle.

THE COURT:  She didn't sell for sexual harassment, which is what she's suing your clients for.

MS. CHEN:  Sexual harassment was not made by the hotel management.

THE COURT:  You're making a factual argument, and partly legal.  You'll argue that to the jury.

What you're dead wrong on, you're absolutely wrong

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

SIDEBAR CONFERENCE                         153

on, there is a lot of case law that says your clients could be on the hook for sexual harassment by third-parties by shelter guests.  You guys are completely wrong on that.  You're completely wrong on that.

MR. TUNG:  Unless -- I'm not saying -- that's a different issue, that's a different issue.

THE COURT:  It's part and parcel of this whole thing.  She sues your clients for sexual harassment she didn't sue the city and ally for sexual harassment, so regardless of her settlement with them, she has liable claims against your clients separate and apart completely from that.

MR. TUNG:  Okay.

THE COURT:  If she's trying to get --

MR. TUNG:  If she can prove.

THE COURT:  -- if she's trying to get damages for her physical injuries related to Robinson throwing the table in this lawsuit, then you would say you got an offset because she's already been compensated for those physical injury.

MR. TUNG:  The question counsel asked, right, she didn't settle for emotional, psychological injuries.  My understanding that his position is that those emotional and psychological injuries resulted from Robinson tossing that picnic table.

MR. SCHWEITZER:  No.

THE COURT:  No.  He's saying that Robinson tossing

SIDEBAR CONFERENCE                    154

the table is part of the sexual harassment.  She's entitled to

her emotional injuries based on that and the other conduct

that she was subjected to by the shelter guests.  Am I wrong?

MR. SCHWEITZER:  Not at all, your Honor.

MR. TUNG:  If that's the situation then I'm going to

argue later to the jury saying that they didn't establish

Robinson tossing the table, that event is related to sexual

harassment.  I understand, okay.  That's a different claim.

Yes, they can say it but we can say it's not related.  We'll

explain to the jury.  We'll argue before the jury.

THE COURT:  You'll argue to the jury.  Move on.

MR. TUNG:  I'll just finish, then I'm done.

(End of sidebar conference.)

(Continued on the next page.)

PROCEEDINGS                    155

(In open court.)

MR. TUNG:  Your Honor, I have no further questions at this time for this witness.

THE COURT:  Thank you.

Mr. Schweitzer, I take it you have no re-redirect?

MR. SCHWEITZER:  No, indeed, your Honor.

THE COURT:  Thank you, Ms. Figueroa.  You're excused.  You can sit down with your counsel.

THE WITNESS:  Thank you.

(Whereupon, the witness was excused.)

THE COURT:  Mr. Schweitzer, does the plaintiff have any further witnesses?

MR. SCHWEITZER:  No, your Honor.  Plaintiff rests.

THE COURT:  Okay, ladies and gentlemen, we are going to take a break now.  The plaintiff has rested her case.

And we are going to resume at 2:00 o'clock to hear from the defendants, the defendants' case, I believe they have two witnesses that will be testifying.

You're free to go back to the jury room, go out to get lunch, but be back here in the jury room a little before two so we can begin promptly at 2:00 o'clock.

Again, don't talk about the case, don't speak with the parties, keep an open mind, and enjoy your extended lunch break.

(Jury exits the courtroom.)

PROCEEDINGS                                    156

THE COURT:  Now that the plaintiff has rested, Mr. Tung, Ms. Chen do the defendants have any motions to make.

MR. TUNG:  Yes, your Honor.  I have a motion to make against the plaintiff for failure to establish a prima facie case.

THE COURT:  You've got to explain it a little more detail.

MR. TUNG:  Yes.

THE COURT:  I assume this is pursuant to Rule 50.

MR. TUNG:  Your Honor, there are two individual defendants here.  One of them is Henley Liang and the other one is the president of the hotel corporation Mayflower or Yan Zhi, all these defendants.

Now, the plaintiff failed to establish a prima facie case against these two individual defendants for the following reasons.

The law is very clear, when people -- first is the definition of employer here by the statute and the human rights New York City human rights law.  The definition for employer here does not include the individual defendants who is a shareholder of the corporation, who is a upper management of a corporation, that is why people doing business using the name under corporations.  So these people, the defendants here, the individual defendants here, do not have their personal liabilities for whatever the allegations here against

PROCEEDINGS                                                    157

those defendants for a non-employee, a third-party, a guest of the hotel or other people a third-party sexual harassment claims.  Those claims can only be against the corporation defendants.

If the corporation failed, the corporation not those individual defendants, if the corporation failed to do anything.  If they can prove the corporation after they learned about the incidents and they failed to do anything to prevent the same occurring in the future.  But that's the only liability against the corporation.

However, there is no liabilities against the individual defendants here.  Only under these circumstances if the individual defendants participate in the events, the injury, sexually harassed the plaintiff.  Such as, if they asked Mr. Robinson to toss the table, to attack the plaintiff. Out of all the evidence we have heard, there is nothing in the record indicates that those two corporate defendants in their individual capacity have done anything to participate the events that she alleged that she was being sexually harassed by the guests.

So that's why, your Honor -- also, even if she allege the employer created a hostile work environment, but even if that's true that's only the created hostile work environment was only created by the corporation not the shareholders, not the president or the manager in their own

PROCEEDINGS                           158

personal capacity.  We have heard no evidence that these two individual defendants personally, individually, did anything. For instance, she never even had a chance to talk to, she never even met with Ms. Hu, the president or the owner shareholder the owner of the hotel corporation.

That's why -- this is clear on the law I provided yesterday, I was asking -- there is no -- there is no triable defense here.

Even now, after all the evidence, there is nothing, not a shred of evidence, not a piece of evidence to hold these two individual, two defendants individually liable for the claims asserted by the plaintiff.  That's the only portion for this motion to dismiss against the two individual difficulties not the company because that's something for the jury to decide whether or not the company had created a hostile work environment or they had sexually harassed the plaintiff.

THE COURT:  Mr. Schweitzer.

MR. SCHWEITZER:  The law is very clear that an employer can create a hostile work environment not only by affirmative action but also by omission having received notice.  Here the record is clear that these two individuals did receive notice.  Every day Ms. Figueroa would report to Mr. Liang the incidents that had occurred the previous day. Most days these incidents included incidents of sexual harassment including indecent exposure, including other

PROCEEDINGS                          159

things.  We've heard testimony and we've seen documents from Mr. Liang saying, okay, I'm going to report to the boss.  I'm going to try to take action.  In point of fact, however, no action was taken.

Further, we've heard testimony that Ms. Hu had the final say over transfers between the two hotel locations operated by the Mayflower group the Howard Johnson and the Wyndham Garden.  A transfer was one of the remedies that Ms. Figueroa had requested and was apparently not offered and not granted.  Ms. Hu had the final say over that, that's her action and omission.

Finally, the assertion that there is no individual liability for a shareholder, distant shareholder, under the city and state human rights law, that I believe is not true, at least under the state human rights law, the city is different.  But, even if it were the case, here that shield from liability doesn't extend to individuals who are themselves employers, who have actual control over employees. That's why Ms. Hu's control over transfers in particular is so important.  It's also why --

The other thing I forgot to mention was, we have Jeannette (sic) coming over from the Wyndham garden to report to Ms. Figueroa, Jeannette Tiam to report to Ms. Figueroa, how Ms. Hu was reacting to Ms. Figueroa's treatment, particularly to the wet floor sign falling down on her.  She was laughing,

PROCEEDINGS                          160

she dismissed it.

Over the next few months, as things got worse, as the violence increased, she was hit with the table, as there were more and more reports of sexual harassment, stalking, indecent exposure, all piling up, there was no action taken. So we have Ms. Hu aware at the outset that Ms. Figueroa was reporting problems and Ms. Hu taking no actions.

We have Mr. Henley Liang aware every day there is problems and there is no action taken. There is a pattern of outward dismissal or willful blindness. This is something that employers can and should be liable for. As a matter of law there is no reason to dismiss under Rule 50.

MR. TUNG: May I respond shortly?

THE COURT: In a moment.

Putting that aside, Mr. Schweitzer, why shouldn't the Title VII claims be dismissed?

MR. SCHWEITZER: Against the individuals?

THE COURT: No, against the corporations. I know this wasn't something that Mr. Tung mentioned, but the Court has authority to sua sponte dismiss claims under Rule 50 where a party has been fully heard on an issue. And it seems to me that the plaintiff has failed to establish an element of her claim under Title VII; in that she testified early on in her testimony about the employees of the corporate defendants, she mentioned I believe only eight employees, there is a minimum

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

of 15 that are required under Title VII.

MR. SCHWEITZER: I see. Because there were only eight at the Howard Johnson, there is also the Wyndham Garden ones.

THE COURT: No testimony about that. That's her burden. I don't know that it matters because we're at trial and she still has her state and city human rights law that don't have an employee requirement, if I'm not mistaken.

MR. SCHWEITZER: No, that's correct.

THE COURT: And the state human rights law claim, I think it's hostile work environment claim is identical to Title VII standard.

MR. SCHWEITZER: Yes.

THE COURT: So it is no practical --

MR. SCHWEITZER: It's academic. For that reason, however, there is no reason to dismiss it at this point. There is still the defendants' evidence that is going to come in and that could establish --

THE COURT: It would make, at the very least, it makes the special verdict sheet a lot simpler because I would have to ask questions on each of the claims Title VII, state human rights law, city human rights law. If we remove Title VII because Ms. Figueroa hasn't established the requisite number of employees to trigger Title VII liability, it's a more streamlined case.

PROCEEDINGS                                        162

MR. SCHWEITZER:  I see.

THE COURT:  It's a practical concern.

MR. TUNG:  In addition, your Honor, what Mr. Schweitzer just mentioned, all those facts related to -- he's trying to support that the plaintiffs claim, again the individual defendants, is actually wrong because whatever he says -- whatever he described those facts, right, that actually are whatever they did, the individual defendants did. The facts that he just described they were on behalf of the corporation not in their individual capacity.  What the law says to the individual capacities, right, only if they participate; meaning, if I ask, if Ms. Hu ask a third-party to go to the --

MR. SCHWEITZER:  That's simply not true.  You can create an environment by malign neglect, as it were, if you know something is going on you take no steps to stop it, you're tolerating it, you're enabling it.

MR. TUNG:  That is not participating.  That's because the corporation, hotel corporation, failed to create working environment that the plaintiff seeking is a hostile work environment.  That's why I didn't make a motion to dismiss the claims again the corporation just against the individual defendants here.

THE COURT:  We're going to ruminate on this over the lunch break, look at the case law.  I understand the arguments

and we'll let you know before we continue with the defendant's case.

MR. TUNG:  All right.  Thank you.

MR. SCHWEITZER:  Thank you, your Honor.

MS. CHEN:  Your Honor --

THE COURT:  But we're going to, we are going to sua sponte dismiss the Title VII hostile work environment claim because Ms. Figueroa has not established the requisite number of employees to trigger Title VII liability.  Again it makes very little difference at the end of the day.

MS. CHEN:  Your Honor, we can offer the contract with --

MR. TUNG:  You don't need to because --

MS. CHEN:  Because the contract is contracting parties is Howard Johnson hotel is very clear not Mayflower --

MR. SCHWEITZER:  It's not in evidence.

THE COURT:  Not only is it not in evidence, but the contract that you put forth expired.

MS. CHEN:  No, it's automatically renewed.  It only signed one contract.

THE COURT:  The actual paper contract you submitted --

MS. CHEN:  Is automatically renewed.

THE COURT:  There is no evidence of that.

MR. SCHWEITZER:  There is no evidence of that.

PROCEEDINGS                        164

THE COURT:  And number two --

MS. CHEN:  The only signed one contract the same terms --

THE COURT:  Please.

MS. CHEN:  Sorry.

THE COURT:  Neither of the corporate defendants are parties to this contract.  It's between the city, Department of Homeless services and the Hotel Association of New York City.

MS. CHEN:  Actually the employer, the employer of the plaintiff is Howard Johnson hotel, is not Mayflower international hotel group.

THE COURT:  The time for you to have made this argument was long since passed.  We've got pay stubs from both of the corporation defendants to the plaintiff --

MS. CHEN:  Because.

THE COURT:  Those corporate defendants by virtue of those pay stubs are her employer. Period.  Done.

MS. CHEN:  No, because the defendant was chosen --

THE COURT:  Ms. Chen, we're done.  That's part one of your appeal, okay, if you get that far.

We'll break for lunch.  And we'll give you a response to this motion before we start with the defendants case.

MR. TUNG:  Thank you, your Honor.

PROCEEDINGS                165

MS. CHEN:  Your Honor, I just want to make sure Ms. Hu will testify because you know her defense attorney told me and he should have attorney from that office to be present when he was testifying.

THE COURT:  He's got every right to come and make whatever argument, and he can do it at 2:00 o'clock.  If he doesn't show it up --

MS. CHEN:  We are start Mr. Liang testify, he will be our first witness.

THE COURT:  -- and --

MS. CHEN:  I just make sure Ms. Hu to testify as well, I need to let him know when he should come.

THE COURT:  I don't know how long you'll be with Mr. Liang.  I have no control over that.

MS. CHEN:  But just make sure she has to testify.

THE COURT:  If Mr. Brafman wants to come.

MS. CHEN:  Mr. Lent will come, he emailed me yesterday.

THE COURT:  So then he can come.  You tell him when you think Ms. Hu is going to be testifying.

MS. CHEN:  Okay.  Thank you.

(Lunch break.)

(In open court.)

THE COURT:  I promised you a ruling on the, I guess it's Ms. Hu's motion, under Rule 50 for directed verdict as to

liability against her.  I want to clarify, is that just her or is it Mr. Liang as well?

MR. TUNG:  Both of them.

THE COURT:  Both of them, okay.

Succinctly, in no more than four sentences, without going through all of the evidence tell me what is the basis us for the motion?

MR. TUNG:  The basis of the motion is both defendants in their individual capacity, during the trial up until now, there is no evidence at all to support their allegations in their individual capacity because there is no evidence that they engaged or participated in their personal capacity.  Everything opposing counsel laid out for the Court, their involvement with the allegations sexually harassed the plaintiff was -- when they do this -- if there is anything on behalf of the corporation as the employee for the corporation. They themselves are not under the definition in New York human rights law, the employer.

THE COURT:  In making that argument you're relying on the case of Doe versus Bloomberg, 36 New York 3rd 450.

MR. TUNG:  Correct.

THE COURT:  I understand your argument.  We went back and took a look at Doe versus Bloomberg.  We looked at some other cases, and I am not clear that you are correct. I'm not clear that you're incorrect either.  It seems like

PROCEEDINGS                    167

there may be a blind spot, if you will, in the law as I understand it.

The Doe versus Bloomberg case was a very specific case of high ranking corporate officer who had nothing to do with anything that took place as far as discrimination or anything like that.  And the Court said that, yes, in that context that person is not an employer within the meaning of the state and city human rights law.  And there are cases since Doe in this Court and others that have interpreted Doe and come out with different results.

It doesn't seem to me that Doe does away with the older tests of when someone, an individual is an employer, someone who has the power to hire and fire and directly control the conditions of employment and all of that.  So it may be that that traditional way of determining if someone is an employer still exists.  But that solely by virtue of your title, that doesn't answer the question of whether you're an employer or not.  I don't know the answer to that.  So I'm going to defer ruling on the motion.

Defendants will put on their case, and you will get me letter briefs of no more than four pages single spaced as to citing, to the extent you can, post-Doe case law that says under the facts of our case, or something like or close to it, individual defendants like Ms. Hu and Mr. Liang can or can not be deemed employers under the state and city human rights law.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS                                 168

Because if they can, irrespective of Doe, be considered employers, even if they didn't take any affirmative action in relation to the hostile work environment, I think I have to deny the motion. Because there are traditionally two ways of individual liability under the state and city human rights laws. One, if you're an employer; and two, if you aided and abetted. I don't think aiding and abetting applies here. So if they are still employers and they didn't remedy the harassment when they knew of it and just let it continue, I think they are on the hook. So I'd like to see those briefs both sides.

MR. TUNG: I'll be more glad to provide the court. I did a quick research, I'm not sure what actually subsequent to Doe --

MR. SCHWEITZER: I briefed a similar issue in the state court. I can get that to you this evening.

THE COURT: That discusses Doe?

MR. SCHWEITZER: The same standard under the state and city human rights law, yes.

THE COURT: I want to see those by tomorrow.

And what we're also going to do is revise -- flush out the jury instruction and get that to you tomorrow as well, tomorrow morning.

We have Ms. Hu and Mr.-- first Mr. Liang then perhaps Ms. Hu, and then that's it?

PROCEEDINGS                      169

MR. TUNG:  That's it.  And tomorrow morning or afternoon --

THE COURT:  Tomorrow we go until 2:00 o'clock with no lunch break.  We'll go through with testimony and argument and the jury charge and all that, and maybe Thursday we'll do summations and charge and deliberations.

MR. TUNG:  That's fine.

THE COURT:  Okay.  Are we ready to bring in the jury?

MR. TUNG:  Yes.

(Jury enters the courtroom.)

THE COURT:  You may be seated.

Ladies and gentlemen we're going to proceed with the defendant's case.

Mr. Tung, call your first witness -- Ms. Chen, I'm sorry.

MS. CHEN:  I will call my first witness, Mr. Henley Liang.

(Witness takes the witness stand.)

**HENLEY LIANG,** called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT:  Madam interpreter raise your right hand.

(Interpreter sworn.)

THE INTERPRETER:  Yes, I do.  My name is Stephanie Liu.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

HENLEY LIANG – DIRECT – MS. CHEN                170

THE COURT:  If you need to use the chair, we've got the chair for you.

You may inquire, Ms. Chen.

DIRECT EXAMINATION

BY MS. CHEN:

Q    Hello.  Good afternoon, Mr. Liang.  Can you hear me?

A    Yes.

Q    Mr. Liang, can you speak your name to the record?

A    Henley Liang.

Q    Mr. Liang, when did you start work at Howard Johnson hotel?

A    In June 2020.

Q    What is your position at Howard Johnson hotel?

A    Hotel manager.

Q    Are you the representative of the hotel management?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    Yes, yes, correct.

BY MS. CHEN:

Q    Can you tell me the location of Howard Johnson hotel?

A    The hotel address is 3861 12th Street, Long Island City Queens.

Q    How did you become the manager of the Howard Johnson hotel?

A    During the pandemic I was unemployed and at that time

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

Ms. Hu offered me this position during the pandemic.

Q    Can you tell me how Howard Johnson become a shelter?

A    In May then because of the contractual relationship the Howard Johnson became a shelter.

Q    So is that correct why you become the manager of Howard Johnson hotel, Howard Johnson have already become, change into a shelter?

A    Correct.

Q    Can you tell me how many employees of the hotel working at Howard Johnson?

A    In the very beginning there were about seven employees, in the beginning.  Then later on because we needed more employees, then we hired more, and then there were about eight employees.

Q    Can you describe how many different kind of work are the employees of the hotel?

A    Front desk, maintenance, also some employees that do the housekeeping work.

Q    So you tell me, the hotel was a shelter and then do you know how many employees of the city are working at hotel?

A    In every shift approximately about 15 to 20 New York City employee working there.

Q    What do you mean shift, how many hours?

A    We have a three shift system, 24 hours a day.  Three shifts in each day, 24 hours around the clock.

HENLEY LIANG – DIRECT – MS. CHEN          172

Q    Do you know how many residents are staying at the hotel?

A    Approximately 250 residents in the hotel at that time.

Q    Can you tell me who are the residents?

A    They are all like homeless people who needed shelter, most of them have PTSD.

        MR. SCHWEITZER:  Objection.  Move to strike that last bit.  He's not competent to testify about their diagnosis.

        THE COURT:  I'll strike that last bit.  "Most of them have PTSD," that's stricken.

        MR. SCHWEITZER:  Respectfully, I request that the jury be directed to --

        THE COURT:  I've already told them, I think, if I strike testimony, they ignore it.

BY MS. CHEN:

Q    Can you describe who are the residents of the shelter?

A    Most of the residents were -- all the residents are veterans.

        MR. SCHWEITZER:  Objection.  Move to strike.

        THE COURT:  How do you know that, Mr. Liang?

        THE WITNESS:  Because at that time we were told by the managing entity that all the residents that would come into the hotel are or were veterans.  We were told that.

        MR. SCHWEITZER:  Move to strike as hearsay.

        THE COURT:  Overruled.

BY MS. CHEN:

Q    Can you tell me what is the gender of the residents how many male how many females?

A    All male.

Q    200 residents, they are all males?

A    Correct.

Q    Can you tell me who is in charge of the security of the shelter at that time?

A    The city was.

Q    So the city itself or the city hired some third-party company?

        MR. SCHWEITZER:  Objection.  Foundation.

A    They --

        THE COURT:  Overruled.

A    The city hired another management company to manage the security.

BY MS. CHEN:

Q    Do you know the name of the company who is in charge of the security of the shelter?

A    Allied, A-L-L-I-E-D management company, Allied Security Company.

Q    How many people are working at the Allied company?

        THE COURT:  I assume you mean at the shelter.

BY MS. CHEN:

Q    The security company, yes, beside the city staff.  And I

HENLEY LIANG – DIRECT – MS. CHEN            174

asked you how many people working for the security company only.

A    In every shift approximately about ten of them from Allied.

Q    Do you mean one shift.  How about total, do you know that?  Three shifts, one day so that they have about 20 to 30?

A    Approximately 30 of them, approximately, a day.

Q    So how many are -- they all the security workers?

A    They are all security guards, yes.

Q    Do they have both male and female?

A    They were all male.

Q    To your knowledge how many security workers are working in the lobby at any time of the day?

A    Approximately four to five of them.

Q    So how about the rest of them?  You said about ten, one shift, where are the rest of them?

A    The rest of them will be patrolling different floors.

Q    Over 200 residents of the shelter, to your knowledge how many residents are always sexual harass the employees of the hotel?

          THE INTERPRETER:  The interpreter does not understand your question.

BY MS. CHEN:

Q    How many residents are often sexual harassed the employee of the hotel?  Of 250 residents, residents is a guest of the

HENLEY LIANG – DIRECT – MS. CHEN            175

shelter, so I just ask Mr. Liang if you understand?

MR. SCHWEITZER:  Objection.  I don't understand.

THE INTERPRETER:  I'm sorry.  I don't understand your question.

BY MS. CHEN:

Q    My question is:  He just said there are 250, over 200 residents of the hotel, the guests of the hotel.  How many of them always sexual harass an employee?

THE COURT:  Sustained.

Q    How many of them always make troubles?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

Q    To your knowledge is there any residents, sexual harass the employee of the hotel?

A    You mean that they sexually harass our people?  Is that what you mean by the question?

Q    If any, yes?

A    Yes, the plaintiff informed me about it.

Q    So how many of them always do this?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

Q    So how did you hire the plaintiff?

A    I advertised the position in Indeed.  Afterwards the plaintiff applied through Indeed.  Then I did an interview of her.

HENLEY LIANG – DIRECT – MS. CHEN          176

Q    Where did you interview the plaintiff online or on site or telephone?  Where did you interview?

A    I met her and did the interview in the front desk of the hotel.

Q    Did you remember what she said about this job?

A    She was interested in giving a try to this job.

Q    Does she have any experience?

         MR. SCHWEITZER:  Objection.

         THE COURT:  I'll allow it.  You can answer the question.

A    She did not have any experience in this sort of job.

BY MS. CHEN:

Q    Has she worked at any hotel?

         MR. SCHWEITZER:  Objection.  Calls for speculation.

         (New interpreter.)

         (Interpreter sworn.)

         THE INTERPRETER:  I do. Iching Ng.

         THE COURT:  Overruled.  You can answer the question.

         THE INTERPRETER:  Can you repeat the question?

BY MS. CHEN:

Q    Has she ever worked at any hotel before she got the job at Howard Johnson?

A    She worked at Wyndham before.

Q    What position at that hotel?

A    She was greeting the guests at the hotel.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

HENLEY LIANG – DIRECT – MS. CHEN          177

Q    Is that a job for the front desk?

A    At our hotel that would be what the front desk person would do.  Besides that, he (sic) did not have other experience working at the front desk.

Q    Do you have right to hire her or do you have to ask your boss?

A     If that position is available then I could just hire her. If I create a new position, I need the approval of the boss.

Q    Did you tell her the Howard Johnson hotel was a shelter at that time?

A    Yes.

Q    Have you asked her if she has ever worked at a shelter?

A    Yes.

Q    What did she say?

A    She had no experience.

Q    So did you decide to hire her finally?

A    Yes.

Q    Did you remember when did she start work?

A    Around April.

Q    Did you remember how much he was paid at that time?

A    Fifteen dollars per hour.

Q    Do you understand standard how much will pay employee?

         MR. SCHWEITZER:  Objection.  Relevance.

         THE COURT:  Sustained.

BY MS. CHEN:

Q    How did you decide her starting salary?

A    That would be based on her experience.

Q    Anything else?

A    I would also consider whether she has any special skills or permits.

Q    So at that time how many people are working at the front desk?

A    Three to four people.

Q    How many shifts do you have on the front desk?

A    Three shifts.

Q    Can you recall when did she start working and when she finished her work every day?

A    From 3:00 p.m. to 12 midnight.

Q    What was her job duty?

A    Her duties would include making the room keys and sometimes she would get the towels.  If anything happened and I was not around, she would inform the house manager of the management company.

Q    So was her position at the front desk?

A    Front desk receptionist.

Q    Is there any employee was under the supervision of the plaintiff?

A    No.

Q    Why do the plaintiff say he (sic) was supervision of the another co-worker named Fiona can you describe --

MR. SCHWEITZER:  Objection.

THE COURT:  Can you rephrase the question, please.

BY MS. CHEN:

Q   Why did plaintiff say he was the supervisor of another employee Fiona?

MR. SCHWEITZER:  Objection.

THE COURT:  Mr. Liang, did Ms. Figueroa supervise Fiona?

THE WITNESS:  No.

BY MS. CHEN:

Q   So why did she say he (sic) was, you know, supervise her?

MR. SCHWEITZER:  Objection.

THE COURT:  Ms. Chen, I don't know that Mr. Liang could know why Ms. Figueroa would say anything.  It's in how you're asking the question that's improper.

Do you know why Ms. Figueroa would say that she supervised Fiona?

THE WITNESS:  Since we took care of each other, if somebody needs help we would take a look.  I'm not sure if she misunderstood that as supervising.

BY MS. CHEN:

Q   So what was Fiona's job duty?

A   She worked in the laundry room.  She would clean the bed sheets, towels, and she would pick up trash from each floor.

Q   So what occasion do they work together?

HENLEY LIANG – DIRECT – MS. CHEN          180

A    If Fiona needed someone to accompany her, that may happen.  But the plaintiff work at the front desk and Fiona works somewhere else, so normally that should not happen.

Q    So is that correct in Figueroa was not working that day, somebody else will go with Fiona as well?

MR. SCHWEITZER:  Relevance.

THE COURT:  Overruled.  You can answer.

A    If Fiona has such a need she can get someone from the front desk to help her.

BY MS. CHEN:

Q    Is it the requirement from the hotel management to ask the front desk receptionist to accompany the laundry worker when they are cleaning the guest, the residents' room, is that a requirement from the hotel?

A    Yes, it depends on the needs when they were cleaning upstairs.  Let's say they finish all the cleaning detergents or ran out of towels, then we need to replenish them.  Or if some guests are troublesome, we need to take a look.  So they would either call me or call the management company.

Q    Can you tell me about the procedure for reporting the, for example, the sexual harassment, if they have any complaints from the employee of the hotel and who will report?

A    First of all, if I was around, you can just tell me and I'll inform the house manager Sarah.  If I was not around --

THE INTERPRETER:  Interpreter would like to repeat

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

the answer.

A      First of all, if I was around you can just tell me directly and I would tell the house manager or Sarah.  If I was not around then you can just tell the people who are on site.

Q      Can the employee report to the shelter management directly?

A      Yes.

Q      So why you have the complaint from the employee did you report to your boss Ms. Hu first or did you report to the shelter management first?

A      The shelter management.  Because they just sat right opposite us, across us.

Q      So why you report the complaints to the shelter management?  Do they have a procedure how soon they will you know give you a feedback response?

A      Typically we would be facing each other, so the response would be instant.  If it's a major incident then we will send out email and they had to reply within five days.

Q      Is that reply orally or in writing?

A      If I was talking to them verbally, they would give me a verbal reply.  If I send an email, then the reply will be a written one.

Q      If you think their security is not enough, can hotel hire their own security workers for the hotel?

HENLEY LIANG – DIRECT – MS. CHEN          182

A    That is not allowed.  According to our contract the management company will be responsible for all the security staff.  So we had to go through their security company to protect our employees.

Q    Did you sign the contract with the city on behalf of the management, hotel management?

A    No.

Q    Did you have an opportunity to review the contract between the city and the hotel?

A    Yes.  After I was hired I would do that initially.

Q    So how about the residents?  If you have a complaint about the residents of the shelter, the hotel management, the hotel management have the right to dispose this dispute?

A    No, the hotel would provide a place of stay and also maintenance of the building and housekeeping and the room card services, so we only provide that.  The management, people of the shelter, they would have the management program and they would provide security.

Q    Can you just tell me, when did you, the Howard Johnson, become shelter?  How long is that program to your knowledge?

A    It should be from May of 2020 to September or early October of 2021.

Q    Do you renew the contract with the city every year?

A    No, it should be renewed automatically.

Q    To your knowledge, during your employment at the Howard

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

HENLEY LIANG – DIRECT – MS. CHEN            183

Johnson hotel, has Howard Johnson hotel ever signed a contract with any other Government agency?

A    After this program ended we had another program, but at the time I no longer worked there, so I don't know.

Q    When was the last day you work at the Howard Johnson hotel?

A    November in 2021.

Q    So from -- is it correct from June 2020 until November 2021 is Howard Johnson hotel was always the shelter for the veterans; is that correct?

A    I think it was until September or early October, because we under went refurbishment.

Q    To your knowledge, have any terms and the conditions of the hotel agreement with the city ever changed?

A    No.

        MS. CHEN:  Defendant move to mark the copy of the hotel agreement with the city as Defense Exhibit B.

        MR. SCHWEITZER:  Objection.  Exhibit B is the photograph of the lobby.  And it's already in evidence.

        THE COURT:  The contract, I think, is Exhibit A.

        MR. SCHWEITZER:  That's how it's marked in the pretrial order, yes, your Honor.

        THE COURT:  Any objection to that?

        MR. SCHWEITZER:  The motion is to mark it, so I don't know what I'm supposed to be objecting to.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

HENLEY LIANG – DIRECT – MS. CHEN          184

THE COURT:  You want to offer Exhibit A into evidence, Ms. Chen?

MS. CHEN:  Yes.  I have the complete copy of the hotel agreement with the city and the contract, Mr. Liang talk about.

MR. SCHWEITZER:  Objection.  Lack of authentication. This witness testified sight unseen about a contract but not about any particular document to be offered into evidence.

THE COURT:  I'll receive it in evidence.

(Defense Exhibit A, was received in evidence.)

MS. CHEN:  So can I publish?

THE COURT:  Yes.

MS. CHEN:  I want Mr. Liang to look at this document and to tell me which provision in this contract regarding the responsibility of the city or hotel.

MR. SCHWEITZER:  Objection.  The document speaks for itself.

THE COURT:  Do you have particular thing you want to show him?

MS. CHEN:  I want to show the first ten pages.  I want Mr. Liang to point out because he talk about according to the contract.

THE COURT:  You can approach the witness.

MS. CHEN:  Okay.

BY MS. CHEN:

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

Q    What kind of document is it?

A    This is the contract between the hotel and the city.

Q    Can you just briefly review this the contract to see if there is any provision, you're talking about the security, anything you said based on contract?

A    There is a provision here saying that they will provide the security 24 hours and other than contacting, the guests would have to go through the security.  We cannot have our own security.  We have to use their security.

Q    Can you tell me which page and which section?

A    On page three, section two.

Q    Can you tell me, you mentioned about the reporting procedure for the dispute of residents.  Can you find any provision in the contract regarding this procedure?

A    It will be on page seven, section five.  If there is any issue with the guest in the shelter, we have to go through the city or DHS to inform them about it and they would handle it with the resident.  So if there is an issue we have to go through them.

            MS. CHEN:  I think I finish.

            THE COURT:  I can't hear you.  You can go back.

            MS. CHEN:  Thank you.

BY MS. CHEN:

Q    There are many complaints from the plaintiff, so I just want you to confirm?

MR. SCHWEITZER:  Objection?

BY MS. CHEN:

Q    Ms. Figueroa --

THE COURT:  I don't know what the question is.

MR. SCHWEITZER:  Neither do I, hence the objection.

THE COURT:  Sustain the objection.  Rephrase your question.

BY MS. CHEN:

Q    The plaintiff once said, you know, all the complaints have to go through you, the hotel manager before reporting to the shelter management; is that correct?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

A    When I was at work she could have told me about it.  But when I was off work, she could also tell the house manager of the shelter.

BY MS. CHEN:

Q    Can you give me example who are the representative of the shelter management?

A    Mr. Green, Mr. Cheek.

Q    So beside their name please tell me what is their position in the shelter management as well?

A    They are both house managers.  And Sarah is a director. And then also there was some social workers that were there too, but that I do not know these social workers names.  There

HENLEY LIANG – DIRECT – MS. CHEN          187

is a guy there who is in charge of security and his name is called Sunday.  And Sunday supervises all the security guards. Then there is some housekeeping staff.

Then in terms of housekeeping mostly with Miranda, all these people I just mentioned are people from the shelter side.

Q    I just asked you from the shelter side.  So who is the highest representative of the city?

A    Sarah.

Q    Can they report to Sarah directly or they have to go through their procedure to report?

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.  If you know.

A    Yes, correct they all report to Sarah.  Sarah is located on the 12th floor and our hotel physically, anyone can just go up there to see her on the 12th floor.

BY MS. CHEN:

Q    To your knowledge when they report to the shelter management, did they respond to their complaints?

A    If there is a complaint they would tell me that they would handle it, they will deal with it.

MR. SCHWEITZER:  Move to strike.  Hearsay.

THE COURT:  Overruled.

BY MS. CHEN:

Q    At one time the plaintiff has said, when she complains

HENLEY LIANG – DIRECT – MS. CHEN          188

about the sexual harassment from the residents you said:  Bear with it.  Have you said that?

THE INTERPRETER:  What is it?

MS. CHEN:  Bear with it.  He said bear with it.

BY MS. CHEN:

Q    Have you said that?

A    No, I would handle it.  I would talk to the person that is the house manager who is sitting right opposite me.

Q    Have you ever discouraged your employee from reporting to the police?

A    No, I have not.  In fact, I actually encouraged them to report it to the police if anything happens or anything bothers them.

Q    Have you told them if you report to the police, and the hotel will lose the contract with the city.  Have you said that?

A    No, I have not.  At that time it was not a matter of concern, a matter of consideration to us at all.

Q    Can you decide if the hotel the sign the contract with the city or not?

A    I do not have such an authority.

Q    Now I'm talking about some incidents the plaintiff talk about earlier.  Have you heard of the resident called Besley?

MR. SCHWEITZER:  B-E-A-S-L-E-Y.

THE INTERPRETER:  Thank you.

HENLEY LIANG – DIRECT – MS. CHEN                189

A     Yes, I'm aware of it, yes.

Q     Do you know which floor did Besley live in the hotel, which floor?

A     Second floor.

Q     Do you know Besley ever ask Ms. Figueroa to go with her to the subway station, have you heard of that?

A     I only heard it directly from the plaintiff.

Q     So what did plaintiff told you about it?

A     She said to me that Besley wanted to accompany her to the subway station.

Q     So why did plaintiff tell you about that?

A     She wanted me to stop him from doing that.  So at that time all I could do was to just to inform the management, the shelter people.

Q     So have you reported to the management of the shelter?

A     Yes, I did.

Q     Have you told Ms. Figueroa to call the police?

A     Yes, I told her, and everyone else that if there is a need to report to the police go ahead and report it to the police.

Q     Did you require her to walk with Besley to the subway station after work?

A     So after work, anytime after work is her own personal time, no.

Q     To your knowledge, has Ms. Figueroa ever called the

police regarding this incident?

A    I heard that she has called the police and then she had to wait for the police to arrive.

THE INTERPRETER:  Correction.

A    I have heard that she had actually called the police but she did not wait for the police to arrive.

Q    Was the request of Ms. Figueroa from the hotel management regarding this incident?

THE INTERPRETER:  I don't understand your question.

Q    What was the purpose of Ms. Figueroa to you tell you about this incident?

A    She wanted me to prevent this from happening, to intervene.  I also related and reported this to the shelter management and she herself also called the police.  And if there is nothing else that happened, that actually happen from that, there is nothing else I could do.

Q    Now let's talk about the incident occur April 2021.  Were you present at hotel when this incident happened to the plaintiff?

A    No, I was not present.

Q    How did you learn about this incident?

A    At that time the plaintiff informed me about it and also the house manager also informed me about it.

Q    Can you describe from their description what happened that day?

HENLEY LIANG – DIRECT – MS. CHEN                 191

MR. SCHWEITZER:  Objection.

A    At that time --

THE COURT:  Hold on.

What did the plaintiff tell you about this incident?

A    At that time Besley kicked that sign on the floor and then that sign that he kicked then hit the plaintiff.

Q    Did the plaintiff call you immediately after that happened?

A    Yes.

Q    So what were you doing at that time?

A    I was at home.

Q    So how did you respond to her?

A    So I said to her, talk to the house manager on site.

Q    So after that, did you get any response from house manager or plaintiff?

A    Then afterwards the house manager told me that, so the house manager asked the plaintiff if she wanted to file the police report and she said no.

Q    So did plaintiff finally file a police report or not to your knowledge?

MR. SCHWEITZER:  Objection.

THE COURT:  Do you know?

THE WITNESS:  I do not know.

BY MS. CHEN:

Q    Did you told plaintiff not to file the police report?

HENLEY LIANG – DIRECT – MS. CHEN          192

A     No.

Q     Did you tell the plaintiff:  You should call the police?

A     I said to her that if you feel that it was a need to do that, then you go ahead and file the police report.

Q     Have you seen any video footage about this incident?

          MR. SCHWEITZER:  Objection.  Calls for hearsay.

A     No.

          THE COURT:  Overruled.

A     I have not seen it, I have not seen it.

Q     To your knowledge, do you know if Ms. Hu has ever seen this video footage?

A     I don't know if she did or not.

Q     Have you ever reported this incident to Ms. Hu?

A     Yes, I did.

Q     When did you report it?

A     A couple of times a week, a couple of times a week I would report to Ms. Hu weekly.

Q     To your knowledge, had Ms. Hu laugh at the plaintiff when he (sic) see that, he (sic) know about this incident?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A     At that time when I reported this to her, she did not.

Q     So now talk about the incident, June 4, 2021.  Were you at hotel when this incident happened?

A     At that time, no, I was on my way home.

Q    Did you remember what time it is?

A    Sometime after 6:00 p.m.  At that time after 6:00 p.m. in the afternoon I was stuck in traffic in a highway on my way home, I was stuck in traffic.

Q    Did you receive a phone call from the plaintiff around that time?

A    I forget whether she called me or whether it was Fiona who called me.

Q    Is that her shift at that time?

          THE INTERPRETER:  The "her" means which one?

          MS. CHEN:  The plaintiff, Ms. Figueroa.

A    Yes, it was.

Q    During his (sic) working shift or starting or finished?

A    She started her shift at 3:00 p.m. and when this incident happened sometime around 6:00 p.m. that was in the middle of her shift.  It was her normal working hour.

Q    So at that time did you know what happened?

A    At that time I heard she was being thrown at by a table, because at the time I was not present so I did not know what actually happened.

Q    Did you see the video the plaintiff just played earlier at the trial?

A    Yes, I did.

Q    You got a phone call or text message from plaintiff or Fiona?

HENLEY LIANG – DIRECT – MS. CHEN          194

A     By phone.

Q     So what did you respond?

A     I told her that I was actually stuck in traffic, I couldn't do anything.  I told her to report this to the police herself.

Q     To your knowledge, did she report to the police?

A     Yes.

Q     To your knowledge, did city call the ambulance or not?

A     I don't know.  Normally speaking, I think the EMT would come.

Q     I'm sorry can you repeat that, I didn't hear?

A     Normally speaking ambulance will come.

          MR. SCHWEITZER:  Objection.  Move to strike.

          THE COURT:  I'll strike the latter part of that answer.

          MR. SCHWEITZER:  Everything after "I don't know."

          THE COURT:  Correct.

BY MS. CHEN:

Q     After that, did you ever ask the hotel -- not the hotel, shelter management about how did they resolve this issue?

A     Yes, I did.  I did not know who actually called the EMT and but no matter what, the ambulance came.

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A     But the people there said that she was okay.  She

HENLEY LIANG – DIRECT – MS. CHEN                195

continued to work on that day.  Afterwards she said she was okay and then afterwards when she finished her shift then she went home.  She should have finished her shift at midnight but she said that she was in pain, then she left early and then she went home early because of pain.

Q    After that, can she still work at the front desk?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

Q    After that incident, can Ms. Figueroa still work --

THE COURT:  Sustained.

Did she come to work after that?

THE WITNESS:  She would come on and off.  Sometimes she would say she was in pain, she would not come, but sometimes she would come for a day or two.

BY MS. CHEN:

Q    So does she have any request after this incident?

A    Yes.  She wanted to work in another hotel.

Q    Can you tell me the name of the hotel?

A    Wyndham Gardens.

Q    Can you tell me the location of that hotel?

A    6127 186 Street Fresh Meadows.

Q    Is that regular hotel or also shelter?

A    It's still a shelter.

Q    What kind of shelter it is?

A    It's a halfway house so for the newly released prisoners

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

before they could find a place to stay this will be their temporary home.

Q    Do you have authority to transfer Ms. Figueroa to this hotel?

A    Since I'm not managing that hotel, I do not have the authority.

Q    Who has authority?

A    Janice Tian.

Q    Who is Janice Tian?

A    She is the hotel manager at that location.

Q    To your knowledge, is there a vacancy at that hotel or shelter?

A    Initially there were no vacancies, but later on there was a vacancy working the night shift in the wee hours.  But the plaintiff said she did not work in the evening so there were no other vacancies.

Q    How did you know she didn't get the job from that hotel?

A    Janice told me that.

Q    Did you ask Janice to transfer her or Ms. Figueroa ask Janice to transfer her directly?

A    I did ask for it and I believe the plaintiff also asked for it as well.

Q    Does Ms. Figueroa knew this hotel was also a shelter?

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

HENLEY LIANG - DIRECT - MS. CHEN          197

He already testified it was a halfway house, correct?

Q    Did plaintiff knew this is a regular hotel or it is a shelter?

MR. SCHWEITZER:  Objection.

THE COURT:  Halfway house.

When Ms. Figueroa suggested a transfer, to your knowledge did she know if the Wyndham garden was a regular hotel a halfway house or anything else?

THE WITNESS:  She should have known because Wyndham gardens became a halfway house much earlier than we did.  Once Wyndham gardens became a halfway house, about a month or two months later we became a shelter.

MR. SCHWEITZER:  Move to strike.  It's speculation "she should have known.""

THE COURT:  Overruled.  Motion denied.

How much more do you have with Mr. Liang because we need to take a break at some point, a mid late afternoon break?

MS. CHEN:  Okay.

THE COURT:  Take a break now?

MS. CHEN:  Yes.

THE COURT:  Okay, ladies and gentlemen we'll take a 15 minute break and we'll be back at 4:25 p.m.

My intention -- we'll see how things play out the

HENLEY LIANG – DIRECT – MS. CHEN          198

rest of the day.  I'm not going to promise anything.

(Jury exits the courtroom.)

THE COURT:  How much more do you think you have, Ms. Chen?

MS. CHEN:  I think very soon, no more than half an hour.

THE COURT:  What do you think you have, Mr. Schweitzer?

MR. SCHWEITZER:  Let's see, I have about four single spaced notes from the direct, probably about an hour.

THE COURT:  All right.  It would be nice to -- we'll have redirect too.  We'll just play it by ear as they say.  Recess.

(Brief recess.)

(Jury enters the courtroom.)

THE COURT:  You may be seated.  Thank you.

You may continue, Ms. Chen.

MS. CHEN:  Yes.

BY MS. CHEN:

Q    Mr. Liang, have you ever been sexual harassed by the residents of the hotel?

A    Yes, for sexual harassment and other regular harassment, and all type of harassment.

Q    So how often did you be harassed by the residents?

A    Sometimes it would be every week, sometimes it's every

HENLEY LIANG – DIRECT – MS. CHEN          199

day, it depends on the condition of the day.

Q    So how many residents always sexually harassed you or your employee?

A    Typically about five people.

Q    To your knowledge has other front desk receptionist been sexually harassed by the residents of the shelter?

A    Same as me, sometimes it happened, sometimes they would come up and talk to; if you just ignore them they will be fine.  Sometimes they would harass you, it depends on the condition of the day.

Q    Do you think you are sexually harassed because of your gender, your sex?

        MR. SCHWEITZER:  Objection?  Question presumes a conclusion:  Sexual harassment is done because of sex.

        THE COURT:  Why don't you ask the question a different way, Ms. Chen.

BY MS. CHEN:

Q    Do you think you're sexually harassed by the residents because you're a male?

        MR. SCHWEITZER:  Objection.  That's the same question.  It wasn't even rephrased.

        THE COURT:  Mr. Liang, do you think you were harassed by these residents because of your sex or gender?

        THE WITNESS:  Since they would harass anyone, I don't think so.

HENLEY LIANG – DIRECT – MS. CHEN          200

BY MS. CHEN:

Q    Is that harassment serious enough where you cannot continue your work?

A    No.

Q    So this is general question.  After the incident of June 1st, 2021, what action did hotel management take to protect the security of the hotel employee?

MS. CHEN:  If it's too long, you can break into several parts, otherwise the interpreter cannot finish.

THE COURT:  Let the interpreter interpret.

THE INTERPRETER:  Interpreter just asking the witness to pause.

A    First of all, we would ask the head of the security who was on duty to come sit next to us for each shift at the front desk to look at the security camera.  This request was refused by the plaintiff because she did not want to have any male around her.  So besides her, each person would have the security person sitting next to him or her.  If something were to happen then the security person can look at the surveillance camera right away.

And secondly, when it comes to cleaning the rooms, we would ask a group of cleaning staff go to a room together so that person would not be going up to the room alone.  And sometimes the front desk personnel would also go up as well to see what is going on.  Let's say someone doesn't want you to

HENLEY LIANG - DIRECT - MS. CHEN          201

go up and clean the room, that person --

THE INTERPRETER:  Interpreter would like to correct.

A    Let's say when it comes to the cleaning time for the room, the resident within the room doesn't want to come out, I would ask the staff to inform me, then I would ask the house manager to go up there and ask that person to leave the room. We would like to reduce the number of interactions between the guests and staff.  For instance there is a need to make the room keys, then the house manager would inform us about it so we would make a key and place it at the front desk.  Then the security guard would give the key to the guest.

Four, we cannot stop anyone from reporting to the police.  After this incident happened, we also called the police, and I did not stop anyone from calling the police. And no one was being penalized for calling the police.  That's it.

Q    The first one I want you to point out, you said the security director you sit in the front desk.  Can you point out from the picture we have we showed earlier where in the front desk the security guard sit?

MR. SCHWEITZER:  Is this supposed to be broadcast? Because it's not.

THE COURT:  This is Defense Exhibit B.

BY MS. CHEN:

Q    Mr. Liang, can you describe where the security guard will

HENLEY LIANG – DIRECT – MS. CHEN                202

sit at the front desk?

A    Looking from this direction the security guard would sit next to the computer on the left-hand side because from there he or she can look at the surveillance camera.

Q    You said plaintiff refused to let the security director to sit next to her.  How did you know that?

A    It's because Sunday, the security guard told me about this directly.  She refused to have any male person sitting next to her.

            MR. SCHWEITZER:  Move to strike.  Hearsay.

            MR. TUNG:  This is statement against the --

            MR. SCHWEITZER:  This a statement by the security guard.

            THE COURT:  Stop.  I'll allow it.  Overruled.

A    After --

            THE COURT:  The question has been answered already, right?

            MR. TUNG:  Correct.

            THE COURT:  Ask another question.

BY MS. CHEN:

Q    Mr. Liang have you ever confirmed with Ms. Figueroa why she doesn't want the security guard to sit next to her?

A    It's because she felt if there is a male person next to her, she doesn't feel safe.

            MS. CHEN:  I have no more questions.

THE COURT:  We're going to go to 5:30.

MR. SCHWEITZER:  We'll make some progress, your Honor.

Before I inquire, this interpreter needs swearing in.

(Interpreter sworn.)

THE COURT:  State your name.

THE INTERPRETER:  Weiyn Ye.

THE COURT:  You may inquire.

MR. SCHWEITZER:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. SCHWEITZER:

Q    Mr. Liang, when Ms. Figueroa applied for a job at Howard Johnson she was answering an Indeed post that you had made, correct?

A    Yes.

Q    And you don't have a copy of that posting to show to this jury, do you?

A    No.  After I resigned I stopped using the company account any more.

Q    From your memory, it's true, isn't it, that the Indeed posting didn't mention that the job was to work in a men's shelter, correct?

A    I'm not sure.

Q    Once Ms. Figueroa applied for the job to work at the

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

LIANG – CROSS – MR. SCHWEITZER                204

front desk at Howard Johnson you interviewed her, correct?

A    Yes.

Q    And this was about in April 2021, right?

A    Yes, about that time.

Q    You interviewed Ms. Figueroa in English, correct?

A    Yes.

Q    And she spoke to you in English and you understood her, correct?

A    Yes.

Q    Once she was hired you also text messaged with Ms. Figueroa in English from time to time, correct?

A    Yes.

Q    You understood her English text messages to you?

A    Yes.

Q    Did you use Skype to communicate with Ms. Figueroa?

A    No.

Q    Showing you a copy of Plaintiff's Exhibit two, which is in evidence.  Publish to the jury, please?

          THE COURT:  This is in evidence?  Okay.

          MR. SCHWEITZER:  Yes, Exhibit Two is in evidence.

BY MR. SCHWEITZER:

Q    In particular, this text message here on May 15, this is yours, right.  I can't make marks on my screen, so this one?

A    Yes, should be me.

Q    This logo up top here, that's for Skype isn't it?

LIANG – CROSS – MR. SCHWEITZER                205

A     This is to used Skype to call, but the app itself is not Skype.

Q     I see.  On May 15, 2021, in response to Jeannette's concern for her safety you said:  I understand.  I will take care of it correct.

         Those are your words?

A     Yes.

Q     What occurred on July 28, 2021 such that Jeannette had to take the tech guy to the sixth floor?

A     I do not recall the details.  We, our hotel needs to be inspected from time to time, so that's probably why the tech guy was mentioned here.

Q     It was part of Jeannette's job to escort him to where he needed to go, show him how to lock a lock, and otherwise offer her help if he needed it?

A     Part of the receptionist work, yes.

Q     Going back to May 15, did Ms. Figueroa ask you to talk to the house manager Sarah and say that and ask for security to essentially be a middle man between her and residents so residents didn't interact with her directly?

A     Yes, I have talked to Sarah about this issue.

Q     You say, these are your words at 10:07:  Of course also ask security to redirect them.

A     Yes.

Q     Was that a direction to Ms. Figueroa that she should ask

security to redirect the guests or were you saying I will also ask security to redirect them?

A    Because when the incident happened I was not there working, so when things happened at the time you have to tell people who were actually there.

Q    Okay so this was an instruction to Ms. Figueroa, correct?

A    Yes.

Q    Come the next Monday after, May 15, did you in fact talk to Sarah?

A    I have talked to Sarah on different days, but I'm not sure if it was exactly on that date.

Q    You don't have a record of when you spoke to Sarah or what you said to her, correct?

A    Because Sarah's office was in the building where our office was, so if anything happened I could talk to her directly, otherwise I could email her.  But now I do not have the authority to the company, so I cannot have it.

Q    You also don't have any of emails to Sarah to show to this jury, do you?

A    Not now.

Q    You didn't write-up any incident reports, did you?

A    Because she said in front of us we could just tell her.

Q    Sarah told you you didn't have to write any incident reports?

A    No.  Because usually we talked face-to-face so we do not

write it down.

Q    My question was, was it Sarah who told you not to write any incident reports or was it someone else?

A    Not Sarah.

Q    Who was it who told you not to write any incident reports?

A    Because we already communicated about it, so our mutual understanding is that we did not need to write it down. Sometimes if it's needed and then we would write it down in emails.

Q    I'm asking you, who told you?  You said somebody spoke some words to you and that you understood that from those words you shouldn't be writing down incident reports.  Who spoke those words to you?  What person?  What is their name?

A    Nobody.

Q    So nobody told you you shouldn't write incident reports?

A    Correct.

Q    You decided on your own hook not to write incident reports, correct?

A    Correct.  Based on the fact that we had this mutual understanding.

Q    What mutual understanding?  That you shouldn't write incident reports?

A    Yes.  Because we all knew about it and she said she would handle it.  So my understanding was that I did not need to

LIANG – CROSS – MR. SCHWEITZER                    208

write it.

Q    Was Ms. Hu involved in coming to this so-called mutual understanding that you shouldn't write incident reports?

THE INTERPRETER:  Say it again?

BY MR. SCHWEITZER:

Q    Was Ms. Hu involved in coming to that understanding that you shouldn't write incident reports?

A    No.

Q    Referring to June 25, 2021 again.  What did you understand by the phrase:  Fix my time to midnight?

A    Because she wanted to leave at 8:00 p.m. but she wanted to receive all the payment so she wanted me to change the time to midnight.

Q    Was Ms. Figueroa's regular clock out time around midnight?

A    Correct.  Her shift was from 3:00 p.m. to 12 midnight.

Q    There is no question before you, sir, you answered it.

Referring to August 14, apparently Mr. Cheek wrote an incident report regarding the spitting incident with Fiona. Did you ever see this incident report?

A    No, that's their internal incident.  We did not have the authority to read their internal reports.

Q    Did you make a report on your end?

A    No.

Q    Ms. Figueroa used the term sexual harassment to you on

LIANG – CROSS – MR. SCHWEITZER                209

August 14, did you investigate any further into what happened?

A    No, I believe what she said.

Q    Did you interview Fiona?

A    Yes, she also told me directly.

Q    And you believe both of these women when they said an incident of sexual harassment had occurred, correct?

A    I believed both of them.

Q    You didn't take any action to prevent a reoccurrence, did you?

A    I could only tell their management to send more security guards for patrol and if it's needed to escort them upstairs.

Q    Did you put such a request in writing on or after August 14?

A    No, but it's everybody's understanding, the security guards also had that understanding.

Q    On June 6, 2021, Ms. Figueroa asked you to talk to Janice Tian about a transfer to the Wyndham garden, correct?

A    Correct.

Q    These are your words:  Just stay behind the desk and please wait until I get a replacement.

A    Yes, those are my words.

Q    Coming back to the start of Ms. Figueroa's employment. You hired her for the front desk position, correct?

A    Correct.

Q    , and you decided that Ms. Figueroa would start at a rate

LIANG – CROSS – MR. SCHWEITZER                    210

Q    of $15 per hour correct?

A    Correct.

Q    At the time Mr. Anderson was earning $18 an hour, correct?

A    Correct.

Q    You decided he would earn that rate as well?

A    No.

Q    Who did?

A    I do not know.  He started before I started.

Q    I see.  You said on direct you started to work at Howard Johnson May or June of 2020, correct?

A    June, yes.

Q    And you said that Howard Johnson started to be used as a shelter about the same time you became the manager, correct?

A    In May, one month earlier.

Q    I see.  Isn't it true that you had been previously employed by the Mayflower hotel group to work as an accountant from October 2019?

A    Correct.

Q    And you worked for the Mayflower hotel group as an accountant continuously October 2019 through about May 2020 at which point you were transferred to the manager of Howard Johnson in June, correct?

A    No.  Due to the pandemic, which it started from March 2020, I stopped working.

Q    You stopped working from about March until the end of May, and you came back to work as a manager in June?

A    Correct.

Q    It was Ms. Hu who transferred you from being an accountant to being a manager correct?

A    Correct.

Q    You said on direct that there were about seven employees at Howard Johnson initially rising to about eight overtime. Do you recall that?  When I say initially I mean when you started working there as the manager?

A    Correct.

Q    Do you recall being deposed by my colleague Tiffany Troy in this matter?

A    She has.

Q    Do you recall being asked the following question and giving the following answer:

          THE COURT:  Hold on, what page.

          MR. SCHWEITZER:  Page 19, starting line 22.

          THE COURT:  Do I have this?

          MR. SCHWEITZER:  If your Honor can't find it I have a copy here.

          THE COURT:  Page 19?

          MR. SCHWEITZER:  Page 19 line 22, through page 20 line one.

BY MR. SCHWEITZER:

LIANG – CROSS – MR. SCHWEITZER                  212

Q    Question:  How often did you hire people on behalf of the Howard Johnson hotel?

          Answer:  So basically it is maintained at between ten to 12 personal and I would interview to retain someone who left.

          Do you recall that exchange.

A    I think I did probably.

Q    You said there were between four or five security guards at the lobby at any one time; is that right?

A    Yes.

Q    You saw the video I played for Ms. Figueroa and the jury yesterday, didn't you?

A    Yes.

Q    In that video there was one security guard and the social worker, Mr. Cheek, correct?

A    You have to show me again, I wasn't counting at the time.

Q    Fair enough.  I'll play you the video and you point out to me when you see a security guard.  I'm going to hit play you tell me when you see a security guard, I'll pause and you can point them out.

          (Video played)

A    Yes.

Q    Where do you see a security guard?

A    The person in white and he was facing another person talking.

LIANG – CROSS – MR. SCHWEITZER                    213

Q    This person in the metal detector or near the metal detector rather?

A    Yes, and he was facing another person, there was another one, because there is a stair and that person usually was at the stairs.

Q    So is usually somebody around here where the play button is but you can't see them at the moment, correct?

A    Correct.

Q    Continuing.

         (Video played)

A    Another person now coming out of the elevator.

Q    That's this fellow in teal?

A    Yes.

Q    Is that Mr. Cheek?

A    No.

Q    Is that a security guard?

A    He's security guard, that person is the house manager but I could not recognize if --

Q    What person, the gentleman in teal?

A    The person in black.

Q    In black.  Where in the frame?

A    Where you were circling.

Q    Here?  On the left?

A    Yes, that person is the house manager.

Q    Okay.  Somebody seems to have emerged beneath the stairs

LIANG - CROSS - MR. SCHWEITZER                214

also in teal, who is this?

A    That should be the person the other security guard was talking to earlier.

Q    Is that person themselves a security guard?

A    Correct.  And this person is probably another -- the one on the stairs another security guard.

Q    It's behind the pause button, but this person?

A    Correct.

Q    That person was upstairs but is now am coming down; is that correct?

A    There were two mezzanines.  There was one mezzanine upstairs.  He came down from the mezzanine through the stairs.

Q    So he was stationed in the mezzanine and left his station to go into the lobby; is that right?

A    I did not manage them, I do not know where they are stationed.

Q    You said he was originally upstairs, right?

A    I was saying the one walking downstairs was a security guard.

Q    And he was coming downstairs from upstairs, down to the lobby, right?

A    Correct because they had their bathrooms toilets upstairs.

          (Video played)

Q    Pictured in the video the incident started with two

LIANG – CROSS – MR. SCHWEITZER                215

security officers present, one behind the picnic table and one

operating -- one viewing the items to come through the metal

detector.  Overtime they were joined by two others, one down

the elevator and one down the stairs, correct?

A    Correct.

Q    When you say there was a proposal one point to have a

security guard sit at the front desk, would that be an

additional security guard to sit by the built-into-the-floor

front desk where Ms. Figueroa's work station was?

A    I do not know about their arrangements, but when we were

working their supervisor on duty would sit next to us.

Q    You were referring in your direct testimony to a proposal

made, you pointed to a photograph as to where the security

officer was proposed to be.  Can you describe where they were

supposed to be?

A    Because there was only one computer which could view the

surveillance videos, so that security guard actually did sit

there.  It was not my proposal, we proposed and it was

actually carried out.

Q    At some point -- let me show it to you again.  Can you

point out where on this image the monitor is this is the front

desk.  This is the metal detector, picnic table is over here?

A    It was on the desk behind the white sign.

Q    That's right here?

A    Yes.

LIANG – CROSS – MR. SCHWEITZER          216

Q    Okay.  Right behind where Ms. Figueroa is standing in this image, right?

A    Correct.

Q    You say at some point there was actually somebody stationed there?

A    Correct.  Somebody always sat thereafter the incident happened until they left.

Q    I thought you said Ms. Figueroa refused to have anyone sitting there next to her?

A    Correct.

Q    So there was someone stationed there but that person was removed when Ms. Figueroa was there?

A    Because we wanted to respect her willingness.  If she did not want anyone to be there, we couldn't just force it upon her.

Q    The answer is yes, there was usually somebody there but that person was removed when Ms. Figueroa was there, correct?

A    Correct, because she didn't want it, so the security guard would spontaneously left.

Q    Who controlled the security guard being present or absent?

A    The management company.

Q    So the management company made a decision to station a security guard at the front desk, and the management company made a decision to remove that person when Ms. Figueroa was

LIANG – CROSS – MR. SCHWEITZER                217

present; is that right?

A    So we communicated with the management company to station a security guard next to us.  But if the person who was involved did not want the security guard to be there, the security guard would naturally walk away.  And I wasn't present at the time when the incident happened.

Q    Did you ever observe a security guard walking away at Ms. Figueroa's request or are you inferring that happened?

A    When she was working, I was not there so I do not know.

Q    Okay.

            THE COURT:  Mr. Schweitzer, find a good place. We're going to break at 5:30.

            MR. SCHWEITZER:  I'm aware of the time.

BY MR. SCHWEITZER:

Q    Is it true that when you started at the Howard Johnson the security company informed you that it wasn't their job to protect the hotel workers?

A    They I believe they said so.

            MR. SCHWEITZER:  All right.  I'm about to begin a new line of questioning, so we'll pause until tomorrow.

            THE COURT:  Okay.  All right ladies and gentlemen, we're going to break for the day.  We will resume tomorrow morning at 9:30 a.m. to finish up with Mr. Liang and then I believe hear from Ms. Hu.

            Have a great night.  Remember, tomorrow we're only

LIANG – CROSS – MR. SCHWEITZER                218

going through 2:00 o'clock.  We're not going to have a lunch break, but we'll have a later morning break.  So you'll be released at two, have lunch then, and the rest of the day to be free make plans, to catch a matinee.

          Don't talk about the case.  Keep an open mind. Don't speak with anyone else.  I'll see you tomorrow.

          (Jury exits the courtroom.)

          THE COURT:  Mr. Liang, you're in the middle of your cross-examination, please, do not discuss your testimony with your attorneys.  All right.

          MR. SCHWEITZER:  Or his co-defendant.

          THE COURT:  Or his co-defendant.

          (Whereupon, the witness steps down.)

          THE COURT:  So get the letters first thing in the morning.  No more than four pages, single spaced.

          MR. SCHWEITZER:  Tomorrow at 9:30?

          THE COURT:  Yes, 9:30.

          (Proceedings adjourned.)

219

I N D E X

WITNESS                                      PAGE


**JEANNETTE FIGUEROA**


CROSS-EXAMINATION     BY MR. TUNG         126

REDIRECT EXAMINATION  BY MR. SCHWEITZER   144

RECROSS-EXAMINATION   BY MR. TUNG         146

**HENLEY LIANG**

DIRECT EXAMINATION    BY MS. CHEN         170


CROSS-EXAMINATION     BY MR. SCHWEITZER   203


              E X H I B I T S

DEFENSE                                      PAGE

A                                            184

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*