220

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                        23-CV-04729(RER)
JEANNETTE FIGUEROA,

                                        United States Courthouse
            Plaintiff,                  Brooklyn, New York

            -versus-                    October 22, 2025
                                        9:30 a.m.
MAYFLOWER INTERNATIONAL
HOTEL GROUP, ET AL.,

            Defendants.

------------------------------x

                TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE RAMON E. REYES, JR.
                   UNITED STATES MAGISTRATE JUDGE
                        BEFORE A JURY


APPEARANCES


For the Plaintiff:        BY:  AARON SCHWEITZER, ESQ.


For the Defendant:        BY:  KEVIN K. TUNG, ESQ.
                               BO CHEN, ESQ.



Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                          Phone:  718-613-2268
                          Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

221

(In open court.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  You may be seated.  We're going to continue with Mr. Liang's cross-examination, redirect, and then we'll get into Ms. Hu's testimony.

We'll deal with the letters you submitted at the end of the day -- not the end of the day, after the testimony, which will be hopefully before 2:00 o'clock.

Anything you want to discuss before we continue?

MR. SCHWEITZER:  No, your Honor.

MR. TUNG:  No, your Honor.

MR. LENT:  Good morning, your Honor.  Ezra Lent of Brafman Associates defense counsel for Ms. Hu in the criminal case before Judge Kovner in this Court.  Ms. Hu will be testifying today, as you're aware, and if at any point she does chose to invoke her Fifth Amendment privilege -- I don't believe she will have to, I've spoken to defense counsel doing the questioning and they will stay within this case -- I'll request respectfully that your Honor instruct the jury not to consider it to impact on this case.

MR. SCHWEITZER:  We would oppose that.  This is a civil trial.  The privilege against negative inference only applies to criminal trial.

THE COURT:  I'm going to play it by ear, which I said yesterday.  From my understanding of the criminal case

and this case, there should be no area of inquiry here that would implicate Ms. Hu's Fifth Amendment rights and I've advised counsel not to go there.  And it's more likely that if he does go there, I'll sustain an objection so she won't need to exercise her Fifth Amendment rights.

If for whatever reason there is something within this case, separate and apart from the criminal case that may implicate Ms. Hu's Fifth Amendment rights, then she'll have to assert them and the jury can draw a negative inference.  But I can't see how that would be.

MR. LENT:  Understood, thank you.

(Jury enters the courtroom.)

THE COURT:  You may be seated.

Good morning, ladies and gentlemen.  We are going to continue with Mr. Liang's cross-examination.

MR. SCHWEITZER:  Is the interpreter deemed sworn from yesterday as well?

THE COURT:  Everyone has been sworn and they are reminded.  Mr. Liang, you're under oath; as are you, ma'am.

CROSS-EXAMINATION

BY MR. SCHWEITZER:

Q    Good morning, Mr. Liang.

A    Good morning.

Q    Do you recall yesterday on direct you described there being a sexual harassment reporting policy in place at the

Mayflower Hotel/Howard Johnson, correct?

A    Yesterday I said there is such a policy?

Q    Do you recall saying?  That or no?

A    Because we co-managed the shelter with them, so we directly reported to them.

Q    In fact, there was no policy in place, was there?

A    If we receive any complaints, we would handle it directly.

Q    Do you recall giving the following testimony at your deposition, page 32 lines two through 12.

          THE COURT:  Hold on.  There is no question pending.

          This is not inconsistent with what he already said.

          Why don't you just ask him?

BY MR. SCHWEITZER:

Q    It is true, isn't it, that there was no --

          Your Honor, I believe there is an inconsistent statement.

          It is true, isn't it, that there was no internal sexual harassment policy at the Howard Johnson hotel, correct?

A    When we received any complaints we would report to the boss to see if there is anything we can do.

          THE COURT:  That's not the question, Mr. Liang.

          Was there a written policy for the Howard Johnson hotel for reporting sexual harassment.  Not with the shelter, not with the city, not with anyone else; the Howard Johnson

hotel that was managed by the Mayflower hotel group, a written policy?  Yes or no?

THE WITNESS:  That I'm not sure.  I haven't seen any but I believe the company had such a policy.

Q    Now do you recall being asked the following question and giving the following answer.  Page 32, lines two through 12 of your deposition.

Question:  So that the record is clear, the harassment and abuse that occurred in 2021 at the Howard Johnson hotel, were there any Mayflower hotel group policies in place with respect to any claims of sexual harassment or abuse?

Answer:  No.  Only because we never had anything like that internally in the company.

THE COURT:  Were you asked that question and did you give that answer?

THE WITNESS:  I don't remember exactly that I was being asked that.  But if it's written there, then it should be correct.

BY MR. SCHWEITZER:

Q    Please restrict publishing to the witness stand.

I'm showing you a copy of your deposition transcript, I've highlighted text, which I read to you.  I'll make a representation that it is written there.  So were you asked that question and did you give that answer?

THE COURT:  Highlight it again.

MR. SCHWEITZER:  The trouble is when I highlighted it, this edit box comes up and covers part of it.

A    Because I was deposed a year ago, I don't recall all the questions that I was asked.  But if it's written here, then yes.

Q    Okay.  It is true, isn't it, that Howard Johnson hotel didn't employ or contract its own security guards when it was being used as a shelter, correct?

A    No.  As I said yesterday, according to the contract the city hired the security and we are not allowed to hire our own security.

Q    In fact, you also testified on direct that Howard Johnson wasn't allowed to have its own security, correct?

A    Correct.

Q    Isn't it true, though, that Howard Johnson hotel was both permitted and assumed in its contract with its city to have it's own perimeter security at least?

THE INTERPRETER:  Could you say it again please?

Q    Isn't it true, though, that in the contract Howard Johnson hotel was both permitted and presumed to have its own security?

A    My impression is that the city was responsible for that part, so we did not do it.

Q    Okay.  Showing you Exhibit A, in evidence.  I'll have it

published as well.  Direct your attention to section two, subsection two titled:  DHS responsibility security.

Isn't it true that that section provides that, quote, "all hotel security located on site should coordinate with the city security guards, but that, however, the city security should be in charge of all interactions with guests."

A    What is the question?

Q    Isn't it true that the contract provides that all hotel security located on site should coordinate with the city security guards, but that the city security guards should be in charge of all interactions with guests?

THE COURT:  To be fair, counsel, it doesn't say anything about that they must have security or --

MR. SCHWEITZER:  It doesn't say it must have, but it permitted them to have.

THE COURT:  That's not the question you asked before that.  I can read it for you from the record:  Isn't it true that through the contract, Howard Johnson was both permitted and presumed to have its own security.

It doesn't say anything about presumed.  It says if they have security they've got to coordinate with the city.

MR. SCHWEITZER:  Fair enough.

Q    But that does permit the hotel to have security?

THE COURT:  Mr. Liang, there is nothing in this contract that prohibited Howard Johnson from having its own

security, correct?

THE WITNESS:  Correct.

THE COURT:  Did Howard Johnson at the time of these incidents have its own security?

THE WITNESS:  No.

BY MR. SCHWEITZER:

Q    You said on direct that you left Howard Johnson in November 2021 because the hotel was undergoing renovation, correct?

A    Correct.

Q    Isn't it true that you actually left because you were looking for a better paying job at the time?

A    That's one of the reasons, and I also went to a trade school later.

Q    In your deposition do you recall be asked the following question and giving the answer, page 17, line seven.

Question:  Why did you leave?

Answer:  I was looking for a better paying job.

A    Correct, I have done that; but I also needed to continue my education.

Q    Isn't it true that when you left in November 2021, Ms. Hu offered you a chance to return?

A    Yes.

Q    Isn't it true that you refused that offer?

A    Correct.

Q    Isn't it true that one of the reasons you refused was because you didn't want to return to the work environment at the Howard Johnson hotel?

A    First because the previous shelter was gone, so I did not know about a situation at that time.  And also I was in school and I was not able to handle so many things, I could not manage both school and manning a hotel at the same time.

Q    Do you recall being asked the following question and giving the following answer, page 67, line 25.

THE COURT:  Hold on.  Go ahead.

Q    Question:  Was one of the reasons you refused the offer to be rehired the work environment at the Howard Johnson hotel?

Answer:  So I would say more or less, yes.  However, the other main reason is that I get paid more or better in this regard.

A    Correct.  Because I thought after I have learned another skill I could be paid better.

Q    You said that from time to time you were sexually harassed by residents at Howard Johnson, correct?

A    Correct.

Q    You said that harassment didn't prevent you from working, correct?

A    They would stay next to me and keep talking, but I continued to do what I have to do.

H. LIANG - CROSS - MR. SCHWEITZER                229

Q    Given a chance to return to this job, you didn't take it, in part, because of the work environment, right?

A    As I said, those people at the shelter were gone and I did not know what was the situation at that time.  So what I could say was that I did not return for now.

Q    The harassment you describe consisted of residents insisting on talking to you when you didn't want them to, right?

A    Correct.

Q    None of the residents asked you out on a date, right?

A    As I said earlier, when they were talking I would not pay much attention to what they were talking, I just continued to do what I have to do.  I just tried to ignore them.

Q    Is the answer yes, or no, or I don't know?

A    I did not try to remember, so I don't recall.

Q    None of the residents attempted to follow you home, correct?

A    I drove to work and home, so impossible for them to follow me.

Q    So the answer is no.  Right?

A    Correct.

Q    No residents told you they were going to bust a nut in your face, right?

            THE INTERPRETER:  What does bust a nut mean?

            MR. SCHWEITZER:  Ejaculate.

A     As I said earlier, I did not try to remember; so maybe, I don't recall.

Q     And no residents showed you their penises, right?

A     Not intentionally to me.  But sometimes when we were cleaning the rooms, we open a door, and they probably got out of shower, they haven't put on clothes yet so we would see.

Q     Uh-huh.  Do you recall giving the following testimony at your deposition, page 89, line 24?

THE COURT:  Hold on.  Go ahead.

Q     Question:  Following your mentioning a key in the lobby, are those incidents when shelter residents frequently have their penis on display as well?

Answer:  I have not witnessed that.

A     Because you were asking if it was often, my answer was it was not often.

Q     I had asked you ever, sir?

A     Because those things happened five years ago, I did not try to remember everything.  So maybe it happened, but I don't, I'm not sure if I had seen any.

Q     If you had, would it stick in your mind?

A     No.  Why would I try to remember other people's sexual acts.

Q     It would be fair to say that any harassment you experienced was not terribly severe or pervasive, correct?

A     Not really.  There was one person got crazy at the front

H. LIANG - CROSS - MR. SCHWEITZER          231

desk, he scold at me for an hour.  I just let him be and continue working.

Q    Scold you about sexual matters or something else?

A    Everything.  I did not try to pay much attention to try to remember it, so I don't quite recall.

Q    You don't know what he was talking to you about, correct?

A    I did not pay much attention or intentionally to listen to what that person was saying.  If I tried to understand what he was saying I could, but I don't think -- I did not think it was necessary.

Q    You don't recall whether David Anderson, the other front desk manager, ever complained to you about sexual harassment, right?

A    I'm not sure.  Probably not.

Q    In fact, it was mostly the female employees who were on the receiving end of sexual harassment at Howard Johnson, wasn't it?

A    They probably received more because it was an all-male shelter.

Q    You said on direct that Ms. Figueroa reported to you that Beasley was following her to the subway station.  Do you recall testifying to that on direct?

A    Yes.

Q    Do you recall giving the following -- withdrawn.  Do you know whether -- withdrawn.

H. LIANG - CROSS - MR. SCHWEITZER          232

Do you recall giving the following -- being asked the following question and giving the following answer at your deposition, page 95, line 24.

THE COURT:  Hold on.  95, line 24?

MR. SCHWEITZER:  Yes.

THE COURT:  This is not a proper impeachment.

BY MR. SCHWEITZER:

Q    Let's put it this way.  To your knowledge, did Beasley intimidate Ms. Figueroa physically to get her to agree to let him walk with her?

A    In my impression I don't think there was anything physical.  Because if such things happened, the security guard will definitely intervene.  And if you called the police, they would definitely do something.

Q    Were you asked the following question and give the following answer at your deposition.

Question:  Did Beasley --

THE COURT:  No --

(Judge exits courtroom.)

(Brief pause.)

THE COURT:  I'm sorry about that.  I can't guarantee it won't happen again.

I don't think this is proper impeachment for the last question.

MR. SCHWEITZER:  Your Honor, the witness professed

knowledge in response to this question.  In response to the question at deposition, he said he didn't know.

THE COURT:  What you're about to read involves on her way home.  What he just testified to was at the facility.  So it's different things.

Did you ever observe Mr. Beasley physically intimidate Ms. Figueroa?

THE WITNESS:  Honestly, it happened four to five years ago, I do not recall very clearly.  But if it happens in hotel, based on my understanding, the security guard would intervene.  But I cannot say that I recall very well.

BY MR. SCHWEITZER:

Q    You didn't work the same shift as Ms. Figueroa, did you?

A    We had two to three hours overlap, other than that we were separate.

Q    You were aware that Ms. Figueroa was afraid of Beasley, correct?

A    I do.

Q    And you said on direct that Ms. Figueroa told you about the April 3, 2021 incident, correct?

A    Yes.

Q    And you told her -- you said that she told you that the wet floor sign hit her on direct, correct?

A    Because I wasn't present at the time, so I could only believe what she said.

Q    Isn't it true that you did not believe the sign touched or hit her?

A    Because I have heard different versions.  I had heard that the wet floor sign fell and hit the wall behind her and it drops next to her.  She claimed that when it drop, when it was dropping, it hit her because.  I did not see it, so I'm not sure.

Q    Isn't it true that -- at page 52, line 19 -- you testified that, quote, "my understanding is that the sign did not touch her, did not hit her," unquote?

          THE COURT:  You're reading a portion of his answer --

          MR. SCHWEITZER:  Yes.

          THE COURT:  -- number one.

          Number two, the rest of it is not inconsistent to what he testified to.

          MR. SCHWEITZER:  It is inconsistent to what he testified to on direct.  On direct he testified that he believed that the sign did hit her.

          THE COURT:  I don't understand your point in doing all this.  But why don't you confront him with the question and the answer, the full question and answer.

          MR. SCHWEITZER:  All right.

BY MR. SCHWEITZER:

Q    From line 16 through 22:  Do you recall that Jeannette

H. LIANG - CROSS - MR. SCHWEITZER          235

Figueroa was in fact injured after being hit with the wet floor by a resident?

          Answer:  My understanding is the sign did not touch her, did not hit her, that the sign hit the wall and fell down.  But that's my understanding.

          THE INTERPRETER:  Sorry, counsel, can you say the question again?

          THE COURT:  I'll read it because he didn't read the question correctly.

          Question:  Do you recall that Jeannette Figueroa was in fact injured after being hit with the wet floor sign by a resident?

          Answer:  My understanding is that the sign did not touch her, did not hit her, that the sign hit the wall and fell down.  But that's my understanding.

          Is that your testimony at the deposition?

          THE WITNESS:  I suppose so.

BY MR. SCHWEITZER:

Q     You testified on direct that you remembered reporting the April 2021 incident to Ms. Hu, correct?

A     I think so, because every week we would have reports several times.

Q     Isn't it true that you didn't, that you don't remember whether you actually reported this incident to Ms. Hu?

A     As I said earlier, because it happened four to five years

ago I don't remember what I did exactly on which date.

Q    You said on direct you didn't have the authority to approve or deny transfers between Howard Johnson and Wyndham Garden, correct?

A    Correct because the manager at Wyndham Garden was another person.

Q    You said that one of the reasons that Ms. Figueroa's transfer -- withdrawn.

You said that eventually Ms. Figueroa was offered a transfer to the Wyndham Garden position, correct?

A    Correct.

Q    And you said that Ms. Figueroa declined that transfer because she didn't want to work in the evening, correct?

A    It was overnight, not evening.

Q    Now Ms. Figueroa's shift at Howard Johnson began at 3:00 p.m. and ended about 11 or midnight, correct?

A    It's 3:00 p.m. to midnight.

Q    That's a shift that includes most of the night, correct?

A    Correct.

Q    You said you called the police about sexual harassment from time to time.  You don't have copies of police reports to show to this jury, do you?

A    If there was any report, I left at the company when I left there; I did not bring any with me.

Q    And you don't have a record of Ms. Figueroa's alleged

H. LIANG – REDIRECT – MS. CHEN                237

refusal to have a security guard sit next to her in writing,

do you?

A    No, because the security, the head of security guard had

told me directly; and I also asked Ms. Figueroa.

Q    When did these alleged conversations take place?

A    When I knew about the incident, it was probably in July

or August.

Q    That is of 2021, July or August 2021?

A    Correct.

          MR. SCHWEITZER:  All right.  Nothing further.

          THE COURT:  Madam interpreter you're still under

oath.

          THE INTERPRETER:  Yes, of course.  Thank you for

reminding me.

REDIRECT EXAMINATION

BY MS. CHEN:

Q    Mr. Liang, I remember why you reviewed the deposition

transcript.  Did you tell me --

          MR. SCHWEITZER:  Objection.

          MS. CHEN:  Those translation are not complete and --

          THE COURT:  Sustained.  Sustained.

          MS. CHEN:  -- and ---

          THE COURT:  Ask it a different way.

BY MS. CHEN:

Q    Is that deposition accurate?

MR. SCHWEITZER:  Objection.

MS. CHEN:  Complete.

THE COURT:  Sustained.

BY MS. CHEN:

Q    Mr. Liang, did you ask me to bring the original recording of your deposition?

MR. SCHWEITZER:  Objection.

THE COURT:  Sidebar.

(Continued on the next page.)

(Sidebar conference.)

THE COURT:  Did you send him a copy or send them a copy of the deposition?

MR. SCHWEITZER:  Yes.

THE COURT:  Did he sign it?

MR. SCHWEITZER:  I don't recall.

THE COURT:  You sent it to him, though?

MR. SCHWEITZER:  No, he did not sign it; but we sent it.

THE COURT:  But he had the opportunity to review it?

MR. SCHWEITZER:  Yes, he had the opportunity to review it; no objection was made.

MS. CHEN:  Yes, many objections.

THE COURT:  Did you put them in any errata sheet?

MS. CHEN:  He had errata sheet.

THE COURT:  Do you have the original of the deposition that you received from counsel?

MS. CHEN:  I have -- I remember he write, you know, its translation is not accurate or something like that.  And then I asked the recording from the plaintiff's counsel.  The recording, actually the link doesn't work after one month, so later we have no opportunity to compare the original answer of his deposition.

MR. SCHWEITZER:  But they reviewed the transcript and had the opportunity to look at the words to see what, if

anything, was inaccurate.

THE COURT:  You didn't follow the proper procedure. You get a deposition transcript, your client reviews it, if he thinks it's inaccurate, he makes changes to it.  If he thinks the translation is wrong -- it was videotaped?

MR. SCHWEITZER:  Yes.

THE COURT:  You look at the videotape and do what you have to do.  You had it and you didn't do that.  And besides that, if there are particular -- if I were to allow you to go down this road, it wouldn't be, oh, the translations are wrong, it would be specific questions.

MS. CHEN:  Okay, all right.

THE COURT:  So I'm not going to allow this.

MS. CHEN:  I will not ask.

THE COURT:  You've got to follow the proper procedure.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

BY MS. CHEN:

Q    Mr. Liang, why do you prefer to report the incident of harassment to the shelter guards orally?

A    Because of the fact that that the shelter security was only a few steps right in front of us.  So it would be more convenient for us to just step forward a few steps and just report the incident to them orally.

Q    So I remember exhibits from the plaintiff counsel and there is text message between you and Ms. Figueroa and talking about the changing of the working hours of the plaintiff.  Can you do that?

A    I remember that I had been asked about that, yes.

Q    I asked you.  Can you change the working time on your own?

A    I cannot.  However, if she makes such a request for change of hours, I can inform the HR.  And it depends on what the HR department can do.

Q    Can you just describe how the employee of Howard Johnson hotel recorded their working time?

MR. SCHWEITZER:  Objection.  Beyond the scope, and also not terribly relevant to this case.

THE COURT:  Sustained.

BY MS. CHEN:

Q    Can you explain to me why David Anderson salary is higher

than Ms. Figueroa?

A    Yes, I can.  Because of the fact that he started working before I started.  And also secondly, he also has a fire and safety director license, and the boss liked it.

Q    Usually anyone who has obtained such kind of fire and safety director license usually deserve to get higher pay?

A    Yes.

Q    Is the compensation of the employee, do you consider their gender to decide their salary?

A    Not relevant, no.  No, we just consider their experience whether their job duty and also the qualification and also whether they have any license.

Q    Do they have female employee making more money, I mean the salary higher than Ms. Figueroa?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A    Because in Howard Johnson there are no other female employees which have any license and because of that then everybody got the same rate as her.

Q    You said to your knowledge there is no written policy regarding the sexual harassment, internal sexual harassment reporting; is that correct?

          THE INTERPRETER:  No written policy?

          MS. CHEN:  Yes.

A    I have not seen such a written policy statement, so

H. LIANG – REDIRECT – MS. CHEN                    243

that's why I cannot say for sure.

Q    Can you punish a resident for misconduct or sexual harassment based on your internal employee reporting policy?

A    I don't know whether in a regular hotel whether such policy can be applied to the resident.  But because Howard Johnson is a shelter, and so we do not have the authority to punish a resident that harassed an employee.  So in that sense, when this happened we can only report the case and refer that to the management of the shelter management about it.

Q    So after the April incident did you receive any, the doctor's diagnosis from the plaintiff, the injury, after the April incident?

A    I have not.

Q    So after the June incident, after one played in the video, have you received any doctor's diagnosis from the plaintiffs?

A    I have not received it, no.

Q    During the employment throughout the employment of the plaintiff, have you received any doctor's diagnosis from the plaintiff?

A    I have not.

Q    Did you tell the plaintiff to see the doctor after the incident of June?

A    Yes, I have.  If she doesn't feel, if she did not feel

H. LIANG – REDIRECT – MS. CHEN                    244

well, then she should go and see a doctor.

Q    So to your knowledge, did she went to, did she go to a doctor?

A    She only send me a text message that she was going to see a doctor.

Q    Did you get any doctor's notes?

A    No, I have not.

Q    So you said you asked the security, the director of security, company to sit at the front desk.  Did that happen before the incident or after the incident of June?

A    After the incident.

Q    So how about the -- what the plaintiff refuse the security guard to sit next to her, how about the rest of the employee, are they, do they welcome the security guard to sit next to them?

            MR. SCHWEITZER:  Objection.

            THE COURT:  Sustained.

BY MS. CHEN:

Q    Do you think the security guard, if the security guard sitting next to the front desk receptionist can such incident be avoided?

            MR. SCHWEITZER:  Objection.

            THE COURT:  Overruled.

A    So he can be the first person to react towards the situation.  And also, the fact that he was stationed there,

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

H. LIANG - REDIRECT - MS. CHEN                    245

that would be a deterrent.

Q    So if you think the increase the number of the security guard in the lobby, do you think such kind of incident can be avoided?

A    I believe that this will reduce the problems or the incidents from happening.  But, if it happened, it happened, it would happen, it will still happen.

            (Continued on next page.)

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

H. LIANG – REDIRECT – MS. CHEN                246

EXAMINATION BY

MS. CHEN:

(Continuing.)

Q    You said Ms. Figueroa was at fault when such incident happened?

MR. SCHWEITZER:  Objection.

THE COURT:  What's the question?  Hold on, I have to reconnect.

Can you read that back?

(Record read.)

MR. SCHWEITZER:  Objection.

THE COURT:  Sustained.

Q    You said Ms. Figueroa can do something different to avoid such kind of incident?

MR. SCHWEITZER:  Objection.

THE COURT:   Sustained.

Q    Did you remember the time when the incident happened?

THE COURT:  What incident?

MS. CHEN:   At the time of the, I mean, the June 4th incident.

A    It happened some time after 6:00  p.m. because at that time I already left the hotel.

Q    At that time, Ms. Figueroa just arrived to work or she is leaving from work?

MR. SCHWEITZER:   Beyond the scope and has been

H. LIANG – REDIRECT – MS. CHEN                247

thoroughly explored on direct.

THE COURT:  I'll allow it.

A    She started working at 3:00 p.m., so this happened in the middle of her work shift.

Q    So was Ms. Figueroa working when this happened?

A    Correct.

Q    Was she working at front desk?

A    Yes, she was working at the front desk.  She should be working at the front desk.

Q    Was she working in front of the desk or behind the desk?

MR. SCHWEITZER:  Objection; he already testified she left.

THE COURT:  Were you there when this happened?

THE WITNESS:    No, I was not.

Q    I just asked you, at the front desk --

MR. SCHWEITZER:  There was an objection.

Q    -- when Ms. Figueroa was working, was she working in front of the desk or behind the desk?

MR. SCHWEITZER:  Objection.

THE COURT:  If he wasn't there, he has no clue.

MS. CHEN:  But that's the, you know, where the receptionist work.  That's, you know...

THE COURT:  That's not the question you asked.  You asked, at this incident, on the June 4th incident, was she in front or behind?  She's supposed to be working behind the

H. LIANG – RECROSS – MR. SCHWEITZER          248

desk, who knows on a given day if she's in front of the desk, by the elevators.  If he's not there, how does he know?

MS. CHEN:  I just about, you know, the general question.

Q    Usually, the receptionist is working in front of desk or behind the desk?

It's not on that day I just basically asking.

A    Usually, the receptionist would be working behind the front desk.

Q    So when Figueroa was hit by the table was she – –

THE COURT:  The jury has seen the video, they know where she was hit.

MS. CHEN:   Okay.

THE COURT:  Unless there's something burning that you need to get on to redirect, I'm not letting this go beyond another five minutes.

MS. CHEN:  I have no more questions to ask.  Thank you.

RECROSS-EXAMINATION

BY MR. SCHWEITZER:

Q    You said just a moment ago on redirect that, quote, the boss liked, unquote, Mr. Anderson's having a fire and safety license.

When you said, "the boss," you meant Ms. Hu; right?

A    First of all, I did not mean that Ms. Boss Hu liked that

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

H. LIANG – RECROSS – MR. SCHWEITZER          249

particular person, I meant Boss Hu liked persons who had such license.

Q    Fair enough.  But my question was different.

When you used the phrase, "the boss," you were referring to Ms. Hu; right?

A    Yes.  When I was working there, Ms. Hu was the boss.

Q    Would it be fair to say that Ms. Hu had some degree of control over employees' wage rates?

THE INTERPRETER:  Excuse me.

MR. SCHWEITZER:  Wage rates.

A    Correct.

Q    And you also said on redirect that you believed stationing a security guard at the front desk would act as an effective deterrent to guests harassing front desk personnel; correct?

A    Correct.  Because the security guards at the shelter knew all those people so they could function as a better shield to such events.

Q    And to your understanding, there were at least some employees who had such a security guard next to them but not Ms. Figueroa; correct?

A    Correct; because she refused such arrangements.

Q    That was your understanding, she refused to have a male security guard next to her; correct?

A    Because she had told me directly.

Q    I thought you said you heard it from one of the security guards?

A    Correct.  I heard it from one of the security guards, but I also asked the plaintiff herself.  She confirmed with me.

Q    I see.

And after that, you didn't talk with Allied to potentially send over a female security guard; did you?

A    Correct.  I could only propose but I could not request them to do anything.

Q    Well, you could request them to do something, they just didn't have to follow your request; right?

A    I could only ask them to but the final -- they were the final decision-maker.  I could only ask them to do something.

Q    But you never did ask them to send a female security guard, did you?

A    I think I had asked them but eventually they did not send anyone.

Q    And you didn't put this request in writing, did you?

A    No.

Q    You said you think you asked them.  You don't recall distinctly whether you did or didn't?

You don't recall definitively whether you did or did not; correct?

A    Because it happened four to five years ago.  I could only say that based on my current understanding that would be

something that I would have done.

Q    But you don't remember distinctly, yes or no?

MR. TUNG:  Objection, become argumentative.

THE COURT:  I'll allow it.

A    Not a hundred percent.

Q    And Howard Johnson didn't hire a female security guard of its own when Ms. Figueroa was working there; correct?

A    No.

MR. SCHWEITZER:  Nothing further.

THE COURT:  Anything further.

MS. CHEN:  Defendant rests.

THE COURT:  Mr. Liang, you can step down.  Thank you.

(Witness leaves the witness stand.)

THE COURT:  We're going to take a break, bathroom break, until 11:20.  Okay?

(Jury exits courtroom at 11:04a.m.)

(A recess in the proceedings was taken.)

THE COURT:  Are we ready to bring the jury in?

(Jury enters courtroom at 11:32a.m.)

THE COURT:  You may be seated.  Mr. Tung call your next witness.

MR. TUNG:  Yes, Your Honor.  Defendants will call Ms. Weihong Hu.  W-e-i-h-o-n-g H-u .

(Witness leaves the witness stand.)

THE COURT:  Ms. Hu, please raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony that you are about to give to the Court will be the truth, the whole truth, and nothing but the truth.

(Witness takes the witness stand.)

**WEIHONG HU**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT:  You may be seated.  I remind the interpreter you have been previously sworn.

You may inquire.

MR. TUNG:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. TUNG:

Q    Good morning, Ms. Hu.

A    Thank you.

Q    Ms. Hu, can you tell us in what capacity that you are taking the stand to give testimony today?

A    I'm the president of Mayflower International.

Q    I just want the record to reflect.

Ms. Hu, when you mean Mayflower International, is that the full name -- is the company's name is Mayflower International Hotel Group, Inc.; is that right?

A    Yes.

Q    And Mayflower International Hotel Group, Inc., is a defendant here; right?

W. HU – DIRECT – MR. TUNG                    253

A     Yes.

Q     And are you also taking the stand to testify on behalf of another corporate defendant Yan Zhi Hotel Management, Inc.?

A     Yes.

Q     And Ms. Hu, you, in your individual capacity, you are also named as a defendant in this lawsuit; is that right?

A     Yes.

Q     Now, as the president for both companies, you are --

        MR. TUNG:  Withdrawn.

Q     Ms. Hu, as the president for the corporations, what kind of work do you do?

A     I'm serving as the president of the company.

Q     As the president of the company, do you participate in the process to setting up policies for the companies?

        MR. SCHWEITZER:  Objection, leading.

        THE COURT:  Overruled.

A     Yes.

Q     And you are also involved giving directions to your employees or staff; is that right?

A     Yes.

Q     And in the corporations here for Mayflower International Hotel Group and Yan Zhi Hotel Management Inc., to your knowledge, do you have any policies that were set up against discrimination in your organization?

A     We have the employees manual.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

Q    Are those employee handbooks in writing?

A    In written form as a booklet.

Q    Did the companies, both companies, hand out those employee handbooks to the employees?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A    Yes.

Q    Is there any provisions in those employee handbooks that contains provisions prohibiting the employees to engage in activities to discriminate against other employees based on sex?

          MR. SCHWEITZER:  Objection.

          THE COURT:  Overruled.

A    Our manuals are clearly stated that there's protection for all the employees and it prevent them from harassment.

Q    To your knowledge, is there any provisions that describes the reporting procedures in the event an employee being a feeling of being discriminated against could report?

A    It is clearly stated that whoever is being discriminated, that person can report to his or her manager and that manager would escalate it and report it to me.

Q    Now, Ms. Hu, regarding the incidents that the plaintiff claimed that she was discriminated against by the residents or the guests of the shelter in your hotels, did you receive any complaints, either written or oral, from the plaintiff

Ms. Figueroa here?

MR. SCHWEITZER: Objection. She just described the policy that she would receive reports from the manager.

THE COURT: Overruled.

A    Not yet.

Q    Are you aware that if any of your management employees who were working for you reported to you regarding plaintiff's allegations that she has been sexually harassed by residents of the shelter?

A    Yes.

Q    Can you describe what exactly that you have received the complaint from your management?

A    I will speak slowly. First of all, we have two hotels, one is in Long Island City and the other one is in Fresh Meadows. For the Long Island City hotel, the manager is Henley Liang, and for the other hotel the manager is Janice Tian. Last name is T-i-a-n. She is also my assistant and my so-called daughter, and she's the hotel manager. She would often check the Long Island City hotel to take a look.

One day, Janice Tian told me that there's an incident that happened in the hotel at night. And I said that we have to have a meeting right away because such a big incident happened, we need to talk to this lady to see what happened. And we also said that we have to report this to the management company because we are suffering huge harm for this

W. HU – DIRECT – MR. TUNG                    256

incident, we will require more protection.

Q    What incident --

THE INTERPRETER:  The interpreter would like to ask the witness to continue.

A    So the next day, Henley Liang told me  about this and then I told Henley Liang that you have to send an e-mail to the management company or talk to them face-to-face.  We have to elevate the level of protection because of that.  And then I requested that we should have a higher level of protection; therefore, we should have a security guard sitting next to our staff.

And the next day, I talked to Janice about this and I said, What can we offer to this lady to give her more protection and whether she would need any compensation?  And the lady said she would like to sue the city government, that way she can get more money.

MR. SCHWEITZER:  Objection, move to strike.

THE COURT:  I'll strike that last bit.

Q    Ms. Hu, what specific incidents that you are referring to when Janice told you that something had happened, you didn't specify so I just want to make sure the jury understands.

A    She told me about the incident that happened in the evening which happened to our colleagues and my employees.  So she said that there was a resident who was very high in the hotel and he was throwing the glass in the lobby and that

glass fell and employee was scared.

MR. SCHWEITZER:  Move to strike as nonresponsive. The witness was asked for a time or date.

MR. TUNG:  Well, that's my next question, your Honor.  This is -- I did not finish my questioning and it is my job to clarify.

THE COURT:  I'm not going to strike that.  Follow up.

MR. TUNG:  Thank you very much.

Q    Ms. Hu, when you referred to that incident, right, do you remember when that incident occurred?

A    I forgot the time but that incident happened during the time when we still had that tenant agreement.

Q    And, Ms. Hu, during those the past few days, the plaintiff had alleged three major incidents and I'm going to recap this.

One of them is when she just started to work, a person by the name of Beasley throwing a wet floor sign in the hotel, in the lobby.  That was the first incident.

The second incident, it was plaintiff was trying to protect what she calls a staff by the name of Fiona.  She was spit by a guest.

And the third incident was that a person by the name of Mr. Robinson, he came downstairs and he's throwing a picnic table.  He tossed that picnic table in the air that

W. HU – DIRECT – MR. TUNG                    258

accidentally landed on her.

MR. SCHWEITZER:  Objection.

Q   That table landed on the plaintiff.  Those are the three incidents; do you recall that?

THE COURT:  I'm overruling the objection.

Look, why don't you ask, you know -- you have to have an idea of this incident that Ms. Hu just testified to. Why don't ask you her if it's that date.

This is the June 4th, right?

MR. TUNG:  All right.  I'll do this.

EXAMINATION BY

MR. TUNG:

(Continuing.)

Q   Ms. Hu, were you referring --

MR. TUNG:  Withdrawn.

Q   Ms. Hu when you refer to the incident, are you referring to the incident that occurred in June of 2021.  That incident was actually shown on the video during the examination -- during the direct -- during the course of this trial?

THE COURT:  No, it wasn't.

Q   Do you remember --

THE COURT:  The video was the table incident.  She talked about the --

MR. TUNG:  That's what I believe, sir.  That's why I

don't know which one she's referring to.  I think she's referring to that table - - tossing of the table incident .  Let me ask the question.  I don't know which one she's referring to, these three incidents.

EXAMINATION BY

MR. TUNG:

(Continuing.)

Q    Ms. Hu, when you referred to in your answering my question, right, you referred to Janice is telling an incident.  Which incident that you are referring to, is that the one when you see on the video when a man tossing a picnic table in the hotel lobby?

A    Yes.

Q    Okay.  And that incident occurred in June of 2021; is that your memory?

A    Yes.

Q    And after you heard Janice conveying that incident to you, what kind of corrective -- what kind of actions did you take to correct - -

          MR. TUNG:  Withdrawn.

Q    After you hear the incident that conveyed to you by your staff, Janice Tian, did the company do anything?

A    Janice Tian later on told me about it for the second time.  And when Janice Tian told me, she also said that she reported this incident together with Henley  Liang to the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

headquarters.

And according to our contract for the lease, for our company's responsibilities, we can only have three functional roles which are the front desk and housekeeping and maintenance. Besides these roles, we cannot have the security guard.

We did ask the management company whether we can have more security guards but they said in reply that they have more than 50 security guards so we don't need that; therefore, I told them that we would like to apply to get more security guards but they did not agree. They said that according to the contract, you are not allowed to have the security guards because if you have more security guards, I would just make the hotel more chaotic.

Q    And the contract that you are referring to, that's a contract between Howard Johnson Long Island City with the shelter, the City's shelter; is that right?

A    Yes.

Q    And, to your knowledge, the service Howard Johnson Long Island City provided to  the City or to the shelter, isn't it true they providing a sheltering, lodging service to the city; is that right?

A    Yes.

Q    To your knowledge, isn't that true that most of the residents from the shelter were veterans discharged from

W. HU – DIRECT – MR. TUNG                    261

military or inmates recently released from prison; is that right?

MR. SCHWEITZER:  Objection, calls for hearsay.

THE COURT:  Overruled.

A     The city government told us that for all the residents in the hotel, these people have made contributions to the country.  They are the veterans and, therefore, they will spend so much money and manpower as in more than a hundred people to manage them, to protect them, and the Government also asks us to take care of them.

Since these people are from the battlefield, they were injured or they were very high and, therefore , there were more than 50 security guards there.  So for each shift, there will be a lot of security guards, and so, we have to take care of them.

Q     Ms. Hu --

MR. TUNG:  Withdrawn.

Q     Ms. Hu, is it fair to say the shelter is not a jail, so the level of security required it's not the same standard for a jail; do you agree with me?

MR. SCHWEITZER:  Objection, leading.

THE COURT:  Sustained.  Sustained.

Q     With reference to the incident that the plaintiff alleged that she was going to, she was going to locate her staff member, Fiona, who was spit by a resident.

Were you aware of that incident?

A    No, I don't.

Q    And with reference to the other incident where the plaintiff alleged Mr. Beasley throwing a wet floor sign through the air that hit the plaintiff in the hotel lobby, were you aware of that incident?

A    Yes, I knew that.

Q    And how did you learn that incident?

A    Janice told me that, yes.  Both Janice Tian and also Henley told me that, both of them.

Q    Did they show you a video of the incident?

A    Yesterday was the first time that I saw that video.

MR. SCHWEITZER:  Objection, the video was of the June incident.  The question was about the April incident.

THE COURT:  Sidebar.

(Continued on the next page.)

(Sidebar held outside the presence of the jury.)

THE COURT:  You guys are utterly confused.

MR. TUNG:  She's confused .

THE COURT:   No, you're confused.  There is no video of the Beasley sign incident.

MR. TUNG:  Your Honor remember the testimony.  The accusation is she saw the video and she laughed.  She laughed.

THE COURT:  Yes; but the jury hasn't seen the video and you just alluded that this Beasley incident is the video that the jury saw and it's not it's the Robinson incident.

MR. TUNG:  Right.  Right.

THE COURT:  Clean it up.  Clean it up.

MR. TUNG:  I'll lean it up.  She misunderstood.

THE COURT:  You're adding to her confusion and the jury's confusion by not referring to it correctly.

MR. TUNG:  There is an allegation she laughed at the video and she --

THE COURT:  I know that.

MR. TUNG:  She was referring to --

THE COURT:  I could have Anthony read back where you linked the Beasley incident with the video that the jury saw and that is what's wrong.

MR. TUNG:  Let me clean it up.

THE COURT:  Clean it up.

(Continued on the next page.)

(In open court.)

EXAMINATION BY

MR. TUNG:

(Continuing.)

Q    Ms. Hu, was Beasley tossing that wet floor sign incident, did you see a video?

A    No, I have not.

Q    And you just told us you learned that the Beasley incident through Janice Tian; is that right?

A    Yes, I know.

Q    And if you never saw the video --

        MR. TUNG:  Withdrawn.

Q    Did you give a commentary to Janice Tian that the plaintiff dressed funny or interesting?

        MR. SCHWEITZER:  Objection.

        THE COURT:  Overruled.

A    No, I didn't say that.

Q    And you laughed at her dress, that was the testimony we heard?

        MR. SCHWEITZER:  Objection.

        THE COURT:  It's the jury's recollection of the testimony that counts, not counsel's characterization of it. But you can answer the question.

A    So I believed in what my employee said and that she was hurt, then how could I be laughing?

W. HU – DIRECT – MR. TUNG                265

Q    All right.  That's fine.

Ms. Hu, do you know the plaintiff here during the time that she was with your company, do you know that person?

A    I have many employees, so actually, yesterday was the first time that I saw her.  I mean, Monday.  Before Monday was the first time I saw her.  I have many employees.

Q    You never met with the plaintiff before; right?

A    No, I have not.

Q    And do you have any personal vendetta against this employee, the plaintiff, Ms. Figueroa?

A    No.  No.  After this incident happened, I've been talking to Henley Liang that, you know, about, you know, giving her more protection because of what she allegedly complained about.  And then that we would like to offer her more protection to prevent this other things from happening.

MR. SCHWEITZER:  I object to the translation.  The witness, at least in English, referred to workers' comp.

THE INTERPRETER:  I haven't finished yet, sir.

MR. SCHWEITZER:  Okay.

THE INTERPRETER:  So I was asking her what was the second part, so you objected too soon.

MR. SCHWEITZER:  I see.  Withdrawn for now.

THE INTERPRETER:  Okay, please.

THE WITNESS:    So because we have been paying through her through workers' comp and then I talked to Janice

about how we can actually offer her more compensation in addition to the workman's comp.

MR. SCHWEITZER:  Move to strike under Rule 408, talking about settlement discussions.

THE COURT:  I don't know that she is.

Overruled.  You can finish.

THE WITNESS:   The workman's compensation required me to authorize it to her and then asked me to sign it.  And then every six months, I have to sign to authorize the workman's comp and then it has been lasting for one and a half years.

And then afterwards,  then, when the workman's compensation stopped, then I talked to Janice Tian and I said that since the workman's compensation stopped, do we have to offer her more compensation?  So then Janice told me that when she sued the Government, then she would get a lot of money.

MR. SCHWEITZER:  Move to strike.

THE COURT:  I'm going to strike that last bit.

Q    Ms. Hu, did you ever, in your personal capacity, instruct or told any of the residents or guests of the shelter to sexually harass the plaintiff, Ms. Figueroa?

A    No, I have not.

Q    Did you ever approve any plan recommended by anyone to sexually harass the plaintiff Ms. Figueroa here?

A    No, I have not.

W. HU – DIRECT – MR. TUNG                    267

Q    Ms. Hu, did there come a time when anyone from your hotel inform you that Ms.  Figueroa request a transfer from Howard Johnson Long Island City to Fresh Meadows Wyndham Garden?

A    Janice told me about this.

Q    Did you disapprove the request of the plaintiff to be transferred from Howard Johnson Long Island City to Wyndham Garden in Fresh Meadows?

A    I welcome her at this.  I welcome her for the transfer.

Q    Do you know Mr. Beasley who tossed the wet floor sign in the hotel lobby?  Do you know that person in any capacity?

A    I don't know this person.

Q    Do you know Mr. Robinson who tossed the picnic table in the hotel lobby which eventually hits the plaintiff, Ms. Figueroa ?

A    I don't know him, no.  I don't know him.

Q    Do you know the person they referred who spit on Fiona?
         Do you know that person, the resident hotel guest?

A    I know I don't know him.

         MR. TUNG:  Your Honor, I don't have any more questions.

         (Continued on the next page.)

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

CROSS-EXAMINATION

BY MR. SCHWEITZER:

Q    Ms. Hu, good afternoon.

A    Thank you.

Q    Between April and September 2021 you were, in part, an owner of Mayflower Hotel International Group Inc., correct? You were an owner of Mayflower Hotel International Group Inc, correct?

A    Yes.

Q    And between April and September of 2021 you were an owner of Yan Zhi Hotel Management Inc., correct?

A    Yes.

Q    Between April and September of 2021 you were the president of Mayflower Hotel International Group Inc., correct?

A    Yes.

Q    Between April and September of 2021 you were the president of Yan Zhi Hotel Management Inc. as well, correct.

A    Yes.

Q    Between April and September 2021 Mayflower International Hotel Group ran the Howard Johnson in Long Island City as a men's shelter, correct?

A    Yes.

Q    And during that time, Yan Zhi Hotel Management Inc. handled payroll for various hotels, including that Howard

W. HU – CROSS – MR. SCHWEITZER                269

Johnson hotel, correct?

A    Yes.

Q    You initially hired Henley Liang as a bookkeeper in Yan Zhi Hotel Management Inc. finance department, correct?

A    Yes.

Q    You hired him on or about October 2019?

A    Yes.

Q    And at the time of the pandemic in March of 2020 he was furloughed and you hired him back in about June 2020 to manage the Howard Johnson hotel, correct?

A    Yes.

Q    You said Howard Johnson hotel has a written employee handbook containing among other things, prohibitions against sexual harassment and a reporting procedure, correct?

A    We have employee handbooks.

Q    Containing prohibition against sexual harassment and a reporting procedure?

A    Yes.

Q    Did you have such an employee handbook in place between April and September of 2021?

A    Yes.

Q    Was it the same employee handbook that is in place now or a different one?

A    We sent our handbook to the law firm every year for updates based on the law and we update our handbook to protect

our employees.

Q    Was the sexual harassment policy changed between April 2021 and the present?

A    Every year we would give it to the law firm to update. We paid them.  And they would give us the handbook and we would hand it out to our employees.

Q    Ma'am, I'm going to ask you again.  My question is specifically directed to the sexual harassment policy.  Did that policy change between April 2021 and the present?  Yes or no?

A    Every year we had the law firm to check this for us.  I'm not a lawyer.  We had the lawyer, we paid the lawyer and the lawyer helped us to do this.

The lawyer update the handbook according to the legislation at that time.

Q    Do you have any personal knowledge from reading the handbook whether the sexual harassment policy was updated between then and now?  Yes or no?

A    The lawyers handled it for us.

MR. SCHWEITZER:  Your Honor, please direct the witness to answer the question.

THE COURT:  Do you know whether the policy has changed at any point between --

MR. SCHWEITZER:  April 2021.

THE COURT:  -- to the present?

W. HU – CROSS – MR. SCHWEITZER                    271

MR. SCHWEITZER:  Yes.

THE COURT:  Do you know?  Yes or no?

THE WITNESS:  I never -- no.

THE COURT:  Okay.

BY MR. SCHWEITZER:

Q    That is no, it wasn't changed?  Or no, you don't know?

THE INTERPRETER:  No, the interpreter stand corrected.

At first the witness said:  I never read it because I don't know English and I had the law firm to have English and Chinese version, I had them to handle this.

And then the witness say:  No, the answer was no.

BY MR. SCHWEITZER:

Q    You don't have a copy of the handbook from 2021 to show to this jury, do you?

A    Yes.

Q    Yes, you do?

A    Yes.

Q    Where is it?

A    I can go back to find, I don't have it now.

Q    So you don't have a copy to show to this jury, correct?

A    I don't know that you asked me for it today.

Q    Do you recall my office asking you for it during discovery in this case?

THE INTERPRETER:  The witness require this

interpreter to interpret for her.

And she claims that the time the law firm refused to use their interpreters and the translation and the interpretation, everything was not correct.

BY MR. SCHWEITZER

Q    Ma'am, that is not a response to my question, which is simple:  Do you recall whether or not my office asked you for a copy of the handbook?

(Interpreter Weiyun Ye stepped aside.)

(Interpreter Stephanie Liu continued.)

A    No, there was no such request.

MR. SCHWEITZER:  May I approach, your Honor?

THE COURT:  Yes.

MR. SCHWEITZER:  This is a copy of Ms. Hu's deposition transcript.

THE COURT:  Sidebar.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: So you're going to show a document request that asks for policies?

MR. SCHWEITZER: Yes, I'm going to show her from her deposition transcript where she was asked and made a representation that she would provide a copy of the handbook.

MS. CHEN: My concern, maybe she doesn't personally know because I usually when I respond to document request. I contact her office assistant, you know, they email me if they have something or not. Maybe she doesn't personally know.

THE COURT: So you want to impeach her credibility?

MR. SCHWEITZER: Yes.

THE COURT: I'll let you impeach her credibility, but you know what she's going to say, that the translation is wrong.

MR. SCHWEITZER: Then we're back in the same place that we were before.

THE COURT: We're back where we were before. And unless I'm mistaken, this whole issue of the policy is irrelevant. It has nothing to do with anything; if they did have a policy, if they didn't have a policy. She made complaints. They didn't do anything about it. That's the case. I mean that's the case, right?

MR. SCHWEITZER: There is still the credibility issue, but yes.

SIDEBAR CONFERENCE                274

THE COURT:  So fine, you'll ask this question but then move on to something germane.

Mr. Tung, I apologize.  You didn't raise the issue of the video, she did.

MR. TUNG:  She did, yes.

THE COURT:  So I apologize, you were right.

MR. TUNG:  I was trying to clear up.

MS. CHEN:  I think she is talking about April, she was confused.

THE COURT:  She was confused, okay.

(End of sidebar conference.)

(Continued on the next page.)

W. HU – CROSS – MR. SCHWEITZER            275

(In open court.)

THE COURT:  Tell me which volume and what page.

MR. SCHWEITZER:  Volume one from November 5, 2024, page 89 through page 90, line three.

THE COURT:  Let me read it.  Go ahead.

BY MR. SCHWEITZER:

Q    Do you recall the following exchange at your deposition that took place on November 5, 2024 beginning page 89 line 14.

Question:  In terms of the employee handbook do you recall making a representation that no such book existed?

Answer:  When did I say that we have an employee handbook?

Question --

THE INTERPRETER:  Counselor, it would be easier just pause after that and I interpret.

MR. SCHWEITZER:  Can I give you a copy of the transcript and you can read from it to assist your translation?

THE INTERPRETER:  Yes, thank you.

MR. SCHWEITZER:  I don't want an answer in the middle of the recitation, and sometimes that happens.

THE INTERPRETER:  Okay.

BY MR. SCHWEITZER:

Q    The question isn't finished yet, ma'am.  I'll start again.  Do you recall the following exchange at your

deposition, beginning page 89 line 14.

Question:  In terms of the employee handbook do you recall making a representation that no such book existed?

Answer:  When did I say that?  We have an employee handbook.

Question:  Was that employee handbook --

THE INTERPRETER:  Sorry, I'm sorry.  I cannot find this what you're referring to.

Q    Continuing.

Question:  Was that employee handbook produced to us as part of the discovery process?

Answer:  So we do not, we did not provide a handbook but I can send it to you.  They were supposed to be signed by all of the new people, whether they did that or not I don't know, but I can send the handbook to you.

That's it?

THE INTERPRETER:  What is the question?

Q    Do you recall that exchange at your deposition?

A    I have proof.  On the day of the deposition actually I was having a fever, I have proof that actually I was feverish and that is what happened on the day of the deposition, which is I want to tell you first.

Then also there was problematic on the date, the interpretation, the interpreter was not, was not accurate just like -- so also today, the interpreter that the plaintiff

provided for me was not interpreting correctly.  Such as the term related to the sex organ, she said something of a sex habit.  That was another problem that happened today during the interpretation.  And this is another example of the interpretation that happened.

So then on that day I continued to interrupt during the deposition, but they continue to write, to take the deposition down.  And at that time I was feverish, I was having high fever.  I said I want to stop, but they wouldn't let me stop.

Q    Do you recall the following exchange, page 22, line nine?

THE COURT:  Same day?

MR. SCHWEITZER:  Yes.

A    On those few days I was actually feverish.

Q    On page 22, line nine through 23.  Do you recall the following exchange?

Question --

THE COURT:  Hold on.  Page 22, line nine?

THE INTERPRETER:  I need help to find that particular section.  May I ask counsel to point out where he was referring to?

MR. SCHWEITZER:  May I approach?

THE COURT:  Okay.  Let him read the question.

THE INTERPRETER:  I'm just telling her the line.

Q    Question:  Going back on the record again.  The problem

W. HU – CROSS – MR. SCHWEITZER                    278

that we had was that Ms. Hu is unwilling to pay for the adjournment of the deposition; at the moment she would like to proceed.  So that we are clear, are you saying that you are currently able to testify completely and truthfully today notwithstanding your fever?

Answer:  Yes.

Question:  You are waiving any objections based upon your physical or emotional or psychological condition and you would like to proceed; is that correct?

Answer:  Yes.

THE INTERPRETER:  So what is the question?

Q    Do you recall that exchange?

A    Because at that time that the interpreter was making a mistake even though I objected.  The interpreter did not interpret correctly my objection and they continue.

Q    Where in the exchange was an objection to the translation?

A    So I actually said at that deposition that we had an employee manual, but the interpreter at the deposition said, no, we didn't have the manual, but we actually have.

Q    Ma'am, the interpreter interpreted your words to say that you did have an employee manual and that you intended to produce it.

But that's not my question.  My question is, where in this exchange did you object to the translation.  No where?

THE INTERPRETER:  I'm sorry.  I did not understand your question.  I got lost by your questioning.

THE COURT:  Where in this particular exchange that was just read to you did you object to the translation?

A    When I say no, she would say yes.  That often happen.

THE COURT:  That's not the question.

The question is:  Where in this particular exchange that was just read to you did you make any objection to the translation?  If you didn't, you didn't.  If you did, where is it?

A    You have to point out which sentence then I can figure it out.

Q    I just read you to the entire exchange, I'd like you to review.  Where in that exchange was there an objection to the translation?

A    I cannot understand the English written here.  I cannot understand it from reading it.

Q    Would it help if I read it to you again?

A    Yes.

Q    All right.  Page 22, line nine through 23 for a second time.

Question:  Going back on the record again.  The problem that we had was that Ms. Hu was unable to pay for the adjournment of the deposition, and at the moment she would like to proceed.  So that we are clear, are you saying that

you are currently able to testify completely and truthfully today notwithstanding your fever?

Answer:  Yes.

Question:  You are waiving any objections based upon your physical or emotional or psychological condition and you would like to proceed; is that correct?

Answer:  Yes.

No where in that exchange is there an objection, correct?

A    During that exchange for those two, yes, I made, in fact I actually said no but the interpreter said yes.  And I was asked, should I continue.  I was told if I did not continue that day that it would take even longer time; even though I had a fever, I said yes eventually.  And I do have records to show that I had fever.

Also I would like to highlight that previously in that deposition I was asked whether we have the employee handbook or not, I said yes.  But they said no.  But I said yes.

Q    In fact, in the prior exchange the interpreter interpreted you to say:  We do have an employee handbook.  Isn't that true?

A    Yes.

THE COURT:  Mr. Schweitzer, move on.

MR. SCHWEITZER:  That was my last question.

I'm moving on.  I take the Court's point, and I'm mindful of the jury's time.

BY MR. SCHWEITZER:

Q    You've described the reporting chain that employees should report incidents of sexual harassment to the manager and the manager should report incidents of sexual harassment to you, correct?

A    For hotels our managers would report to the management company and then they would inform me about it.  And for major harm, I told Janice that you have to call meeting with the management company right away in order to protect us.

Q    I want to focus on the part of that reporting chain that involves the managers telling you about it.  You didn't receive any report from the managers of the incident where a resident spit on Fiona, correct?

A    I did receive information saying that employee is injured.  So the next day I told Janice that you have to send an email and also call meeting with the management company to talk about how to protect us.

Q    You referred to an incident where an employee is injured, that refers to the June incident with the table throwing, right?

A    Yes.

Q    Ma'am, I'm referring to a different incident.  I'm referring -- I'm asking you whether you received a report from

W. HU - CROSS - MR. SCHWEITZER                    282

any of your managers about an incident involving a resident

spitting on Fiona Whittaker, a room cleaner.

A    I did hear about the incident and we would have weekly

meeting with Henley verbally and also in-person to talk about

all the protection measures and any management issues.  So

regarding which date it was, which incident it was, well, I

did hear about this incident.  And after, that we talked about

enhancing and elevating the protection for our staff and also

improving the management.

So we requested to have the security guard to follow

the staff to go into the room.  And also to have a security

guard sitting right next to them at the front desk.  So we did

have the measures to improve and enhancement security.

Q    Isn't it true that you testified on direct that you did

not receive a report about the spitting incident?

A    Right now I would receive various reports every day.

There are so many reports about minor things and also about

spitting and staring at people.  I receive a lot of reports

every day.  And I did mention that we should have meetings

with the management company about it.

And regarding the spitting incident, I am not very

clear whether it was said or not said.  I'm not sure about

that.  But anyhow, we would inform the management in weekly

meetings that we need to have more protection for our staff

and also for our property.

Q    You didn't receive any reports of residents stalking female employees, did you?

A    What do you mean by that?

Q    For example, you didn't receive any reports of residents following female employees to the subway after their shift, right?

A    I did receive it.  And I said that we need to have the security guard following them until they board the train.  We do have such measures.  But I also heard that later on they did not want that to happen, they did not want this arrangement.

Q    When you say "they" you're referring to the security guards?

A    We did discuss that with the management company in order to protect our staff members.  So that they can be escorted to the subway station and until they board on the train.  So I told Janice about it.  And Janice told me that she did talk to the security guard saying that the security guard should escort the employees to the train until they board and until there are many people there to ensure their safety.

Q    And the security guard said they would not do that?

A    The security guards are willing to do so, they are willing to protect our staff.

Q    Did it happen that the security guards started escorting employees to the subway?

A    However, I'm not sure whether she wanted to have the security guard to escort her or not.  But I think the security guards are willing to escort the staff to the subway station. But as to whether it was implemented or not, or whether she was willing to have that happen or not, I'm not sure.  I think the security guards are willing to protect our staff.

Q    So the answer is I don't know.  Right?

A    For this hotel, I asked somebody else to manage it.  If it was safe then and I would not know about it.  If it's not safe then I would be informed right away.  At the time it was not mentioned to me, so I did not know.  But if it's not safe then I would definitely resolve it.  I cannot stop protecting my staff.

Q    Ms. Hu, you didn't personally observe with your senses any of the security guards escorting female employees from the Howard Johnson to the subway, did you?

A    I was not at the hotel, but Janice told me that they already have taken measures.

Q    So the answer is no.  Right?

A    Janice told me that it happened.

Q    But you didn't see, hear, touch, taste or see it yourself, right?

A    I heard the report from my manager.  I have to trust my manager.  My manager is my eyes.

Q    Janice was a manager of the Wyndham Garden, right?

A    Janice spent half the day at Wyndham Garden and another half of the day at Howard Johnson.  She would help me and look around and resolve these issues.

Q    All these reports that you say you received, you did not receive any of them in writing, did you?

A    When Janice came back she could give me an oral reporting every day, that is even more important.  She would resolve the various issues every day.  And also to enhance the quality of our staff and also to protect them.

Q    So the answer is, no, you did not receive these reports in writing you received them orally.  Yes?

A    Every day I would send an extra manager to go there in addition to Henley so that manager would be my eyes, and to tell me everything to see what is safe or not.

          MR. SCHWEITZER:  Your Honor, please direct the witness to answer the question that was posed to her.

          THE INTERPRETER:  The witness would like to have a bathroom break.

          THE COURT:  Okay.  Ask the question again, and answer the question.  Then we can have a bathroom break.

BY MR. SCHWEITZER:

Q    Such reports as you received, you received them orally and not in writing, correct?  Please answer just yes or no.

A    Every day I would have Janice there and she would report to me verbally.

Q    The last word there was verbally?

THE COURT:  Verbally.

MR. SCHWEITZER:  We can take a break.

THE COURT:  No more than a ten-minute break.

(Jury exits the courtroom.)

THE COURT:  Ms. Hu will be done at 2:00 o'clock regardless.  How much more time do you have?

MR. SCHWEITZER:  I can pare what I have down.  I probably don't have more than 15 minutes.

THE COURT:  Then you'll have?

MR. TUNG:  Two or three minutes, maybe five minutes.

THE COURT:  Great.  She'll be done at 2:00 o'clock.

(Brief recess.)

MR. SCHWEITZER:  Your Honor, before we bring the jury back in.

THE COURT:  Yes.

MR. SCHWEITZER:  It's come to my attention that Ms. Hu is discussing her testimony with counsel while under oath.  I received this information the interpreter, Sarah Ye, who is sitting at plaintiff's counsel's table.

THE COURT:  Is that correct, Mr. Tung?

MR. TUNG:  I do not know where she observe or heard.

THE COURT:  That's not the question I asked.  Were you talking with Ms. Hu about her testimony?

MR. TUNG:  No, I didn't talk about her testimony.

The two incidents.  One is she asking to borrow my phone to call her son; that's why I'm asking where she heard I was talking to my client.  Is she referring to that, that I was talking with my client?  When she sitting next to us, right, the only thing I think she is talking about is this.

I think just -- I just, I just told her, yes or no, forget about this, don't get involved with this.  You know, that's it.

THE COURT:  Did Ms. Chen have any discussions with Ms. Hu?

MR. TUNG:  I do not know that.

THE COURT:  About her testimony and cross-examination?

MS. CHEN:  He (sic) owe some money and he let me bring to the office.

MR. TUNG:  That's another thing.  She is going to pay our legal fee for a small matter.  She was asking me if she wants to pay us now and asking me to go downstairs when she goes home.  That's another matter we discussed.

THE COURT:  So you're saying as officers of the Court that you had no discussions with Ms. Hu about her testimony, cross-examination, during the break other than to tell her to answer yes or no to questions.

MR. TUNG:  That's what I said.  I said, don't get at battling with the counsel.  Just tell them, answer

straightforward, yes or no.  That's the only instruction I gave her.

THE COURT:  Okay.

MR. TUNG:  Because I saw that incident going back and forth, and going back and forth.

THE COURT:  All right.  Bring in the jury.

(Jury enters the courtroom.)

THE COURT:  Be seated.  Thank you.

Ms. Hu.

(Whereupon, the witness resumes the stand.)

THE COURT:  You may continue, Mr. Schweitzer.

MR. SCHWEITZER:  Thank you, your Honor.

BY MR. SCHWEITZER:

Q    Ms. Hu, do you recall testifying on direct that you requested Allied Security to provide additional security guards in the lobby, quote, "during the tenant agreement"?

A    Yes.

Q    And do you recall that you did not recall when this conversation took place?

A    Yes.

Q    I'm going to show the witness and the jury exhibit A, which is in evidence.  You're referring to the tenant agreement, this is that agreement, right?

A    I don't know.  I cannot understand English.

Q    It refers to itself as a hotel use agreement between the

W. HU – CROSS – MR. SCHWEITZER                289

City of New York and Department of Homelessness Service and the hotel known as Howard Johnson Long Island city.  Does that refresh your recollection?

A     Yes.

Q     Now the term of this agreement was between May 8, 2020 and October 12, 2020.  Is that the term in which you had this conversation with Allied Services?

A     I cannot recall.

Q     To your knowledge, was this agreement renewed after October 12, 2020?

A     I think this contract was for more than a year.

Q     The contract says May 8 through October 12, was it renewed after that?

A     This contract was for more than a year.

Q     Was the renewal agreement or the renewal of the agreement put in writing?

A     It was Janice who was managing that.

Q     Do you know whether the renewal agreement or renewal of the agreement was put in writing?  Yes or no?

A     I think so.

Q     But you don't have a copy of the renewed agreement or renewal agreement to show to this jury, do you?

A     Not now.

Q     To your knowledge, the terms of the renewed agreement were identical to the agreement that's before the jury as

Exhibit A, correct?

A    They should be the same.

Q    There is no where in Exhibit A that expressly prohibits Howard Johnson Long Island City from having its own security guards, correct?

MR. TUNG:  Objection.  She's not a lawyer to explaining the contents of the agreement.  The document speaks for itself.

THE COURT:  I'll sustain the objection.

You can ask that question another way, Mr. Schweitzer.

BY MR. SCHWEITZER:

Q    To your knowledge, is there anywhere in the agreement where there is a provision saying that Howard Johnson LIC cannot hire its own security?

MR. TUNG:  Objection to lay a foundation if she has knowledge.

THE COURT:  Overruled.

A    They verbally told us that we can only have three roles (ph).

Q    I didn't hear you.

A    They verbally told us that we can only have three roles (ph).

Q    To your knowledge, was your relationship with the security company and then the city governed by the contract or

what they verbally told you?

A    Janice was managing it.

Q    I'm asking you, to your knowledge, was your relationship with the city and its security contractor governed by this contract this written agreement or by what somebody at the contractor told you verbally?

MR. TUNG:  Objection.  Counsel is asking my client to render a legal conclusion.

THE COURT:  I'll overrule the objection.  If she can answer.

THE INTERPRETER:  Interpreter would like to have the question repeated again.

THE COURT:  I'll read it:  I'm asking you, to your knowledge was your relationship with the city and its security contractor governed by this contract, this written agreement, or by what somebody at the contractor told you verbally?

A    The contract would govern.

Q    And it's equally true that the contract couldn't be amended or modified except in writing signed by a representative of the hotel and the city, correct?

MR. TUNG:  Objection.  Counsel is asking the witness to say, to render legal --

THE COURT:  Sustained.

Q    Did you review the terms of the agreement?

A    It would be my manager, Janice, reviewing the terms.

W. HU – REDIRECT – MR. TUNG                292

Q    So you did not, correct?

A    Yes.  But she did tell me about what happened everything.

Q    One of the measures that Howard Johnson took to protect its female employees from guests was to tell them they needed to be careful not to bother guests, correct?

        MR. TUNG:  Objection.  Where did you get that idea?

        THE COURT:  Overruled.

A    We send a security guard to sit next to them.

        MR. SCHWEITZER:  Nothing further.

REDIRECT EXAMINATION

BY MR. TUNG:

Q    Ms. Hu, with reference to reporting channels in your hotel management company, your companies, are those procedures are in the employment handbook, right?

        MR. SCHWEITZER:  Objection.  Calls for hearsay.

        THE COURT:  Overruled.

A    Yes.

Q    And Ms. Hu, in addition that the employees working at Howard Johnson Long Island City hotel, if there they were harassed they can still communicate or report to the shelter management, right?

        MR. SCHWEITZER:  Objection.  Leading.  Beyond the scope.

        THE COURT:  Overruled.

A    Yes, they can.

PROCEEDINGS                              293

MR. TUNG:  I have no further questions, your Honor.

MR. SCHWEITZER:  No recross.

THE COURT:  Thank you, Ms. Hu.

(Whereupon, the witness was excused.)

THE COURT:  Mr. Tung, Ms. Chen do the defendants have any further witnesses?

MR. TUNG:  Defendant rests.

THE COURT:  Thank you.

Putting on any rebuttal witnesses?

MR. SCHWEITZER:  No, your Honor.

THE COURT:  Ladies and gentlemen, we are going to break for the day, a little earlier than I promised, but I told you we might.  We are going to resume tomorrow I'll ask you to be here by 9:30.

My hope, I have some things to cover with the attorneys before we begin with the remainder of the trial, but it's my hope that we get going at around 10:00 o'clock.

Tomorrow we will hear closing arguments.  I will then charge you on the law.  And you'll begin your deliberations.  As I said earlier at the beginning of the trial, you can deliberate for as long as you desire.

So have a great night.  Enjoy the rest of the day. Same admonitions that I gave you previously.  Don't talk about the case.  Keep an open mind.  If anyone contacts you, let me know.  Don't do any research or go to the hotel or anything

PROCEEDINGS                                    294

like that.

(Jury exits the courtroom.)

THE COURT:  You can be seated.

All right before we talk about the letters I received, we received, on the issue of dismissing the claims against the individual defendants I'm trying to figure out the schedule from here on out.  How much time do you think you will each need for your closings?

(Continued on next page.)

THE COURT:  You go first.

MR. TUNG:  I don't think I need more than half an hour.  I don't think I just think about 30 minutes at the most.

THE COURT:  Mr. Schweitzer?

MR. SCHWEITZER:  Probably about 25, 30 minutes.

THE COURT:  All right.  So we're going to get you the jury charge, we've been editing it since we gave it to you at the beginning of trial.  And so, we'll give you the jury charge and the special verdict sheet some time late this afternoon or evening.  Be prepared to discuss the charge at 10:00 a.m. tomorrow.  And the special verdict sheet.

The way I like to talk about the charge is basically go page by page.  And if anybody has any issues with it, you raise them at that point.  And then at the end, if there are other issues you want to discuss about the charge.

So once you get the charge, print it out and go by page.  Determine whether it's a line edit or conceptual ideas or what have you.  Put it all on the page, so as you follow along you can raise them.

And I'm going to give us, I'd like to start at 9:30.  Give us about an hour, I don't think we're going to need an hour, frankly.  So maybe by 10:00, 10:30 we'll be able to make any quick edits, make the copies for the jury, and get them back in and give them, deal with your closings and then charge

them.

As for the defendant's motion to dismiss the claims against the individual defendants.  We've reviewed the letters, we've done additional research, and have come to the conclusion that the claims against the individual defendants will be dismissed and here is why.  In their individual capacity.

It seems that there was a drastic change in the law, or at least understanding of what the State and City Human Rights Law provide as far as individual liability.  In 2022, when the Court of Appeals issued the Doe versus Bloomberg case which expounded upon the prior case of, let me get the name right, bear with me, Patrowich versus Chemical Bank which the courts had misinterpreted according to the Court of Appeals.

But the net result of Patrowich and Doe is that individual liability under the New York City and New York State Human Rights Law cannot be based solely upon a person's position within the company whether they have the authority to hire or fire or control or supervise the workplace or anything along those lines.

Individual liability under both laws has to be based on the person's own conduct whether they contributed to the harassment or discrimination or whether they aided or abetted the harassment or the discrimination or retaliation for that matter.

PROCEEDINGS                                    297

And here there is, there has been no evidence that the individual defendants took part in the sexual harassment or engaged in any discrimination themselves.  The only allegation is that they didn't do anything about it once they knew about it and that is not enough for individual liability.

Plaintiff makes the argument that, in their letter at least, that that failure to act can constitute aiding and abetting.  But that is contrary to this court's understanding of aiding and abetting jurisprudence.  I just  want to pull something up real quick.  Just the dictionary definition of aiding and abetting means assisting or encouraging.  And a failure to act doesn't constitute that.  And I know there's some cases that the plaintiff cites for that proposition that aiding and abetting can, over the failure to act, excuse me, can qualify as aiding and abetting.

The cases that where that comes from are all before Doe and there's post-Patrowich and they're before Doe.  If that sort of logic were to hold true, it would really undercut the whole meaning of Doe and take an employee who -- or supervise, whomever, does nothing and put them in the place of the employer.  Now, their inaction as in this case, I think the jury, it's clear, it's clear to me, maybe clear to the jury that there was inaction.  That could be imputed to the company and maybe enough for the companies to be liable but not individuals.  So I'm dismissing the claims against the

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

PROCEEDINGS                                    298

individual defendants and the jury charge will reflect that

and the special verdict sheet will reflect that and we'll go

forward on that.

MR. SCHWEITZER:  Understood, your Honor.  Please

note our objection for appeal.

THE COURT:  Sure.  That being said, we'll turn

around the jury charge and special verdict sheet as quickly as

we can.  I think you folks should take the rest of the

afternoon and have a serious discussion about resolving this

case and the case that's in front of Judge Vitaliano, I think

it is.

MR. SCHWEITZER:  I believe so, yes.

THE COURT:  If you were watching the jurors, you

should be having a serious conversation with your clients

whether it's them individually or the companies, you might

have a problem.  Just saying.  So please have an honest

discussion about this.  This case should be resolved, both

cases should be resolved.  But we will see you tomorrow at

9:30.

MR. TUNG:  Thank you.

MR. SCHWEITZER:  Thank you.

(WHEREUPON, this matter was adjourned to October 23,

2025 at 9:30 a.m.)

                              *    *    *

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

299

I N D E X

WITNESS                                    PAGE

HENLEY LIANG

CROSS-EXAMINATION     BY MR. SCHWEITZER   222

REDIRECT EXAMINATION  BY MS. CHEN         237

RECROSS-EXAMINATION   BY MR. SCHWEITZER   248


**WEIHONG HU**

DIRECT EXAMINATION    BY MR. TUNG         252

CROSS-EXAMINATION     BY MR. SCHWEITZER   268

REDIRECT EXAMINATION  BY MR. TUNG         292