300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                          23-CV-04729(RER)
JEANNETTE FIGUEROA,

                                          United States Courthouse
          Plaintiff,                      Brooklyn, New York

          -versus-                        October 23, 2025
                                          9:30 a.m.
MAYFLOWER INTERNATIONAL
HOTEL GROUP, ET AL.,

          Defendants.

------------------------------x

          TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
        BEFORE THE HONORABLE RAMON E. REYES, JR.
             UNITED STATES MAGISTRATE JUDGE
                    BEFORE A JURY


APPEARANCES


For the Plaintiff:        BY:  AARON SCHWEITZER, ESQ.


For the Defendant:        BY:  KEVIN K. TUNG, ESQ.
                               BO CHEN, ESQ.



Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                          Phone:  718-613-2268
                          Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

(In open court.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  You've received the special verdict sheet and the final jury instructions.  And I understand there is the defendants have only one issue; is that correct?

MR. TUNG:  That's correct, your Honor.

THE COURT:  And that is that you would like a charge in here about the Farrager-Ellerth defense.

MR. TUNG:  It doesn't have to have that specific name, but the contents of this, whenever the plaintiff is offered something by the defendant and if plaintiff refused that offer and that should be considered that the defendant had taken corrective action.  That's the context.

THE COURT:  And plaintiff says there is no such defense from the state and city human rights law; is that right?

MR. SCHWEITZER:  The Court of Appeals have affirmatively ruled there is no such defense under the city law.  It has not ruled one way or the other whether there is such a defense on the state law.  But the Second Circuit said that it hasn't ruled in such a way.  As such, it would be error to instruct the jury on even on the state law but certainly there is no such defense under the city law.

Furthermore, the defendants didn't actually plea the Farragher-Ellerth in the way they are trying to assert it now.

The way they pleaded it in the answer was that plaintiff refused call the police.  Now their theory is that plaintiff refused a reasonably offered obligation of a transfer.  That's not in the answer.

They advanced a theory that we refused additional security provided by the security company.  That's not in the answer.  It's an affirmative defense, you need to plead it if you want to assert it at trial.

THE COURT:  I need to pull up the answer, to see if you're correct.

There is in the New York pattern jury instructions for state hostile work environment claims a defense PJI95.2, which in essence is the Farragher-Ellerth defense under no name.  And even though the Court of Appeals has not ruled on it, putting aside the answer issue, why shouldn't I include that defense here?

MR. SCHWEITZER:  Because we're not in state court, we're bound by the Second Circuit's precedent.  And reading into what the Court of Appeals might say in the future, the Second Circuit has said the law is not settled.  Treating the law as settled to the jury would be error.

THE COURT:  Mr. Tung, do you want to respond?

MR. TUNG:  Your Honor, I don't think it should be taken because pattern jury instructions are including that jury instruction.  And defendant is entitled to have that

303

instruction to be given to the jury because there is facts here.

The plaintiff had been offered to transfer from Long Island City to Fresh Meadow, which she believes that hotel is a regular hotel. It could be more safer. And she refused that. So that should be part of the defendant's defense they have taken something of corrective actions. That's according to the case law I cited.

It's up to the jury to decide whether or not the fact plaintiff refusal to be transferred is a reasonable or not reasonable. It is for the jury to decide if defendants offer to is a reasonable obligation to be transferred to fresh meadow from the unsafe location in the Long Island City. All facts of dispute it's up to the jury to decide.

I'm not asking the Court to give a clear definition to them, to the jury, it's just saying that that could be a factor to be considered that on the part of defendants corrective actions. That's all I'm asking for.

MR. SCHWEITZER: If that's what is being asked for it should definitely fall by the way side. The Farragher-Ellerth is an affirmative defense that they have to prove by preponderance of the evidence; it's not merely one factor among others to consider.

Further, if we're looking at the answer, I'm looking at the 14th affirmative defense --

304

THE COURT: Hold on, let me pull it up.

It seems peculiar that it almost sets up strict liability. If an employer has a -- I'm not saying the facts of this case are this but -- if an employer has a anti-harassment policy, ability to complain by the employee, and a mechanism for the employer to remedy the harassment, they could not be avail themselves of this defense. It sets up strict liability. I can't believe the New York legislature would want that.

MR. SCHWEITZER: I think it very well could. A number of legislatures, certainly the city counsel has said, it wants its human rights law to be the most protective over any other that could possibly be considered. The state legislature, if we look at the legislative history is animated by similar impulse, although it doesn't state it explicitly in the statute the way the city counsel did.

In any event, if we're looking at pattern jury instructions those are merely patterns, suggestions, not binding on this Court, nor would they be binding on state Courts. The only binding on this Court is the Second Circuit. And the Second Circuit has said the law has not been settled by the Court of Appeals, and that's still the case.

THE COURT: Mr. Schweitzer, what docket number is the answer?

MR. SCHWEITZER: Docket number is 12, on pages 14

and 15.

THE COURT:  There was no amended pleading here in this case?

MR. SCHWEITZER:  No.

THE COURT:  Okay.

MS. CHEN:  There is an amended complaint.  It's not the answers to the amended complaint and, I think when I do the answer I see in the April incident, you know, the plaintiff was instructed to call the police but actually the security guard -- and if you read the complaint the security guard and the harasser -- not the harasser, the person who dropped the, throw, the wet sign begged her not to call the police.  It's her option didn't call the police --

MR. SCHWEITZER:  Okay --

MS. CHEN:  -- in that incident.

MR. SCHWEITZER:  -- amended answer docket 19.  It's identical.  It only talks about the plaintiff not availing herself calling the police and does not talk about denying --

THE COURT:  Docket 19?

MR. SCHWEITZER:  Nineteen, page 14th, the text is identical.

THE COURT:  So there is an amended complaint, okay.  You say it's the 14th?

MR. SCHWEITZER:  Yes.

THE COURT:  I'm just looking at all of the

306

affirmative defenses.  There are a bunch of affirmative defenses that don't have any application to this case.  You can't throw every affirmative defense into an answer, technically a Rule 11 violation.

MR. SCHWEITZER:  This is before we get into the pretrial order where only three defenses are asserted, none of which were Farragher-Ellerth.

MR. TUNG:  Your Honor, I don't have a copy of the answer here, but if there is an affirmative defense the employer has already taken corrective actions that should include this -- even though Farragher-Ellerth is not specifically spelled out but that defense should be used.

MR. SCHWEITZER:  That's not right.  Affirmative defenses can be waived by plea or failure to include in the pretrial order.  The whole point of the pretriel order is trial management, that includes the claims and defenses that go to the jury.

THE COURT:  All right.  I'm not going to include it. You can argue to the jury, but I'm not including that as a specific affirmative defense.  It's not in the amended answer and I don't see it in the joint pretrial order either.

MR. TUNG:  How about, your Honor, the defendant would like to show the jury a copy of the amended verified complaint.  Can you mark, can the Court mark this as Court Exhibit J1 or something?

307

THE COURT:  For what?

MR. SCHWEITZER:  I object in the strongest possible terms.  That didn't get into the trial record, it wasn't admitted.

MR. TUNG:  The Court record.

MR. SCHWEITZER:  The Court record is not the trial record.  The exhibits in evidence and the witness testimony, that's what the witness --

THE COURT:  What is the purpose of showing them the amended complaint?

MR. TUNG:  Well, in this case, it's different from most other cases because the Court has dismissed -- cause of action one, and dismissed part of cause of action two and three.  And I think defendants should be entitled to explain to the jury that what was originally pleaded allegations and now been proved --

MR. SCHWEITZER:  The Court is instructing the jury expressly not to be swayed by the dismissal of the dismissed claims and to only consider the elements and defenses for the claims that are before it.

MR. TUNG:  Jury will be confused if originally --

THE COURT:  They are not going to be confused, Mr. Tung.

MR. SCHWEITZER:  They will have an instruction.

MR. TUNG:  Well, your Honor, if even I'm not allowed

to show --

MR. SCHWEITZER: If anything --

THE COURT: Let --

MR. SCHWEITZER: If anything --

THE COURT: Don't cut him off, Mr. Schweitzer.

MR. TUNG: If defense is not allowed to show the actual copy of amended verified complaint, and they are not -- they are not entitled to see the complaint to start with, but I think defense should still be able to mention, just like in court, to instruct the jury, in jury instruction to discuss, that I should be able allowed to talk to the jury explain to the jury.

THE COURT: You're going to argue the fact that she didn't prove to the Court's satisfaction these other claims, therefore, the claim that remains you should find that she didn't prove that either?

MR. TUNG: Well, I didn't say that.

THE COURT: But that's exactly what you're going to argue.

MS. CHEN: When we select the jury we have the statement, short statement, to say this case is, you know, the plaintiff against both individual defendant and corporation defendant. Do you think we can, you know, explain to the jury why there are only corporate defendants left?

MR. SCHWEITZER: It's not for the jury to know or

speculate as to those things --

THE COURT:  Please.

I'm not following, Ms. Chen, I don't understand. Explain it to me again.

MR. TUNG:  I think Ms. Chen's argument is that at the time when of jury selection, Magistrate Judge Kuo, she did explain to the jury what this case is all about, what the plaintiff asserts her allegations and her cause of actions here.  All of the sudden at the end the jury sees only cause of action to be made, they may wonder what had happened.

MR. SCHWEITZER:  They will be told not to wonder, not to have that influence them.  They are being instructed. Bringing it up is, one, contrary to that instruction; and two, confusing to the jury.

THE COURT:  The purpose -- come on, be real.  The purpose of you making these arguments is to say she didn't prove these other claims, the judge dismissed them so, therefore, her claims that remain are bunk.  That's exactly what you're going to argue.  It doesn't work that way.  No.

What other objections are there to the jury instruction or the verdict sheet?

MR. SCHWEITZER:  None from plaintiff, Your Honor.

THE COURT:  Nothing?

MR. SCHWEITZER:  I thought it was well crafted.

THE COURT:  Okay.

SUMMATIONS – MR. TUNG                310

THE COURT:  And anything else from the defendants?

MR. TUNG:  Nothing else, your Honor.

THE COURT:  Okay.  Great.  Are you ready to close?

MR. TUNG:  Yes, your Honor.

THE COURT:  Okay.  Mr. Schweitzer?

MR. SCHWEITZER:  Yes, your Honor.

THE COURT:  All right.  Let's take a five-minute recess.

(Brief recess.)

(Jury enters the courtroom.)

THE COURT:  You may be seated.  Good morning ladies and gentlemen.  We are going to proceed with the defendant's closing.

Mr. Tung.

MR. TUNG:  Thank you, your Honor.  Good morning everyone.

Ladies and gentlemen, thank you very much for your participating this trial from Monday.  And I really appreciate your help and patience during the trial, listening to the evidence, and observing the witnesses behavior.

What I'm going to do now is connect other dots that you have seen in the trial, heard from the trial, and help you to determine whether or not the defendants are liable for the allegations asserted by the plaintiff in her complaint.

Plaintiff in her complaint has asserted that she was

subject to sex or gender based discrimination in the form of comments, gestures and other physical harassment from the shelter hotel -- from the shelter residents at the hotel. Plaintiff also asserts that the hotel defendants knew or should have known and the hotel defendant did not take corrective actions and accepted or approved the discriminatory conducts of the residents in the hotel. And this is what I believe the basic allegations or her claims against the defendants.

I would like to call it out, among all the defense in the beginning we have defendant corporations, which is Mayflower International Group and you also heard the corporate defendant Yan Zhi Hotel Management. These are the defendants, or I call them corporate defendants, because they are the companies. And you also have heard the individual defendants --

MR. SCHWEITZER: Objection.

THE COURT: Overruled.

MR. TUNG: Ms. Weihong Hu, she was sitting at the defense table. And you also have heard the individual defendants Henley Liang, he's also sitting at the defense table.

But today your role is to help the Court to decide is only for the allegations against the corporate defendants. The judge will instruct you what you have to do, what you have

to consider, what you should not consider.  Judge will instruct you later in the jury instructions.

Defendants, the corporate defendants that I represent, of course, denied plaintiff's allegations.  And they claim once they have learned the conduct of the residents of the hotel or shelter, they immediately did corrective actions.  They did investigations.  And the hostile work environment the plaintiff claim where she worked in, which she worked, that was not created by the defendant corporate defendants.

And they did offer plaintiff and opportunity to move to a different hotel, which is controlled by the defendants, and you have heard the testimony from both sides.  The defendant says she refused to take the transfer, the offer to transfer to another location.  And you also have heard that the plaintiff herself said, in her understanding, that the other hotel is a regular hotel.  And I asked her what to define what do you mean by a regular hotel.  What she defined a regular hotel is to serve the general public, it was not a place a shelter to serve mentally challenged, mentally ill residents.  That's what her definition is.  But the only reason that the defendant said she refused to transfer was because there was only a night shift available, which is starting between 11 to 12 until the next day.

MR. SCHWEITZER:  Objection.  That's not in the

SUMMATIONS - MR. TUNG                    313

record, the time stamps.

THE COURT:  Ladies and gentlemen, it will be your recollection of the evidence that applies, not what the lawyers say to you, what the record shows.  Okay.

MR. TUNG:  Now the evidence presented by the defense when they heard, learned of the incidents, I pointed out to you what corrective action they do immediately.  They talked to the security guards verbally and they talked to shelter management.  They talked to specific people there to report the incidents to Sarah, Sarah is the head of the city shelter program.  And all of these, they reported it right away.

Even though the plaintiff's attorney asked is there anything in the writing.  Think about this.  You have looked at the layout of the hotel lobby.  The hotel lobby is actually similar to the lobby that you come every day to the courtroom. There are security checkpoints on one side.  I cannot say left or right, depends on where you're facing.  The front desk is located against the wall.  You have all seen this layout that was shown, you will see that Defense Exhibit B, it's a picture of the hotel lobby.  You don't have to look at the tables in the middle that was for Christmas party, but the layout the security desk is against the wall and the -- the hotel front desk is against the wall and the security checkpoints is on this side.  Very similar to downstairs.

Now, using your judgment, this is a very typical set

up for a lobby where the plaintiff works.  She works as the manager for the front desk.  And you heard the testimony from Henley Liang the manager of the hotel.  During a normal shift there were always about ten security guards in the facility, five of them constantly stationed at the checkpoints that's on this floor.  And the other five circulating working around in the building, patrolling the building.

So asking yourself, use your common sense, that security is provided by the city, by the shelter.  Ask yourself, did this facility or the place have enough security guard.  And ask yourself, if there are enough security guard in the lobby.

Also, when you get back to the jury deliberation room there is another document that's Defense Exhibit A, which is a hotel agreement between the city of New York and corporate defendant the companies, corporate defendant -- I emphasize the corporate defendant, the companies.  Those are only defendants that you have to determine if they are liable for whatever the injuries, whatever the misconduct of the residents of the shelter hotel.

Now specifically on page three there is a section called securities.  You will see the securities, there it says:  24 hour security will be provided by DHS -- Department of Housing -- a department from the city -- in accordance with the city DHS security plan.  The city security guard shall be

present at access control as well as available to monitor each floor of the hotel.  The city's security shall also monitor the paperwork perimeter provided of the building and other locations within the hotel and as deemed necessary by the social service provided by DHS.  It also says the city security shall be in charge of all and all interactions with guests, guests here are the residents of the shelter.

So when you read that, when you review that section, you'll see the contract clearly defines the responsibilities of the hotel defendants and the responsibilities of the shelter, city shelter.

You heard the testimony and you'll see in the contract the hotel is to provide the kind of services provided by the hotel is for cleaning, maintenance -- it's in the agreement I cannot find the section right away -- but the hotel will provide room service, cleaning the room, the hotel will provide key service giving the keys distributing the keys to the residence, and the hotel will provide laundry service.  Those are defined in the contract also.  You have heard those testimonies repeated from the witnesses.

Particularly I would like to point out the city security shall be in charge of all interactions with guests.  So in other words, the corporate defendants whether its employees are prohibited by the contract to contact or speak to the residents directly by contract.

So you have heard -- that's why you probably wonder why, you have heard three major incidents.  The first incident that occurred in April of 2021 shortly after the plaintiff was hired to work in the hotel.  And that incident, I call the first incident, I call it Besley incident where Mr. Besley came from upstairs and tossed a wet floor sign into the air.  That was the incident.

The second incident, I call it spitting.  Remember that Fiona's incident, Fiona was the one of those cleaning people.  She complained to the plaintiff here she was spit by a person Jamal, I think Jamal.  That was the second incident.

And the third incident is the incident and everyone here had seen a video that was caused by Mr. Robinson who also a resident of the shelter program.  He tossed a picnic desk, picnic table, into the air which eventually landed on to part of the plaintiff's body.

Those are the three major incidents you have heard during the trial.

And you probably wondered, why at no time the management of the hotel walk over talking to those guests directly.  Because, they were prohibited by the contract. They are not supposed to talk to the residents directly.

So don't think the management did not take corrective actions going over there try to stop these residents, because they are not allowed to.  The only people

SUMMATIONS - MR. TUNG                    317

allowed to is the security people staff on the floor in the

hotel.  So that's why you only hear the communication was they

talked to the security guards and asking the security guards

to do something about this instead of the management doing

this directly.

So that's one thing I'd like to point out when you

review the contract here.  It is clearly stated here that the

security work will be maintained by the city.

That leads to another topic, I will cover this

later.  Remember there is a question about this plaintiff's

attorney is asking telling them was there any written reports,

written reports for those complains.  You have heard the

testimony that the city I think Sarah did their own reports

written reports.  But the management testified they only

walked over verbally, communicated maybe through emails, there

is no official written report.  But look at that from the

practically.  When something like this happening all of this

when this busted, what is the quickest way?  You think the

manager Henley Liang should just prepare a report.  No.  The

best effective way is to just walking over to communicate to

the security guards there.  Right.  Do something.  Do

something.

Please note don't think that there is no report that

would normally occur in some other places that is not

applicable here.  The hotel has done what it could have done.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

SUMMATIONS - MR. TUNG                          318

Regarding that offer that plaintiff was offered to transfer from Howard Johnson Long Island city location to Wyndham fresh meadow, you have heard the testimony from Ms. Hu.  She never disapproved or denied that the transfer.  It was actually the plaintiff, she refused to be transferred because there was a night shift.

You also have heard the testimony from Ms. Hu, the hotel defendant here do have employment handbook or employment manuals in place.  Within those manuals there are provisions, kind of standardized provisions, there is no discrimination permitted in the working place.  And if anything similar to that occurred, and there was a channel to report, you report to the immediate management supervisors, and then the supervisors shall report to the senior or top management level.  So those procedures are there, are there.  And this is actually happening here.  They reported and Janice Tian the manager for both places, 50 percent time in Howard Johnson Long Island city and 50 percent in fresh meadow.  She regularly reports to Ms. Hu.  And you heard the testimony from Ms. Hu, Ms. Hu said she's my eyes and ears.  So there is effective communication channels in existence there the hotel management.

Remember, the major complaint or her claims against the corporate defendants was she was sexually harassed based on her gender or sex.  I will submit to you that the plaintiff

didn't prove that. Remember, the person in the hotel right a similar position that was held by a person David, David. And they tried to compare make a comparison David was treated differently by the hotel management, versus she was treated because she was a woman. But look at this.

Number one, I would like to call your attention why do they not call David to take the stand so I can ask some questions --

MR. SCHWEITZER: Objection.

THE COURT: Sustained.

MR. TUNG: But you have observed the fact that David did not come to here to testify, that was a fact.

And now look at the comparison they did the wage. She was making $15 an hour and David was making second call dollars an hour. You heard the testimony from Mr. Liang, Mr. Liang said David started even earlier than him, than Henley in the hotel. If somebody is senior in the hotel making $18 versus $15 that's not a discrimination. Use your common sense.

Also, look at the incident the injury that she suffered. We have nothing any other video but the one video. One video, remember, that was played many times repeatedly I don't want to play it here again.

Remember, it was a resident Mr. Robinson came to the floor, coming out from no where, I don't know where he came

SUMMATIONS - MR. TUNG                 320

from, came out, and he start to throwing thing as round including a picnic table a white picnic table tossed that into the air.  That picnic table eventually lands on to the area where plaintiff is supposed to work, the front desk.  Ask yourself when that incident occurred, is there any difference it will make if the person being hit the plaintiff being hit is a woman or a man?  Yes, she was just standing in the front area the front desk, anybody stand there, whether a male or female, if that table comes over that hits her.

And you don't see that Mr. Robinson was doing this intentionally tossing that chair at her.  He's tossing the chair like this he wasn't even facing her.  This is something I call it accident.

Plaintiff will definitely disagree.  Even if it's accident, it is an incident that occurred in the place where people never expected that occur.  She's not even in what we call in a zone of danger.  She's not standing in a workplace if we have a train coming by and she may fall on to the track.  She's not in that kind of zone of danger.  She's in a place where standing next to the front desk, which is exactly similar to the setting downstairs, to any other building there is a front desk that's where people standing.  So people cannot possibly imagine that somebody comes there agitated and starting throwing things.

So her injury if you look at this her injury was not

SUMMATIONS - MR. TUNG                                  321

caused by discriminatory acts or policies, which up held, which was set up by the hotel management.  Her injury was caused by somebody, a physical injury, by somebody throwing a table at her, anyone there stands there whether male or female.  So look at this.

And now I also the second incident, look at the second incident, Fiona got spit.  Number one that was not her, that was she got spit from a resident.  If that person is a male or female who got spit will make any difference?  If they got into the argument, if the resident or the house cleaning worker got into some dispute or argument you have a very tough customer to deal with, and the customer start to spitting at her or him, would that make any difference?  Number one.

Also, remember that somebody a resident spitting at Fiona a house cleaning staff, that was not caused by the hotel management, right, that was caused by the resident.  And the contract says hotel management cannot have direct contact with the resident.  They can only report to the security or the shelter management of the shelter house manager to take corrective acts to stop him.

Look at this, also look at the first one when Mr. Besley toss that wet floor sign, that was also not controlled by the hotel management.  And whether or not when he tossed this, that creates some fear at the plaintiff, does that make any difference whether she is a female or she's a

male.  And plus, Mr. Besley was doing this was not intentionally had an argument with her or something and then throwing something at her.  It was another incident.

These people, these residents, we know these residents are not, I mean like a normal person.  They are mentally unstable --

MR. SCHWEITZER:  Objection.  We know no such thing.

MR. TUNG:  Your Honor, these --

THE COURT:  Hold on.  Again, ladies and gentlemen, it's your recollection of the evidence that controls.  It's not Mr. Tung or Mr. Schweitzer tell you the evidence is.  Okay.

MR. TUNG:  So from those three major incidents we have not seen any concrete evidence that was caused by discriminatory intent.  It was just the nature of those residents here.  I'm asking you to think about this.  Use your common sense.  Not because somebody thinks I'm a woman I always be treated differently.  You got to look at the facts.  Did the plaintiff present enough facts showing that she was treated differently by the hotel management.  If she's treated differently by the residents of the hotel, can you impede these treatment to the hotel management?  It's third-party especially they are not allowed, the hotel management, is not allowed to directly contact with the residents.

Remember that Besley's incident they said there was

a video.  The management Janice Tian present that video to the owner of the corporation in that video.  And the message the plaintiff testified, right, the owner look at the video and was laughing at what she was wearing and saying that video was funny.  But think about this.  Did anyone here see that video?  Of course not.  Did anyone here explain to you why that video is not available?

MR. SCHWEITZER:  Objection.

MR. TUNG:  I'm not just telling the facts.  This is fact, no one here saw the video.

THE COURT:  This is not the opportunity for you to argue with me, all right.  Let me deal with the objection first.

I'm going to overrule the objection.

MR. TUNG:  No one has seen that video.  We all saw the third video with Mr. Robinson.  Raise a question, why?  You didn't hear any explanation why they could not find the video, the video was destroyed, so how could they make that allegation saying that the owner was laughing at what she was wearing.  And probably everybody here will like to see what kind of things, that clothing she was wearing that caused the owner --

MR. SCHWEITZER:  Objection.

MR. TUNG:  -- to laugh.

THE COURT:  Mr. Tung, enough.

SUMMATIONS – MR. TUNG                          324

MR. TUNG:  We did not see, that's a fact, right, we did not see.  Fiona was not here to give testimony.

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

MR. TUNG:  And we did not see Mr. Robinson is here to give testimony.

Let's look at the facts where that support our defense that they have taken corrective action.  And you will be the one to decide those corrective actions are enough under these circumstances.

Number one, you have heard the testimony.  After the incident occurred, after the complaint to the city, the city increased the security guards number of security guards on the floor.  A particular thing what they did is they stationed a security guard next to the front desk where the plaintiff works.  And you have heard testimony, plaintiff refused to have a male security guard standing next to her station work station because she feels unsafe.  I'm wondering?  Who is discriminating against male?

MR. SCHWEITZER:  Objection.

MR. TUNG:  And that's --

THE COURT:  Stop.

MR. SCHWEITZER:  Sustained.

MR. TUNG:  And the second thing you have heard, the second thing that the management would do, that was in

SUMMATIONS - MR. TUNG                          325

response to the spitting at one of the housekeeping Fiona, they will now require the other employees at the hotel whenever they had to clean rooms that they go up to the guest rooms right and they, the security or the city employees, asked the resident inside that room where they live, right, to come out so the employee of the hotel will go inside to clean the room.  And if they do not leave the room, no cleaning service will be provided.  And that is a very, I think the that's, the best the hotel management could do to prevent any of those unpleasant things from happening again.

What else can they do?  They still have to do their work but that they do is asking the resident to leave so to minimize the contact between the employees of the hotel, which they have to do their work, with the residents or the guests --

THE COURT:  You have five minutes more, Mr. Tung. You told me half an hour, you've gone over that.

MR. TUNG:  And remember also here the keys.  The keys you heard about the testimony the keys was given to the residents that was handled by the front desk before.  After those incidents occurred the keys was given to the security guard, let the security guard of the city give to those residents.  So all of these measures.

And also you have heard the testimony from Mr. Liang.  In the event of those incidents occurred later

they are encouraged to call the police right away.  And even if the plaintiff said before the hotel management and the city management Sarah, she does not like people to call police, she does not want to agitate these residents more, but even I think that was a reasonable explanation, she does not want to create more conflicts.  Whenever you have something, call the police, whenever you have something call the police.  These residents are not mentally stable.

MR. SCHWEITZER:  Objection.

THE COURT:  Ladies and gentlemen, once again, it's your recollection of the evidence that controls, not what Mr. Tung tells you or what Mr. Schweitzer tells you.

MR. TUNG:  You have not heard any testimony that any employees of the hotel management made a 911 call to police got punishment got demoted or fired or laid off.  Those are the things the hotel under these circumstances they could have done to protect their employees.

You can ask yourself what else more?  Maybe there is something else more but the hotel one thing I have to stress is you don't see any evidence the hotel intentionally to create what they call a hostile work environment.  It is a hard place to work.  It is lots of people with mentally challenged, unstable --

MR. SCHWEITZER:  Objection.

THE COURT:  Overruled.

SUMMATIONS – MR. TUNG                    327

MR. TUNG:  Now, now let's get to the point of causation.  Obviously I already described those events before.  The plaintiff's injury physical injury you have seen this already that was not caused by any mismanagement or negligence of the hotel management.  This is caused by the residents, that the hotel management cannot control.  And also it was the injury that she suffered was not caused by discrimination as she said because of her gender.  I already described to you.

Think about this, what she complain, what the injury that she suffered, what is the cause of these is that caused by the management?  You answer this.

Also, you have observed the facts, no medical doctors giving testimony.  We're talking about damages here now.  Let's say she suffers some injuries, the plaintiff, we got to give her compensation.  But what do you award compensation?  You got to give, you cannot just sit here telling your story, I suffer something, you got to pay me some dollar amount.  How do you determine the dollar amounts at this amount of time.  You have not been told by doctor how severe, what kind of latent effects that the plaintiff will suffer, whether or not these injuries were minor or severe.  You have not had any of these testimony from a doctor or expert.  So how do you give any damages if you cannot -- it's the plaintiff burden to prove her case.  I'd like to remind you.

THE COURT: One minute left, Mr. Tung.

MR. TUNG: So you have not heard any dollar amounts or something actual, costs that she spent out of her pocket. What you have heard is that, she whatever the medical expenses covered by worker's compensation. And she file a complaint against the city, she settled the complaint. She didn't tell us how much it is, right.

MR. SCHWEITZER: Objection.

THE COURT: Sustained.

MR. TUNG: So all leaving to us to guess.

Another one is punitive damage. Punitive damages is something that is to punish a defendant and with the hope that the number will be large enough to deter the defendant from repeating whatever wrongdoings they had. Have we heard anything here that you will think we have to punish the corporate defendants here because they intentionally failed to do something, whatever they did, was a gross negligence? Have you heard any of these evidence? I submit to you none.

Also, remember the law does not permit -- the judge will tell you the law okay -- we'll use common sense if plaintiff has been, whatever the injury she had been suffered, if it has been compensated she should not claim more than what she deserves. So there is no what we call double recovery.

I'm going to end up here. I was going to cover more connecting more dots in the evidence that you have seen, but I

SUMMATION - MR. SCHWEITZER                                329

think I have done enough.  Use your judgment and return a verdict in favor of the defendants corporation.  They did what they could have done under these circumstances.  There is nothing intentionally of gross negligence on the part of defendants, no evidence showing any of those.

Thank you very much.

THE COURT:  Mr. Schweitzer, you have equal amount of time, 37 minutes by my estimation.

MR. SCHWEITZER:  I estimated 40, but fair enough.

Members of the jury, thank you for your attention these past few days.

I'm going to tell you a story, it's not evidence. Nothing I say is evidence.  Nothing my adversary said is evidence.  Rather than scatter shots connecting the dots I'm going to tell you what happened.  What we've heard from the evidence.

What we've seen and heard is that in May of 2020 Howard Johnson hotel contracts with the city to act as a shelter.  That contract lasts from May through October of that year, and the reasons there we all remember this is because that was the height of the COVID-19 pandemic nobody was traveling, few people were staying in hotels.  They didn't want to lose money.  Owning a building nobody is staying in, nobody is staying in rooms, contract with the city to open the shelter, the city pays them money subsidies the business keeps

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

SUMMATION - MR. SCHWEITZER                    330

them open.  That contract runs the course over five months.

Henley Liang is brought in at the beginning of that period in

May 2020 or June 2020 to manage that hotel.  He's brought in

by Weihong Hu.

What he sees in the course of managing the hotel you

heard at deposition.  He saw, and he received complaints

mostly from female employees, of male residents sexually

harassing them, propositioning them showing them their

penises, masturbating in corridors or in the lobby, urinating

in the lobby.  That's what he receives reports of over the

course of the five months.

At the end of those five months, once the hotel is

obligated to do absolutely nothing, other than let the

contract lapse, what does it do?  Does it say, I want you out.

I don't want your guests, your shelter members harassing my

employees.  I want them in care of clinicians people who know

what they are doing, who have degrees who can handle it, not

11 grade high school drop outs who were hired to man a front

desk at a hotel.  No.  It does not say that.

Does it insist on changes to the terms of the

contract to maybe protect its employees more to give the city

more responsibility to protect its employees, to put in the

contract express terms like for instance a city -- a security

guard contracted by the city must accompany the employees.  Or

a security guard must be stationed at the front desk.  No, it

does not take those steps to bargain those terms.

It had leverage, the city needs shelters too.  It didn't take those steps knowing of the pervasive hostile atmosphere of harassment caused by the guests.

They say they renewed the contract, but we haven't actually seen any renewed contract containing any term of the contract.  What appears to have happened is that they just kept operating under the contract for an undefined term, like you or I might rent and apartment on month to month basis and end lease by moving out.

Did it end of lease by moving out, in the analogy, or did it terminate the contract?  No.  It continued the contract for another six months until Ms. Figueroa was hired in April of 2021.

Did it try to amend the contract during the time of employment from April through September 2021, a period of five months?  No.  It took no such action.  Rather, as you heard, it tried to hide behind terms that were not even in the contract to try to aggregate its responsibilities to try to protect its employees.

You can read the contract yourselves.  I'll point you to a couple of places.  Page three, section two, subsection 2, DHS responsibility for security.  What does that say?  The defendants say they were precluded from hiring their own security.  Contract said, no, you don't get to do that

only we the city get to do that.  You have to rely entirely on us.

But that's not what the contract says.  In fact, the contract says the exact opposite of that.  The contract says: Hotel security located on site should coordinate with the city security guards.  That's what the contract says., contract permits the hotel have its own security on site.  On page 14 in section six visitors, in big capital letters all caps, can't miss it, the contract says:  Hotel to provide security services as it typically finds in its normal parameter security.

We know what that looks like, don't we, we've seen Defense Exhibit B.

We've seen that normal perimeter security means having at least one hotel security staff on site in the lobby. Here we have exhibit B, at the bottom here, somebody with a wand a security on the hat, that's hotel security.  That's in the normal course of operations, but they didn't have that, did they?  They said, we're prevented from having even when the contract says they can have it.

Not only do they do what they normally did, they did less; expressly less than they normally did.  And they tried to hide behind the city for that.

Contract also provides, going back to page three section two, subtwo, that the city is going to make sure their

SUMMATION - MR. SCHWEITZER                333

guests, quote, "comply with hotel rules," unquote.  What are those rules?  We've not seen any rules.  The hotel didn't show you any rules.  They didn't show you any guest code of conduct.  They didn't show you any prohibited acts.  They didn't testify about any prohibited acts.  Apparently this hotel was the wild west, anything goes; and the employees had to just deal with it.

So that's the situation Ms. Figueroa walked into.  I say walks into, because she was brought into the job by an Indeed posting that said nothing about how she would be interacting with men's shelter guesting, "mentally ill", quote/unquote or otherwise.  She was hired as a front desk person, front desk manager.  She did that job she handed out keys and from time to time.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  From other times she did other jobs.  What did she herself see and experience when she was doing that?  She was propositioned by guests for dates.  She said I don't want to.  They did it any way.  She was stalked on her way home followed to the F train station from Long Island city to where she lives in Flushing.  We do have that in the record it's on the pay stubs that she lives in Flushing.  She said I don't want to, and the men kept following her she said okay just stay behind me don't walk

with me.  One resident tried to leap over the front desk and threatened to bust a nut in her face, those were the words that you heard.  Other residents again masturbated near her work station in the lobby or urinated showed her their penises.

All of this, she said, was unwelcomed.  And four of you, I'm sure, know very well that this is not conduct that any -- I said four I meant five -- that any reasonable woman would tolerate.  Not even female prison guards tolerate this, they have unions to protect them.  Ms. Figueroa had no one.

Why did she have no one?  For one thing, yes, the security guards could hear her verbally when she complained but you can see in her reports to Henley Liang that the only writings, write-ups that you have of these incidents the only person made write-up is Ms. Figueroa.  The security people would ignore her, what does she say?  They just stood there like nothing without saying anything to that person, that person being the guest.  That's on May 15.

Also on May 15 she says security here sucks, those were her words, to Henley Liang.  She asks Mr. Liang to talk with the house manager, that's Sarah, the following commented to make sure that residents go through security rather than interacting with her or other hotel employees directly.  That change apparently never goes through.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  At least if it was talked about among the security and among the hotel management, it never practically changed Ms. Figueroa's experience.  You heard her from the beginning to the end, it was always the same: Interactions, permissiveness, negligence.  That was her lived experience.

And she's the only one competent to testify about that.  Ms. Hu was never present.  Everything she knows is filtered through Mr. Liang and Janice Tian.

And even Mr. Liang was only present for about an overlapping two or three hours each day with Ms. Figueroa he knows nothing goes on at night other than that he knows from his experience that, quote, mostly it was the females that were on the receiving end.  That's what he testified to my colleague at his deposition where he put under oath, same as he was before you.  Those were his words, mostly it was the females on the receiving end.

It's this atmosphere of laissez faire, hands off, conscious pilot watching his hands of the blood, that atmosphere that contributed to what was by April 2021 an environment that could produce things like Besley throwing a wet floor sign down from the mezzanine into the front office where it hit Ms. Figueroa.  It could produce an environment that where security stood around as Mr. Robinson threw items

flipped a table, picked it up and tossed it over his shoulder where it hit Ms. Figueroa on the head and shoulder and she collapsed she lost consciousness for a time.  It was that environment that when Fiona reported a sexual harassment incident and you can see in Exhibit 2.  Ms. Figueroa reported to Henley saying explicitly it was sexual harassment.  We had to call cops on Jamal for sexual harassment and spitting.

Mr. Cheek the social worker for the city he wrote a report he wrote an incident report.  Ms. Figueroa text messaged Mr. Liang make sure that was in writing.

What does Mr. Liang do?  Obviously he's not present so he's not yelling across the lobby for security, he's at home it's 8:19 p.m..  He's gone home at the end of his shift at 6:00 o'clock.  Does he write an incident report?  Does he go to work the next day and write an incident report?  Does he put in an email to Ms. Hu or Janice or anybody?  No.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  You've seen no written incident reports, no records of anything, any action that was taken by the hotel.

MS. CHEN:  Objection.

MR. SCHWEITZER:  Overruled.

MR. SCHWEITZER:  Why is that?  It's so that the hotel management can come here get on the stand and testify to

you about whatever they want to say.  And they don't have a record to be tied to.  That's why people make incident reports, so when lawyers and jurors want to check something that somebody says on the stand make sure its true they can confront them with it say here are your words, aren't they.  Here we don't have that.  Why don't we have that precisely so they only have -- so you had only have their word to rely for what they did.

What do they say they did.  They said they met with security, they proposed various changed, proposed that a security guard sit at the front desk propose that security guard follow Ms. Figueroa to the subway.  But they are admitted those meetings, they never wrote down the proposals.  They can't show they wrote down the proposals to you.  I submit to you that they are not trustworthy when they tell you that.

Why do I say that?  When Mr. Liang was on the stand, I asked him about things he said in his deposition that were different from the story he told you direct.  When he remembered -- on direct he told you things that he omitted saying at deposition.  At the deposition he told you things that contradicted on direct.

He said, I don't remember what I said at deposition but if it's written down, if it's written down that's probably what I said.  So we see here the value of writings.

SUMMATION - MR. SCHWEITZER                    338

Ms. Hu is also not trustworthy for frankly ludicrous reasons. She tells you a lurid story about how she was completely misinterpreted at her deposition, that the interpreter said put in the record the opposite of what she I believe intended to say. You shouldn't believe that because a couple of reasons.

One, she misstated what she what the interpreted said. The interpreted translated her words correctly I believe I have an employee handbook. I can show it to you. Ms. Hu gets on the stand and says the interpreter said I don't have an employee handbook. That's simply not what the interpreter said at the deposition. The interpreter said on her behalf translating her words, I have an employee handbook, I can show it to you.

The other reason is she said she made objections at the time to the translation but they never appeared in the record. You heard how translators are treated, created you've seen that way they are put under oath same as witnesses. The Court, and you all, rely on them holding themselves to that high standard of telling you the truth.

When you see Ms. Hu get up on the stand, hold herself off, closed off body language, hunched shoulders, and tell you things, don't you believe you her.

MS. CHEN: Objection.

THE COURT: This is argument. Overruled.

MR. SCHWEITZER:  Speaking of the employee handbook. She made a promise to my colleague she would give if to her, never happened.  She said she had a copy to show you she never showed it to you.  Got no reason to believe this thing even exists.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  You've not seen a receipt from Ms. Figueroa having received a copy she denies ever having seen one.

This case comes down to credibility in your minds, Ms. Figueroa is the only credible you heard from.  She was never confronted with prior testimony.  She was never contradicted.  Her story was consistent from beginning to ends this is what I saw this is what I heard this is what I felt and what I felt was sexually harassed because of the lured things I saw and heard and had to experience.  These three major incidents happened because this was the sort of environment that the defendants let fester by not doing anything about.

I also want to turn to the issue of the offer to transfer.  You heard that that offer was made by the defendants.  But you've not seen any written request to transfer. -- written offer to transfer.  What you have seen again on Exhibit 2, on June 6, Ms. Figueroa asking Henley to

SUMMATION – MR. SCHWEITZER                340

talk to Janice about her requested transfer.  Please talk

about being transferred with Janice, those are her words.

What are Mr. Liang's words?  Just stay behind the desk.  Wait

until I get a replacement will for you.  That's his response.

Stay in the same place, wait for me, in the meantime nothing

is going to change.

When you consider whether there were comments

gestures or harassment, you know that occurred.  You've seen

Ms. Figueroa testify about it and you heard Mr. Liang that

there was sexual harassment, and that it was mostly

experienced by female employees.  You heard Ms. Figueroa say

the conduct was unwanted.  You can see her text messages to

Mr. Liang saying she felt unsafe.

You know she was subjected to the conduct because of

her sex, because you can compare Mr. Liang's own experience at

the front desk with Ms. Figueroa.  Mr. Liang said it was one

incident maybe when he was maybe talked more insistently than

he ought to be or the guest snuck around longer than he ought

to and insisted on trying to talk to him.  But Mr. Liang

doesn't remember what that guest said nothing stuck in his

mind.  He denies having been sexually propositioned asked on a

date, or stalked himself.

Ms. Figueroa was.  What is the different between the

two?  She's a woman he's not.

Was Ms. Figueroa's characterization of the conduct

she experienced, this harassment, reasonable?  I would think so.  I certainly don't -- a reasonable person doesn't expect somebody to go around waiving their genitals at them.  A reasonable person doesn't spent to have a table flung at their head.  Reasonable a person doesn't expect to be spat upon or have their colleague spat upon or to be threatened, you report this you are going to get what you deserve.

We know that Ms. Figueroa again actually considered subjectively that this environment was hostile because she reported as such to Henley.  She said she was unsafe she invoked the term sexual harassment on August 14.

We know that the sexual harassment degraded Ms. Figueroa's experience, the terms and conditions of privileges of her employment.  She expected to be able to carry on a customer face and customer service job like any other normal hotel attendant or cashier would do maybe some us have worked in retail.  We know, sometimes people get rude sometimes people get up set; but this conduct, this is beyond the pale.

Nobody expects to have things thrown at them. Nobody expects to be propositioned.  Nobody expects to be stalked.

She did report this to Mr. Liang.  Mr. Liang is a representative of the corporate defendants and he says he reported it up.  Ms. Hu says she received such reports.  We

don't know whether it was true, none of it was written down, but they say they did it.  So at least according to their admission they knew what was going on.  They accepted or approved of it.  They accepted it as a cost of doing business continuing business with the city, getting pandemic money rather than having to go out in the marketplace and compete for guests.

Ms. Hu in particular approved of it.  We know that because Janice told Ms. Figueroa that she was laughing about her being struck with a sign.  Janice certainly never denied it.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  Finally, harm and causation of harm.  I'm not here to argue that physical injury is the same as sexual harassment.  What I am here to argue, you can see from Ms. Figueroa's therapist, Mr. Minor in exhibits seven and eight, she experienced sexual harassment and she came down with PTSD, that's the diagnosis that appears in her medical reports.  That PTSD contributed to what Dr. Miner called 85 percent total disability and 100 percent work disability that is she's not able to work any more.

You heard Ms. Figueroa say she tried to get another job at another hotel after her incident. -- after her leaving the Howard Johnson hotel.  She couldn't do it.  It's not that

she couldn't stand at a front desk and take orders -- she walks with a cane now -- she could do that. She literally couldn't stand to do it. It was traumatizing for her. She could not perform customer facing work. She was scared.

MR. TUNG: Objection. That determination should be done by an expert, no expert was here.

THE COURT: Again ladies and gentlemen, it's your recollection of the evidence that controls.

MR. SCHWEITZER: And what caused the mental distress such debilitating mental distress? It was the pervasive conduct over five months that put Ms. Figueroa in fear of her safety and life; in fear of being raped, she said. That's what did it. That's the environment that defendants tolerated at their hotels.

Coming to the issue of damages, the judge will instruct you it's up to you to craft a remedy. The law doesn't provide a particular formula or mathematical operation you need to perform. You need to be guided by your common sense and sense of justice. What do you think Ms. Figueroa deserves. That said, there is some rules of thumb that can help guide you. What I'm not going to do again is argue that you should compensate her for her physical injury that came out of the settlement with the city or the medical bills that came out of worker's compensation. But what you can compensate her for is her lost wages from her lost ability to

work after September 15, 2021 up until the present.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  You can compensate her for her emotional damages, her distress.  You've seen her in front of you breakdown crying several times, not just on the stand but also today when she doesn't have to recount her story, just hearing it told is that distressing for her.  You can send the hotel a message.  You can say, this was wrong.  You shouldn't have done that.  Don't do it again ever.  Because there are consequences for ignoring severe and pervasive sexual harassment.

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  Again, there is not a mathematical formula for emotional or punitive damages, as I said.  Lost wages can be computed to a fair degree of certainty.  You can do that from looking at Ms. Figueroa's pay stubs from April 3 through July 9 in the record.  There is another pay stub from March 20 through April 2 but that's only one days worth of work.  If you look at those seven pay stubs from April 3 through July 9, 2021, you can see they are bi-weekly pay stubs, one pay period is two weeks.  If you convert her pay into weekly pay on average she gets about $489 per week working at Howard Johnson.  She hasn't been able to work since

SUMMATION - MR. SCHWEITZER                    345

leaving Howard Johnson on September 15, except for a couple of weeks when she tried but couldn't stick around because it distressed her.  It's been 214 weeks since Ms. Figueroa left Howard Johnson.  What do those lost wages?  If she stayed at Howard Johnson and kept getting Pate $489 a week it would have been $105,000, that's just lost wages.

MS. CHEN:  Objection.

MR. SCHWEITZER:  Overruled.

THE COURT:  Overruled.

MR. SCHWEITZER:  This was somebody making minimum wage, you heard $15 an hour.  I submit to you her emotional damages are worth more than any lost wages she had.  Because she has to live with that for the rest of her life.  Lost wages only go to your verdict.  What she has to live with, what she experienced until she dies.  Again, there is no mathematical formula for this, you have to use your judgment. Juries in your position are empowered to make any decision on damages that you think is fair, you think is reasonable.  Some juries go as low as $500, some go up to several million as the number.  I've seen one verdict go to $100 million.  I'm not going to ask you for anything in particular today, that's the range you're dealing with, that's the space your head should be in in thinking what is fair to Ms. Figueroa.

I will say, in considering in punitive damages that is damages to punish or deter and a message to say this is

SUMMATION – MR. SCHWEITZER                346

wrong.  When our elected representatives get together and provide for punitive damages in other situations, they typically think in multipliers.  Either double damages; that is, double the award and award as punitive or triple damages for various things.

THE COURT:  You have three minutes, Mr. Schweitzer.

MR. SCHWEITZER:  I submit to you that that's reasonable in terms of thinking about that sort of thing.

I'll ask you after you've heard the Court's instructions on the law, after you thought about the evidence, and after you deliberated with your fellows, and after you've come to a conclusion, that that conclusion be that these two hotels permitted, tolerated --

MS. CHEN:  Objection.

THE COURT:  Overruled.

MR. SCHWEITZER:  A sexually hostile work environment, subjected Ms. Figueroa to the same, and deserve to pay her lost wages, her emotional damages, and as a punishment.  Thank you very much.

THE COURT:  Ladies and gentlemen, I want to give you an option to break now for lunch, come back at 1:15 p.m. and I will then charge you on the law.  Or, we take a ten-minute break then I charge you on the law.  I would prefer you go to lunch first then come back at 1:15 I'll give you the law then.  Do you accept that?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

THE JURY:  (Collective) yes.

THE COURT:  We'll take a break until 1:15.  Come back, I'll charge you on the law then let you deliberate for as long as you want.

Same admonition I've given you all along.  You heard all of the evidence you heard the arguments but you haven't heard the law yet don't start to make up your mind what's what you have no idea what the law is.  Okay.  Thank you.

(Jury exits the courtroom.)

THE COURT:  I'll see you at 1:15 p.m.

(Lunch recess.)

(Afternoon session.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Are you ready?

MR. SCHWEITZER:  Yes, your Honor.

MR. TUNG:  Yes, your Honor is.

(Jury enters the courtroom.)

THE COURT:  You may be seated.

Ladies and gentlemen of the jury, now that you have heard the evidence in this case and the arguments of each side it is my duty to give you instructions on the law you must apply to reach a verdict.  Please pay close attention.  You should not be concerned about the wisdom of any rule of law that I state.  Regardless of any opinion you may have as to what the law may be or should be, it would be a violation of

your oaths as jurors to base your verdict upon any other view of the law than that given to you in these instructions.

During the trial the attorneys may have referred to some the rules of law governing this case.  If there appears to you to be any difference between the law as stated by counsel and the law as I now state to you, it is my instructions on the law that you must follow.  You should not single out any one instruction that I give you as a loan stating the law, rather you should consider these instructions as a whole when you retire to the jury room to deliberate on your verdict.  I'm going to begin by stating some general rules of law that may help you understand your role and the way in which you are to review the evidence in this case.  I will then instruct you as to the particular claims alleged in this case and the elements that the plaintiff must prove with respect to each.

Because there are two claims alleged, I think it may be useful for you to say copy of these instructions to refer to during your deliberations.  These instructions are not evidence in the case.  Rather, they are provided simply so you could understand the legal principles applicable to your deliberations.

In charging you on the applicable law.  Let me be clear that I'm expressing no opinion on how you should decide the facts of this case.  That is a task left exclusively to

you, the jury.  With respect to any question concerning the facts, it is your recollection of the evidence that controls. Nothing I have said or done during this trial should be taken by you as expressing any opinion about the facts in this case. Thus, you should attach no special significance to any questions I may have asked during the trial, or instructions I have given to the attorneys during their questioning of witnesses.  These are asked simply to clarify matters not to express any opinion as to the facts in dispute.

Neither should you draw any conclusion from any occasions when I may have comments about any conduct by the attorneys during trial.  The issue before you is not the conduct of the lawyers.  The issue is whether or not the plaintiff has sustained her burden of proof.

I thank all counsel for their conscientious efforts they have made to present this case to you.

In determining the issues of fact presented in this case, it is your duty as jurors to consider all the evidence before you with complete impartiality and to render your verdict without bias, prejudice, or sympathy as to any party. All parties are equal before the law.  And you can assume that this case is important to all of them.  Thus, this case should be considered and decided by you as an action between parties of equal standing in the community.  All persons and all institutions or entities stand equal before the law and to be

dealt with as equals in this Court. All parties are entitled to equal consideration. No party is entitled to special sympathy or favor on your part you must judge the facts and apply the law as I shall instruct you without bias prejudice or sympathy to eastern the plaintiff or the defendants.

Several witnesses in this case used an interpreter. Court interpreters are specially trained for such translation and you should IN no way draw any negative inferences from a witness's use of an interpreter. You should also rely solely on the interpreter's translation even if any original language in which the witness spoke. The English translation provided by the interpreter is the official version of that witness's testimony. And no juror should attempt to retranslate any of the testimony.

I wish to instruct you now as to what the evidence is and how you should consider it.

The evidence upon which you are to determine the facts comes in several forms. Sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness. Deposition testimony of witnesses who have appeared in court to the extent it is inconsistent with their trial testimony. Exhibits that have been received by the Court into evidence. And any stipulations of fact to which all parties have agreed are stipulated.

Certain things, however, are not evidence. And are

to be disregarded by you in deciding what the facts are.

Arguments or statements by lawyers are not evidence.

Questions put to the witnesses are not evidence unless adopted by the witness.  Objections to questions or to the exhibits are not evidence.  In this regard the attorneys have a duty to their clients to object when they believe evidence should not be received.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection was sustained, ignore the question.  If the objection was overruled, treat the answer like any other answer.  Testimony that has been excluded stricken or that you have been instructed to disregard is not evidence and must be disregarded.  Obviously anything you may have seen or heard outside the courtroom is not evidence.

Finally, nothing I have said or done should be used by you in reaching your verdict.

As I've said already, it is your recollection of the evidence that governs your determinations.  If in the course of your deliberations you have any questions regarding a particular of a witness' testimony.  You can simply send me a note indicating that you would like to have the witness's testimony read back to you.  Although you may request that all of the testimony by witness be read back, you should be as specific as possible and attempt to focus your request on testimony regarding a specific issue.

You may of course view any exhibit admitted into evidence and I'll provide to you all of the admitted exhibits to the bring with you to the jury room.

There are generally speaking two types of evidence from which you may properly find the truth as to the facts. One is direct evidence such as testimony of an eye witness to an event. The other is incorrect or circumstantial evidence. That is proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

A simple example of circumstantial evidence would be the following. If you were to come to court on a bright sunny day and then after several hours in this windowless courtroom you were to see people entering from the rear one wearing a wet raincoat and the other shaking a wet umbrella you may infer but are not required to from these circumstances that it had rained while you were here in court without yourselves ever going outside or even looking out a window.

So in a trial you are permitted to draw from the facts that you find and have been proved such reasonable inferences or conclusions as seem justified in light of your experience and common sense. Circumstantial evidence of no less value than direct evidence. For it is a general rule that the law makes no distinction between direct evidence and circumstantial evidence but simply requires that your verdict must be based on a preponderance of the evidence presented.

JURY CHARGE                                      353

In deciding what the facts are, you must consider all the evidence that has been offered.  In doing this, you must decide which testimony to believe, which testimony not to believe, and what weight to assign the testimony.  In making that decision there are a number of factors you should take into account including the following:  The witness's opportunity to observe the events she described, the witness's intelligence and memory, the witness's manner while testifying, the witness's interest in the outcome of the case, the witness's relationship with any of the parties in this case and the possible bias or prejudice concerning any party or any matter involved in the case, and the reasonableness of the witness's testimony considered in light of all the other evidence in the case.

There are some other points you should keep in mind infer making your decision on credibility.  First, if you find that a witness's testimony is contradicted by what that witness has said or done at another time or by the testimony of other witnesses, you may disbelieve all or any part of the witness's testimony.  But in deciding whether or not to believe the witness keep these things in mind.  Sometimes people forget things, and memories fade overtime.  A contradiction may be an innocent lapse in memory or it may be an intentional false hood.  You must not infer that a witness is lying based solely upon the facts that the witness is it

not recall some or all of the events that are at issue. Consider therefore whether it has to with an important fact or only a small detail.  Different people observing the same event may remember it differently and, therefore, testify about it differently.

Second in deciding whether to believe a witness you should especially note any evidence of hostility or affection which the witness may have towards one of the parties. Likewise, you should consider evidence of any other interest or motive that the witness may have in cooperating with a particular party.

Third, if you find that any witness has willfully testified falsely as to any material fact, that is, as to an important matter, the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything.  You are not required however to consider such a witness as totally unworthy of belief.  You may accept so much of his or her testimony as you deem true and disregard what you feel is false.

By the process which I have just described, you as the sole judges of the facts this case decide which of the witnesses you will believe, what portion of their testimony you accept, and what weight you will give it.  To sum up, what you must try to do in deciding credibility is to size up a

witness in light of his or her demeanor the explanations given and all of the other evidence in the case.  Always remember that you should use your common sense and your good judgment and your own life experience.

The plaintiff, Jeannette Figueroa and Weihong Hu president and owner of the corporate defendants have testified during this trial.  They are what are referred to in the law as interested witnesses, because they have an interest in the outcome of the case.  The fact that a witness is an interested witness, does not necessarily make him or her less credible than a witness who is not interested.  It is for you to determine from the behavior of such a witness while she testified and from your general experience in judging people, whether or not their testimony has been shaded or colored in this case either intentionally or unintentionally.  If you think it is appropriate to do so, you may refuse to believe the testimony of such a witness even though that testimony has not been impeached or contradicted.  You are not, however, required to disbelieve such a witness and you may accept all or so much of her testimony that you think is reliable and reject so much it that you think is unreliable.

In a civil action such as this, the plaintiff has the burden of proving the essential elements of her claims against each defendant by a preponderance of the evidence.  To establish a claim by a preponderance of the evidence means

simply to prove that something is more likely true than not true. A preponderance of the evidence means the greater part of the evidence. It does not mean the greater number of witnesses or the greater length of time taken by either side. The phrase preponderance of the evidence refers to the quality of the evidence, the weight and affect it has on your mind.

In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them and all the relevant exhibits received in evidence regardless of who may produce them.

If the plaintiff is to win, the evidence that supports her claims must appeal to you as more nearly representing what took place than the evidence opposed to her claims. If the evidence ways so evenly that you are unable to say that there is a preponderance on the plaintiff's side, then you must return a verdict for the defendants.

To restate briefly, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it produced in your mint a belief that what is sought to be proved is more likely the case than not the case.

At the start of the case you heard that there were federal claims against the corporate hotel defendants and state and city claims against the hotel defendants and the individual defendants Henley Liang and Weihong Hu. Some of

these claims have since been dismissed. This includes the federal Title VII claim against the hotel defendants and the state and city claims against the individual defendants Henley Liang and Weihong Hu. The two remaining claims in this case upon which you will decide, are those alleging that the hotel defendants are liable for violations of the New York state and New York City human rights laws.

I will now instruct you as to the legal elements of those claims against the hotel defendants; that is, what the plaintiff must prove and the law of damages.

A word of caution. Although certain claims have been dismissed against certain defendants this is has no bearing on your decision on the liability if any for the remaining claims against the remaining defendants. There were both individual and corporate defendants in this case, it does not follow that if some claims have been dismissed against the hotel defendants and all claims have been dismissed against the individual defendants that this determines the liability if any of the corporate hotel defendants for the remaining New York state and New York City human rights law claims. You must assess those claims without regard to any of the other dismissed claims.

I will now instruct you on the substantive law of the New York state and New York City human rights law claims against the hotel defendants.

As you heard, this is an action to recover damages for employment discrimination arising from a hostile work environment.  The New York state human rights law prohibits discrimination based on sex, in this case Jeannette Figueroa claims she was subjected to a hostile work environment because of her sex.  Specifically, plaintiff claims she was subjected to sex based discrimination in the form of excepts gestures an other physical harassment from shelter residents at the hotel, and that the hotel defendants knew or in the exercise of reasonable care should have known about the conduct and either accepted or approved it.

The hotel defendants deny that plaintiff was subjected to a hostile work environment because of her sex and specifically deny that they accepted or approved it.

There is no dispute that Ms. Figueroa is a woman. And was employed by the hotel defendants.

Therefore, in order for plaintiff to recover for employment discrimination arising out of a hostile work environment plaintiff must prove by a preponderance of the evidence:  One, that the comments, gestures, and other physical harassment she claims actually occurred; two, that the conduct was unwanted; three, that plaintiff was subjected to the conduct because she is a woman; four, that a reasonable woman in the plaintiff's position would consider the work environment to be hostile; five, that plaintiff actually

considered the work environment to be hostile; six that the conduct subjected plaintiff to inferior terms conditions or privileges of employment; seven, that the hotel defendants knew or in the exercise of reasonable care should have known about the conduct and either accepted or approved it; and eight, that plaintiff was harmed because of the conduct.

A hostile work environment exists when the conduct that the workplace including intimidation, ridicule or insults would cause a reasonable woman in plaintiff's circumstances to consider the work environment to be hostile.

In deciding whether plaintiff's work environment was hostile and subjected her to inferior terms conditions or privileges of employment, you must consider all of the circumstances including the effect on her psychological well-being, whether the conduct was humiliating or physically threatening, whether the conduct unreasonably interfered with her work performance.

In deciding whether defendants accepted or approved of the shelter residents conduct you must consider whether and if so when defendants learned or should have learned of the conduct and failed to conduct an investigation, conducted an inadequate investigation, and/or failed to take appropriate corrective action.

In order to find defendants liable to plaintiff you must decide that the comments gestures and other physical

harassment actually occurred, that the conduct was unwanted, that plaintiff was subjected to the conduct because she is a woman, that a reasonable woman in the plaintiff's position would consider the environment to be hostile that plaintiff actually considered the environment to be hostile that the conduct subjected her to inferior terms conditions or privileges of employment that the defendants knew or in the existence of reasonable care should have known about the conduct and either accepted or approved it, and that the plaintiff was harmed because of the conduct.

On the other hand, you will find the hotel defendants are not liable to plaintiff if you decide at the comments gestures an other physical harassment did not actually occur or the conduct was not unwanted or that the plaintiff was not subjected to the conduct because she is a woman, or that a reasonable woman would not consider the work environment to be hostile, or that plaintiff did not actually consider the work environment to be hostile, or that the conduct did not subject the plaintiff to inferior conditions or privileges of criminal contempt, or that the defendants did not know or in the exercise of reasonable care should not have known about the conduct or that plaintiff was not harmed because of the conduct.

So far I've told you about the law that you must use in deciding plaintiff's claims under the New York state human

rights law; however, the plaintiff is also seeking violation of the New York City human rights.  Law there are different of legal rules to decide that claim.  I will now tell you about those rules.

The New York City human rights law prohibits employment discrimination based on sex.  In this case the plaintiff claims that she was subjected to a hostile work environment because she is a woman.  Specifically, plaintiff claims that she was treated less well than other employees because she is a woman when she was allegedly harassed through comments gestures an other physical harassment from the shelter residents.  Additionally, plaintiff claims that the hotel defendants knew of the shelter residents conduct and either accepted it or failed to take immediate and appropriate corrective action.  Defendants are considered to have had knowledge of the shelter residents discriminatory conduct if an employee with supervisory or managerial responsibility knew of it.

The defendants deny that plaintiff was treated less well than other employees because she is a woman.  And specifically deny that they either accepted it or failed to take immediate and appropriate corrective action.

As I stated previously, there is no dispute that plaintiff is a woman and was employed by the hotel defendants.

Thus, in order to recover under the New York City

JURY CHARGE                    362

human rights law plaintiff must prove by a preponderance of the evidence that the comments, gestures and other physical harassment plaintiff claims actually occurred, that the conduct was unwanted, that plaintiff was subjected to the conduct because she is a woman, that as a result of the conduct a reasonable woman would consider that she was being treated less well than other employees under all of the circumstances, that plaintiff actually considered that she was being considered less well than other employees because she is a woman, that the employee who allegedly knew of the harassment was exercising math earal or supervisory responsibilities at plaintiff's workplace, and that defendants knew of the shelter residents conduct and either accepted it or failed to take immediate and appropriate corrective action, or that in the exercise of the reasonable care, the defendants should have known of the shelter residents' conduct and failed to exercise reasonable diligence to prevent such conduct and that plaintiff was harmed because of the conduct.

If you decide by a preponderance of the evidence that the comments gestures an other physical harassment actually occurred, that the conduct was unwanted, that plaintiff was subjected to the conduct because she is a woman, that as a result of the conduct a reasonable woman would consider that she was being treated less well than other employees under all circumstances, that plaintiff was actually

JURY CHARGE                                    363

considered that she was being treated less well than other employees because she is a woman, that the employee who allegedly knew of the harassment, was exercising managerial or supervisory responsibilities at plaintiff's workplace, and/or that the defendants knew of the shelter residents conduct and either accepted it or failed to take immediate and appropriate corrective action, or that in the exercise of reasonable care defendants should have known of the shelter residents conduct and failed to exercise reasonable diligence to prevent such conduct. And that the plaintiff was harmed because of the conduct, you will find the hotel defendants liable to plaintiff and you will proceed to consider the amount of plaintiff's damages.

On the other hand, you will find that the defendants are not liable to plaintiff if you decide that the comments, gestures an other physical harassment plaintiff claims did not actually occur; or, that the conduct was not unwanted, or that plaintiff was not subjected to the conduct because she is a woman, or that as a result of the conduct a reasonable woman would not have considered that she was being treated less well than other employees under all of the circumstances, or that plaintiff did not actually consider that she was being treated less well than other employees because she is a woman, or that the employee who allegedly knew of the harassment was not exercising managerial or supervisory responsibilities at

plaintiff's workplace, and/or defendants did not know of the shelter residents conduct or if the defendants knew did not either accept it or failed to take immediate and appropriate corrective action or that even if the exercise of reasonable care defendants could not have known of the shelter residents conduct or if the defendants should have known defendants exercise reasonable diligence to prevent such conduct, or seven, that the plaintiff was not harmed because of the conduct. You will find that the defendants are not liable to plaintiff and will proceed no further on this claim.

Now some words about damages. My charge to you on the law of damages must not be taken as a suggestion that you should find for the plaintiff on either or both of her claims. It's for you to decide on the evidence presented and the rules of law I've given you whether plaintiff is entitled to recover from defendants. If you decide that the hotel defendants are not liable to plaintiff, you need not consider damages. Only if you decide that the hotel defendants are liable to the plaintiff will you consider the amount of plaintiff's damages.

Even if you find for the plaintiff on her claims, you must ask yourself whether the plaintiff has proven by a preponderance of the evidence that the defendants violations caused the damages that she claims to have suffered. You must only award damages caused by these violations. If you find that the plaintiff is entitled to recover from the hotel

defendants, you must render a verdict in a sum of money that will justify and fairly compensate plaintiff for all losses and harm resulting from the hostile work environment. Compensatory damages are not allowed as punishment and must not be imposed or increased to penalize the hotel defendants. Compensatory damages for employment discrimination arising from at hostile work environment are not limited to the actual loss of time or money.  Compensatory damages may include both the mental and physical aspects of the harm.  You must determine the amount that will fairly compensate plaintiff for her harm.

There is no exact standard to be applied.  You must award an amount that is fair and just in light of the evidence.

In determining plaintiff's damages you should consider her emotional pain and mental anguish as well as any monetary loss.  In awarding compensatory damages, if you decide to awarded them, you must be decided by dispassionate common sense.  Computing damages may be difficult but you must not let that difficulty lead you to engage in arbitrary guesswork.

On the other hand, the law does not require a plaintiff to prove the amount of his or her losses with mathematical precision but only with as much definitiveness and accuracy the circumstances permit.

JURY CHARGE                                  366

If you find for Ms. Figueroa on her New York City human rights law claim, you may but are not required to award punitive damages.

Punitive damages are awarded at the discretion of the jury to punish a defendant for extreme or outrageous conduct or to deter or prevent a defendant and others like them from committing such conduct in the future.  In this case, only the New York City human rights law allows for punitive damages while the New York state human rights law does not.  You may award the plaintiff punitive damage if you find that the acts of the defendant demonstrate willful or wonton negligence, recklessness, or conscientious disregard for the rights of others.  An act is in reckless disregard of a plaintiff's rights if under the circumstance it is reflects complete and indifference to a plaintiff's safety or rights. Or defendant acts in the face of a perceived risk that their actions will violate the plaintiff's rights.

If you find by a preponderance of the evidence that defendants acted with reckless or callous disregard of the right of the plaintiff's rights, then you may award punitive damages.

An award of punitive damages, however, is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied then you may decide to award punitive damages, or you may decide not to

JURY CHARGE                                           367

award them.  Whether or not to make an award of punitive

damages a matter exclusively within your discretion.  If you

find that punitive damages are appropriate, you must use

reason in setting the amount.  Punitive damages, if awarded,

should be in an amount sufficient to fulfill their purposes

but should not reflect bias, prejudice or sympathy towards any

party.

In considering the punitive damages you may consider

the degree of represent hence ability of the defendant's

conduct, and the relationship of any award of punitive damages

to any actual harm inflicted on the plaintiff.  Again, you may

award punitive damages for a violation of the New York City

human rights law without awarding compensatory damages, but

remember New York state human rights law does not allow for

punitive damages.  If you find that the defendants did in fact

violate more than one law you must remember in calculating the

damages that the plaintiff is compensated only for the injury

she actually suffered.  Thus, if the defendants violated more

than one law, the resulting injury is still no greater than it

would have been had the defendants violated only one law.

Accordingly, you should award and amount of compensatory

damages no greater than you would award if the defendants had

violated only one of those laws.

In sum, you must be careful in the determination of

the proper measure of damages in a caution of action when

there is a similar state and city law claim that you don't award double compensation for a single injury.

I have now outlined for you the rules of law applicable to this case and the processes by which you weigh the evidence and determine the facts. In a few minutes you will retire to the jury room for your deliberations. The first thing you must do when you retire to the jury room is select a foreperson. Traditionally juror number one serve as a foreperson. If, however, juror number one does not wish to serve as foreperson when you go to the jury room to begin considering the evidence in this case, I suggest that you select another member of the jury to act as your foreperson. Please do that as expeditiously and in and manner which does not result in any disputes among you. To ensure that your deliberations may proceed in an ordinarily fashion you must have a foreperson, but of course that person's vote is not entitled to any greater weight than that of any other juror.

When you are in the jury room you may discuss this case. It is in fact the duty of each of you to consult with your fellow jurors and to deliberate with a view of reaching agreement on a verdict. If you can do so without violating your individual judgment and your conscience. During your deliberations no one should surgeon determine beyond issues beliefs what the truth is and what the weight and effect of the evidence is. Moreover, each of you must decide the case

JURY CHARGE                                   369

for yourself.  And not merely acquiesce in the conclusion of your fellow jurors.  Nevertheless, I ask you to determine the issues and the evidence before you with candor and frankness and a proper deference to and regard for the opinions of one another.

All jurors must be present throughout the deliberations.  Whenever you take a break, you must weight for all jurors to return before resuming your discussion of the case.

If it becomes necessary during your deliberations to communicate with me for any reason, simply send me a note signed by your foreperson.  Or by one or more other members of the jury.  We will provide you with some blank notes for you to do that.

No member of the jury should attempt to communicate with me or with any court personnel by any means other than a signed writing.  I will not communicate with any member of the jury on any subject touching on the subs of this case other than in writing or orally here in open court.

If you wish to have a portion of the testimony repeated you may simply indicate that in a note.  We will make arrangement toes have all the exhibits received in evidence sent to the jury room which I already told you about.

When you have reached a verdict simply send me a note signed by your foreperson that you have reached a

verdict.  Do not indicate in the note what the verdict is.  In no communication with the Court should you ever give a numerical count of where the jury stands in its deliberations.  Your verdict must be unanimous.

To help in your deliberations I have prepared a verdict form in which I have particularized the plaintiff's claims, the relief.  It has six questions on it.  And it has a guide as you answer each question on which questions to answer next.  I hope this form helps you keep track of the claims.  It is, however, in no way intended to indicate how you must deliberate or decide the facts of the case.  For it is your responsibility to decide whether the plaintiff has met her burden to establish each of the claims by the preponderance of the evidence.

In your deliberations please remember that the dispute between the matters is for them no passing matter.  They and the Court rely upon you to give full and conscientious deliberation and consideration to the issues and evidence before you.  By so doing, you carry to the fullest your oaths as jury members to well and truly try the issues of this case and a true verdict render.

Before asking you to retire and begin your deliberations, let me first consult with the lawyers to be certain I have not over looked any point.

(Continued on the next page.)

(Sidebar conference.)

THE COURT:  First things first.  Is there any charge that I forgot to give them, any mistakes in this, any additional charges you want me to give them?

MR. SCHWEITZER:  No, your Honor.

MS. CHEN:  No.

THE COURT:  Let me ask you this question.  You tell me what your understanding of the law is.

We instructed the jury that if they do not find compensatory damages they still may award punitive damages under New York City human rights law claim.  Is that a correct recitation of New York law for punitive damages?

MR. SCHWEITZER:  On city law I believe it is.  The jury is empowered to find either nominal damages or no damages that are compensatory but still to impose punitive damages.

THE COURT:  No damages even if there is no compensatory damages?

MR. SCHWEITZER:  Yes.

THE COURT:  So then we need, I need to change, slightly, the special verdict form.  Because I have here if you follow through all of this it gets you, if they find liability either one of the state or city human rights law compensatory damages.  If you answered yes to the award they found that she has damages, you go to the amount of damages. If they find no, I say, if you answer no go to page three and

SIDEBAR CONFERENCE

372

sign and date.  That should be, if even if they find no compensatory damages, they should go to the punitive damages question.

MR. SCHWEITZER:  Yes.

THE COURT:  Do you disagree?

MR. TUNG:  I'm not disagreeing.  But if the law is correct as counsel stated, I cannot answer it's correct or not at this moment, I didn't verify.  But in any event if counsel's representation is correct, your Honor, then the changes on the jury verdict sheet is correct.

THE COURT:  Okay.  What we're going to do is -- is that the Marshal in the back?  Okay.

We're going to ask the jury to begin their deliberations and we will give them a copy of the instructions, double check with Liora before I do that.  If this is right we'll send the jury to start deliberations. We'll make quick change to this and then send it to them okay.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

THE COURT:  Marshal, will you come up please.  Raise your right hand.

(Marshal sworn.)

THE MARSHALL:  I do.

THE COURT:  Please escort the jurors to the jury room, and Miriam give them a copy of the final jury instructions.  We will give the verdict sheet later.

(Jury exits the courtroom 2:20 p.m..)

THE COURT:  I want to answer this question of whether punitive damages can be awarded absent compensatory damages.  You said yes, Mr. Schweitzer?

MR. SCHWEITZER:  Yes.

THE COURT:  On what do you base that?

THE COURT:  Because it seems inconsistent with the general law outside of New York City human rights law.  We did a little research, we couldn't find anything that says squarely if there are no, absent an award of compensatory damages you're still entitled to punitive damages.

MR. SCHWEITZER:  I see.  I don't have a case off the top of my head.  If the Court's understanding is different than mine, I'm happy to accept the correction.

THE COURT:  Mr. Tung, do you have anything to say on this?

MR. TUNG:  I don't have anything to say.  Your

Honor, actually I don't have anything to say.  As I told you on the record that I have no knowledge on this law.  When there is no compensatory damages damage, punitive damages still can be awarded.  But so we rely on the Court's research.  I cannot have an answer at this moment in time.  My understanding, in general, sometimes punitive damages calculation is capped in whatever the multiple factors of the compensatory damages.  So if the compensatory damages is 0, of course zero times anything adds up with 0.  That's my understanding in general.

THE COURT:  One second.  I'm going to grab my robe, and ask the jurors to come back.  And give them the original special verdict sheet.

MR. TUNG:  Okay.  Thank you.

MR. SCHWEITZER:  Yes, your Honor.

(Brief pause.)

THE COURT:  Bring in the jury.

(Jury enters the courtroom.)

THE COURT:  You may be seated.

Ladies and gentlemen we received your note which you put marked as court Exhibit 1.  I'm going to change that to Court Exhibit 3, because there should be a copy of the instructions the jury instructions that we gave you that has court Exhibit 1 on it.

And then I'll give you the special verdict sheet

PROCEEDINGS                    375

that you asked for in your sheet.

This is marked Court Exhibit 3.  So this will be Court Exhibit 3.  And I've got all of the exhibits for you, which you've also asked for in your note.

I wanted to clarify something with you, a mistake that I made in your charge.  If you'll remember I said that you may award punitive damages for violation of the New York City human rights law without awarding compensatory damages.  That is incorrect.  You must award some amount, whatever amount, in compensatory damages in order for you to award punitive damages.  But you have to assess the punitive damages under the standards that I gave you in the instructions.  It's a different standard than compensatory damages standard.

I'm telling you all of this, not because I have any opinion on whether you should or should not award compensatory damages, whatever the amount is, none of that, or that you should award punitive damages.  I just want you to know that in order to award punitive damages there must be some compensatory damages that have been awarded.

We're going to give you the verdict sheet and we'll give you several copies of it so you each have one as you're going through this.  But the one that has court Exhibit 2 on it, that's the one that you return at the end of the day to us and you'll get the exhibits.

Do the lawyers need a sidebar?

VERDICT                                              376

MR. SCHWEITZER:  No, your Honor.

MR. TUNG:  No, your Honor.

THE COURT:  Okay great.  Thank you.

(Jury exits the courtroom.)

(Brief recess.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Ladies and gentlemen, we have received a note from the jury.  It's been marked Court Exhibit 4.  Received at 4:25 p.m.  It reads simply:  We have reached a verdict.

Would you like to see the note?

MR. TUNG:  That's okay.

MR. SCHWEITZER:  That's all right, your Honor.

THE COURT:  What I plan to do is call in the jurors and receive their verdict.

(Jury enters the courtroom.)

THE COURT:  You may be seated.

Ladies and gentlemen, we understand that you've reached a verdict; is that correct?  Can you please hand the verdict up to me the verdict sheet, Miriam will come get it.

THE COURT:  Ms. Benjamin-Hunter, you were the foreperson, correct?

THE FOREPERSON:  Yes.

THE COURT:  In answer to question one:  Did plaintiff prove by a preponderance of the evidence that the

defendants created a hostile work environment on the basis of her sex in violation of New York state human rights law.  What is the jury's answer?

THE FOREPERSON:  Yes.

THE COURT:  In answer to question two:  Did plaintiff prove by a preponderance of the evidence that defendants created a hostile work environment on the basis of her sex in violation of the New York City human rights law. What is the jury's answer?

THE FOREPERSON:  Yes.

THE COURT:  To question three:  Did plaintiff prove by a preponderance of the evidence that she has suffered damages because of defendant's violation of the New York state human rights law and/or New York City human rights law.  What is the jury's answer?

THE FOREPERSON:  Yes.

THE COURT:  Question four:  State below the amount of compensatory damages awarded.  What is the jury's answer?

THE FOREPERSON:  $1,650,000.

THE COURT:  In answer to question five:  Did plaintiff prove by a preponderance of the evidence that she is entitled to an award of punitive damages against defendants under the New York City human rights law.  What is the jury's answer?

THE FOREPERSON:  Yes.

VERDICT                                    378

THE COURT:  Question six:  State below the amount of punitive damages awarded.  What is the jury's answer?

THE FOREPERSON:  $2 million.

THE COURT:  Would you like me to poll the jury?

MR. SCHWEITZER:  Yes, please.

MR. TUNG:  Yes, please.

THE COURT:  Juror number two, are those your answers?

JUROR NO. 2:  Yes.

THE COURT:  Juror number three, are those your answers?

JUROR NO. 3:  Yes.

THE COURT:  Juror number four, are those your answers?

JUROR NO.4:  Yes.

THE COURT:  Juror number five, are those your answers?

JUROR NO. 5:  Yes, your Honor.

THE COURT:  Juror number six, are those your answers?

JUROR NO. 6:  Yes.

THE COURT:  Juror number seven, are those your answers?

JUROR NO. 7:  Yes, your Honor.

THE COURT:  Thank you.  Ladies and gentlemen of the

PROCEEDINGS                379

jury, thank you very much. Your service is concluded with my

thanks, the thanks of the whole court. We can't do this

without you. You're a vital part, it's your constitutional

duty and you fulfilled it very well. If you go back to the

jury room, I'll come speak with you in a couple of moments.

Thank you.

(Jury exits the courtroom.)

THE COURT: What is next? Attorneys fees motion to

make?

MR. SCHWEITZER: Yes, your Honor. We would be

making such a motion under Rule 54. I believe we have two

weeks.

THE COURT: And post-trial motions are 28 days,

correct?

MR. SCHWEITZER: Yes, your Honor.

THE COURT: So that means -- you could sit down -- I

don't have my calendar with me. Fee motion is due -- what

date is 14th days?

MR. SCHWEITZER: November 6.

THE COURT: Fee motion due November 6.

How much time to respond, Mr. Tung, Ms. Chen?

MS. CHEN: What is the longest time?

THE COURT: The motion has to be made in 14 days.

MR. SCHWEITZER: Opposition is governed by the local

rule, so that's 14 days and seven days to reply, 14 days to

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

oppose, seven days to reply.

THE COURT:  So the 20th and the 27th, which is Thanksgiving.  Correct?

MR. SCHWEITZER:  Yes.

THE COURT:  So then I'll give you until the 28th.

MS. CHEN:  We have not purchased the transcript.  Do you think we can have longer time to respond?

THE COURT:  The transcript has nothing to do with the attorneys fees motion.  The transcript might have something to do with post-trial motions, but not attorney's fees.  So we'll keep that schedule.

November 6 for the motion, November 20 for the opposition, November 28 for the reply.

New trial motions, motions pursuant to Rule 59 are 28 days, 28 days after judgment, judgment will not go in until tomorrow probably.  You'll see when the judgment goes up and you'll have 28 days for opposed trial motion under Rule 59. And whatever the local rules say about briefing on that, you'll follow the local rule for the oppositions and replies.

If you want to work out the attorneys fees, do that within the time that you have to file the motion.

(Continued on next page.)

PROCEEDINGS                              381

MR. SCHWEITZER:  Yes, your Honor.

THE COURT:  Anything else?

MR. SCHWEITZER:  Not from plaintiff, Your Honor.

MR. TUNG:  Not from defendant either.

THE COURT:  Okay.  Thank you, folks.

(Whereupon, the proceedings concluded.)

****************************************

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*